1   JEFFER, MANGELS, BUTLER & MITCHELL LLP
    STANLEY M. GIBSON (Bar No. 162329), sgibson@jmbm.com
2   GREGORY S. CORDREY (Bar No. 190144), gcordrey@jmbm.com
    ANDREW I. SHADOFF (Bar No. 272319), ashadoff@jmbm.com
3   1900 Avenue of the Stars, Seventh Floor
    Los Angeles, CA 90067
4   Telephone: (310) 203-8080
    Facsimile: (310) 203-0567
5
    Attorneys for Plaintiffs
6   SEALANT SYSTEMS INTERNATIONAL INC.
    ACCESSORIES MARKETING, INC.
7

8                       UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10                          SAN JOSE DIVISION

11   SEALANT SYSTEMS INTERNATIONAL          CASE NO.    11-cv-774-PSG (Lead case)
     INC., AND ACCESSORIES MARKETING,
12   INC.                                   **ACCESSORIES MARKETING, INC.'S
                                            NOTICE OF MOTION AND MOTION
13              Plaintiffs,                 FOR PERMANENT INJUNCTION;
                                            MEMORANDUM OF POINTS AND
14         v.                               AUTHORITIES IN SUPPORT**

15   TEK GLOBAL S.R.L., and TEK             [Declarations of Chris Auerbach and
     CORPORATION,                           Gregory S. Cordrey filed, and [Proposed]
16                                          Permanent Injunction lodged, concurrently
                Defendants.                 herewith]
17
                                            Date:      August 27, 2013
18                                          Time:      10:00 a.m.
                                            Courtroom: 5, 4th Floor
19                                          Judge:     Hon. Paul S. Grewal

20                                          (Consolidated with Case No. 11-cv-1649)

21

22

23

24

25

26

27

28

PRINTED ON
RECYCLED PAPER
LA 9609427v1

AMI'S NOTICE OF MOTION AND
MOTION FOR PERMANENT INJUNCTION
CASE NO. 11-cv-774-PSG (Lead case)

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** at 10:00 a.m., on Tuesday, August 27, 2013, in Courtroom 5 of the above-entitled Court, Plaintiff Accessories Marketing, Inc. ("AMI"), will and hereby does move this Court for a permanent injunction prohibiting Defendant TEK Corporation ("TEK") from continuing to infringe AMI's U.S. Patent No. 6,789,581 (the "'581 Patent"). This Motion is made pursuant to 35 U.S.C. § 283, Federal Rule of Civil Procedure 65(d), and the equitable power of the Court, on the following grounds:

First, the Jury in this case found that TEK's TEK400 and TEK500 tire repair kits infringe eight valid claims of AMI's '581 Patent. TEK's past and continued infringement of AMI's '581 Patent irreparably injures AMI because: (1) AMI, through its sister company, Sealant Systems International, Inc. ("SSI"), is in direct competition with TEK for sales of tire repair kits to automotive original equipment manufacturers ("OEMs"); (2) TEK's sales of infringing kits decreases AMI/SSI's market share in the OEM market; (3) AMI does not license the '581 Patent; (4) TEK's financial statements show that it may not be able to pay the current judgment; and (5) TEK's infringement of the '581 Patent allows it to achieve crucial design wins among OEMs, from which TEK can continue to reap the benefits as an incumbent supplier in the tire repair kit market.

Second, TEK's infringing tire repair kits make up between 70 and 80% of TEK's business, so there is no reason to think that TEK will voluntarily stop selling those infringing kits. In addition, TEK's president affirmatively stated that he does not plan to design around the '581 Patent. TEK's continued infringement of the '581 Patent will continue to take away potential sales that could be made by AMI/SSI, and otherwise negatively impact AMI/SSI's share of the OEM market. Furthermore, based on its current business (obtained with infringing products), TEK may obtain future design wins that will continue to decrease AMI/SSI's market share. TEK's infringement cannot be easily quantified or adequately remedied by monetary damages alone.

Third, an injunction would not work a hardship on TEK, because it would simply be required to stop infringing a valid patent. On the other hand, denying an injunction would place a substantial

JMBM | Jeffer Mangels
Butler & Mitchell LLP

- 1 -

1  hardship on AMI, because it would have to continue competing against its own patent in the OEM

2  marketplace.

3      Finally, the public interest favors an injunction in this case.  AMI proposes a permanent

4  injunction that contains a nine-month sunset period (subject to a reasonable royalty), which will

5  provide TEK's current customers time to switch to non-infringing alternative products.  Thus, OEMs

6  would not be injured by the injunction prohibiting TEK from selling its TEK400 and TEK500 kits.

7      This motion is based upon this notice of motion and motion, the memorandum of points and

8  authorities attached hereto, the concurrently-filed Declarations of Chris Auerbach and Gregory S.

9  Cordrey and exhibits thereto, the pleadings and other documents on file herein, and on such further

10  oral and documentary evidence as may be introduced at or before the hearing on the Motion.

11

12  DATED:  June 14, 2013          JEFFER MANGELS BUTLER & MITCHELL LLP
                                    STANLEY M. GIBSON
13                                  GREGORY S. CORDREY
                                    ANDREW I. SHADOFF
14

15                                  By: _/s/ Stanley M. Gibson_
                                         STANLEY M. GIBSON
16                                  Attorneys for Plaintiffs SEALANT SYSTEMS
                                    INTERNATIONAL, INC. and ACCESSORIES
17                                  MARKETING, INC.

18

19

20

21

22

23

24

25

26

27

28

- 2 -

PRINTED ON
RECYCLED PAPER
LA 9609427v1

Jeffer Mangels
Butler & Mitchell LLP

JMBM

**TABLE OF CONTENTS**

Page(s)

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ..................................................1

II.   FACTUAL BACKGROUND.........................................................................................3

    A.    TEK Infringes AMI's '581 Patent ........................................................................3

    B.    AMI Sells SSI All of the Tire Repair Kits That SSI Sells to OEMs ......................4

    C.    AMI Does Not License the '581 Patent..................................................................4

    D.    TEK Occupies a Major Position in the OEM Market.............................................4

    E.    AMI (Through SSI) Directly Competes With TEK in the OEM Market ...............5

    F.    The '581 Patent Provides Important Advances Over Prior Art ..............................6

    G.    AMI's Product Designs Around the '581 Patent With an Expensive Cap
        Design .....................................................................................................................7

    H.    TEK Has Gained Market Share at AMI's Expense By Infringing the '581
        Patent .....................................................................................................................7

    I.    TEK's Infringement Unfairly Allows It To Continue Obtaining "Design Wins"
       in the OEM Market .................................................................................................7

    J.    TEK Does Not Think It Has to Design Around the '581 Patent .............................9

III.  THE LAW APPLICABLE TO GRANTING PERMANENT INJUNCTIONS..................9

    A.    The Four-Factor Test for Granting Permanent Injunctions ....................................9

    B.    Factor One:  Irreparable Injury ...........................................................................10

        1.    Courts Regularly Enter Injunctions Where the Plaintiff and Defendant
           are Competitors in the Same Market ........................................................10

        2.    Loss of Market Share Supports a Finding of Irreparable Injury................11

        3.    The Patentee's Non-Licensing of Its Patent Supports a Finding of
           Irreparable Injury ....................................................................................12

        4.    An Infringer's Lack of Available Resources to Pay A Judgment
           Supports a Finding of Irreparable Injury ..................................................12

        5.    The OEM Market Awards Suppliers "Design Wins" That Lead to
           Future Business........................................................................................12

- i -

PRINTED ON

RECYCLED PAPER
LA 9609427v1

C.    Factor Two:  The Inadequacy of Monetary Damages Supports an Injunction......13

D.    Factor Three:  The Balance of Hardships Weighs in Favor of a Patentee Forced to Compete Against His Own Patented Invention ................................................13

E.    Factor Four:  The Public Interest Favors Upholding Patent Rights.......................14

     1.    Prospective Injunctions are Met With Approval .......................................14

     2.    Patentees are Entitled to Higher Royalties During Sunset Periods ...........15

IV.   AMI IS ENTITLED TO A PERMANENT INJUNCTION TO PREVENT TEK'S CONTINUED INFRINGEMENT OF AMI'S '581 PATENT ...........................................15

A.    AMI Will Suffer Irreparable Competitive Injury Absent an Injunction................15

     1.    AMI, Through SSI, and TEK are Direct Competitors in the OEM Tire Repair Kit Market ..............................................................................15

     2.    AMI, Through SSI, Has Lost Market Share and Customers to TEK ........17

     3.    AMI Does Not License Its Patents ...........................................................18

     4.    TEK's Evidence Shows That It Might Lack the Financial Wherewithal to Satisfy the Current Judgment .................................................19

     5.    By Supplying Infringing Tire Repair Kits to OEMs, TEK Unfairly Reaps the Incumbency Benefits of Design Wins in the OEM Market ......20

     6.    To the Extent It is Required for a Permanent Injunction, a Causal Nexus Exists Between AMI's Irreparable Injury and TEK's Infringement ................................................................................20

B.    The Harm to AMI From TEK's Infringement Defies Monetary Compensation...21

C.    The Balance of Hardships Strongly Favors an Injunction....................................22

D.    The Public Interest Would Be Served By the Narrow, Forward-Looking Permanent Injunction That AMI Requests ...........................................................23

     1.    AMI Seeks a Narrow Permanent Injunction.............................................23

     2.    AMI Seeks a 14% Royalty on Sales Made During the Sunset Period.......24

V.    CONCLUSION.............................................................................................25

**Table of Authorities**

- ii -

PRINTED ON
RECYCLED PAPER
LA 9609427v1

Jeffer Mangels
Butler & Mitchell LLP
JMBM

JMBM | Jeffer Mangels
Butler & Mitchell LLP

Page(s)

**CASES**

*Acumed LLC v. Stryker Corp.*,
 551 F.3d 1323 (Fed. Cir. 2008) ....................................................................13

*Broadcom Corp. v. Emulex Corp.*,
 2012 U.S. Dist. LEXIS 129524 (C.D. Cal. Mar. 16, 2012)............................passim

*Broadcom Corp. v. Qualcomm Inc.*,
 543 F.3d 683 (Fed. Cir. 2008) ......................................................................passim

*Brocade Comms. Systems, Inc. v. A10 Networks, Inc.*,
 2013 WL 140039 (N.D. Cal. Jan. 10, 2013)..............................................21, 24

*Coloplast A/S v. Generic Med. Devices, Inc.*,
 2012 U.S. Dist. LEXIS 112186 (W.D. Wash. Aug. 9, 2012)..........................13, 23

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
 2013 WL 2158423 (Fed. Cir. May 21, 2013) ................................................passim

*eBay, Inc. v. MercExchange, LLC*,
 547 U.S. 388 (2006).......................................................................................passim

*Edwards Lifesciences AG v. Corevalve, Inc.*,
 699 F.3d 1305 (Fed. Cir. 2012) ....................................................................9, 21

*Golight, Inc. v. Wal-Mart Stores, Inc.*,
 355 F.3d 1327 (Fed. Cir. 2004) ....................................................................19

*i4i Ltd. P'ship v. Microsoft Corp.*,
 598 F.3d 831 (Fed. Cir. 2010) ......................................................................passim

*PPG Indus., Inc. v. Guardian Indus. Corp.*,
 75 F.3d 1558 (Fed. Cir. 1996) ......................................................................14, 23

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
 702 F.3d 1351 (Fed. Cir. 2012) ....................................................................passim

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
 659 F.3d 1142 (Fed. Cir. 2011) ....................................................................passim

**STATUTES**

35 U.S.C. § 283..................................................................................................9

- iii -

PRINTED ON
RECYCLED PAPER
LA 9609427v1

1

**OTHER AUTHORITIES**

2   Fed. R. Civ. P. 65 ........................................................................................9

3   Rule 30(b)(6) ..............................................................................................1

4   U.S. CONST., art. I, § 8, cl. 8 .......................................................................9

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PRINTED ON
RECYCLED PAPER
LA 9609427v1

AMI'S NOTICE OF MOTION AND
MOTION FOR PERMANENT INJUNCTION
CASE NO. 11-cv-774-PSG (Lead case)

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.   INTRODUCTION AND SUMMARY OF ARGUMENT**

3       The jury found that TEK's TEK400 and TEK500 tire repair kits infringe AMI's '581 Patent.

4   This patent teaches a two-piece port-and-receptacle system that allows the user to remove and

5   discard the sealant container and port (with the hose connected), without having to throw out the

6   entire kit, which can still function as an air compressor.  A user can then replace the container and

7   port (with hose), and the kit can be reused as a tire repair kit.  This two-piece system is a significant

8   advance over the prior art.

9       Courts regularly grant permanent injunctions where the patentee and infringer compete.  *See*

10  *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1152-53 (Fed. Cir. 2011) (remanding with

11  instructions to enter a permanent injunction against competing infringer); *Broadcom Corp. v.*

12  *Qualcomm Inc.*, 543 F.3d 683, 702-03 (Fed. Cir. 2008) (affirming entry of permanent injunction).

13      Here, there is no dispute that AMI, through its sister company SSI, and TEK directly compete

14  for sales to automotive original equipment manufacturers ("OEMs").  Indeed, TEK's Rule 30(b)(6)

15  witness identified SSI as a "direct competitor" to TEK.  *See* Exh. 1, 48:17-49:10 (Matuszynski).[1]

16  Given the parties' direct and indirect competition, each factor of the equitable, four-factor test set

17  forth in *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006), weighs strongly in favor of entering

18  a permanent injunction barring TEK from further infringement of AMI's '581 Patent.

19      **1.  Irreparable Harm:**  This case is a paradigmatic example of irreparable injury.  AMI and

20  SSI are sister companies owned by the same holding company, AMI Holding Corporation ("AMI

21  Holding"), which in turn is owned by Illinois Tool Works, Inc. ("ITW").  AMI and SSI share the

22  same employees, facilities and resources.  AMI sells SSI all of the products that SSI sells to OEMs.

23  SSI and TEK directly compete for sales to General Motors ("GM") and other OEMs.  At GM, for

24  example, SSI and TEK split approximately 90% of the tire repair kit business.  Thus, infringing sales

25  made by TEK necessarily decrease AMI's sales to SSI, because SSI makes fewer sales to OEMs.

26  _____

27      [1]  Unless otherwise specified, all exhibits ("Exh. _") are exhibits to the concurrently filed
Declaration of Gregory S. Cordrey.

28

- 1 -

PRINTED ON

RECYCLED PAPER

LA 9609427v1

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1    TEK's infringing sales also decrease AMI/SSI's market share among OEMs.  For example,

2  TEK is the sole supplier to other major OEMs, including Ford and Chrysler.  If TEK was not allowed

3  to sell its infringing products to Ford or Chrysler, it is reasonable to infer that AMI/SSI would obtain

4  at least a portion of that business, if not all of it.

5    Moreover, AMI has not licensed any of its patents.  If TEK were only required to pay an

6  ongoing royalty, it would effectively force AMI to license the '581 Patent against its will.  In

7  addition, TEK's financial documents indicate that the company may not have the cash available to

8  pay past damages (particularly because it transfers money out of the country to TEK Automotive

9  Shanghai (a Chinese company) and TEK Global (an Italian company).  Accordingly, AMI is

10  concerned about TEK's ability to pay an ongoing royalty.

11    Furthermore, OEMs tend to look to its current suppliers for future designs.  TEK receives

12  more business than it otherwise would from OEMs because it infringes on the '581 Patent.  TEK's

13  continued infringement may lead to additional "design wins" for TEK, particularly because TEK's

14  use of the infringing technology allows TEK to sell tire repair kits at a lower price than AMI's kits

15  (which incorporate a more expensive cap design designed to avoid infringement).  These design wins

16  will in turn allow TEK to further increase its market share and its incumbency positions at OEMs,

17  which will likely harm AMI's market position for years.

18    **2.  Inadequacy of Monetary Damages:**  Damages alone cannot suffice to remedy the harm

19  that would be done to AMI by TEK's continued infringement.  TEK's sales of infringing tire repair

20  kits comprise 70 to 80% of TEK's overall business.  Having already violated AMI's right to exclude,

21  there is no evidence that TEK will stop selling its infringing products without an injunction.  Indeed,

22  TEK has also admitted that it has no intention to design around the '581 Patent.  If TEK continues to

23  sell its infringing tire repair kits, AMI will continue to lose market share, customers and sales, all

24  while having to continue competing against its own patent.

25    In addition, success in the OEM market is largely measured in design wins, which do not

26  yield readily quantifiable financial rewards.  Tire repair kit suppliers (such as TEK) that already sell

27  to OEMs benefit from the built-in incumbency of the OEM market.  That incumbency leads to an

28

- 2 -

JMBM | Jeffer Mangels
Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER

LA 9609427v1

1   increased likelihood of future design wins and business for suppliers who already sell to OEMs.

2   TEK's infringing kits have been validated by OEMs, so those OEMs will look to TEK for future

3   purchases.  The detrimental effect that TEK's continued infringement would have on AMI/SSI's

4   share of the OEM market (or TEK's increased share) is inherently unpredictable.  All of these

5   injuries cannot be easily quantified or adequately compensated with monetary damages.

6       **3.  Balance of Hardships:**  Requiring AMI "to compete against its own patented invention"

7   is a "substantial hardship."  *Robert Bosch*, 659 F.3d at 1156.  TEK, on the other hand, cannot claim

8   to suffer hardship from an injunction simply because it must stop infringing AMI's patent.

9       **4.  Public Interest:**  The public has a strong interest in upholding and protecting patentees'

10  rights to exclude others from practicing their inventions.  The injunction requested by AMI narrowly

11  applies only to future sales; it does not affect customers who have already purchased infringing TEK

12  products.  Moreover, AMI's proposed injunction provides a nine-month sunset provision (subject to a

13  reasonable royalty) that allows TEK's current customers to continue purchasing infringing TEK

14  products so long as they are on platforms that already incorporate TEK's tire repair kits, until they

15  can transition to purchasing non-infringing products.  Thus, AMI's proposed injunction will not harm

16  the public, and will protect AMI's property interest in its patent.

17      Because AMI satisfies all four factors of the equitable test, the Court should issue AMI's

18  requested permanent injunction.

19

20  **II.    FACTUAL BACKGROUND**

21      **A.    TEK Infringes AMI's '581 Patent**

22      AMI owns the '581 Patent.  Trial Transcript ("Tr.") Vol. I, 81:3-14 (Auerbach); Exh. 3 (Trial

23  Exhibit ("Tr. Exh.") 1).[2]  On April 25, 2013, following a seven-day jury trial, the jury determined that

24  TEK's TEK400 and TEK500 tire repair kits infringed 8 valid claims of the '581 Patent.  Dkt. No.

25  217.  The jury further found that AMI was entitled to a 7% reasonable royalty, and awarded damages

26  _____

27      [2]  The cited excerpts from the Trial Transcript are attached as Exhibit 2 to the concurrently-
filed Cordrey Declaration.

28

PRINTED ON

RECYCLED PAPER

LA 9609427v1

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1    of 7% of TEK's sales of TEK400 and TEK500 tire repair kits from 2007 through 2011.[3]  *Id.*

2        **B.**    **AMI Sells SSI All of the Tire Repair Kits That SSI Sells to OEMs**

3            AMI is the "manufacturing arm" of tire repair kits for its sister company, SSI.  Tr. Vol. I,

4    79:24-80:7 (Auerbach).  AMI and SSI are both owned by Accessories Marketing Holding

5    Corporation, which in turn is owned by Illinois Tool Works, Inc. ("ITW").  *Id.*, 69:19-70:2

6    (Auerbach).  AMI and SSI share the same employees, facilities and resources.  *Id.*, 67:17-69:5

7    (Auerbach).  For example, Chris Auerbach is the General Manager of both AMI and SSI (*see id.*,

8    67:17-19) and Brett Mueller is the Global Director of Manufacturing for both AMI and SSI (*see* Tr.

9    Vol. III, 351:20-21, 352:10-11).

10           AMI sells tire repair kits to SSI through an inter-company sale, and SSI sells those kits to

11   OEMs.  Tr. Vol. I, 79:24-80:7 (Auerbach).  SSI sells tire repair kits "and to a smaller degree, sealant"

12   to OEMs.  Tr. Vol. III, 377:22-378:8 (Mueller).  As a result, their sales are directly connected:

13   AMI's sales to SSI go up when SSI's sales to OEMs go up.  Tr. Vol. I, 80:8-12 (Auerbach).

14       **C.**    **AMI Does Not License the '581 Patent**

15           AMI has not offered to license either the '581 Patent or any of its multiple other patents on

16   related technologies.  Tr. Vol. I, 73:15-19 (Auerbach); Vol. IV, 434:13-17 (Mueller).

17       **D.**    **TEK Occupies a Major Position in the OEM Market**

18           TEK also "sell[s tire repair kits] to the US to the OEM manufacturers."  Tr. Vol. II, 122:19-21

19   (Auerbach).  TEK occupies a primary position in the tire repair kit market in the United States:

20               Q.  Okay.  Let's go back just a couple questions about some of these
                 OEMs.  Does Ford buy from anybody, these products from anybody
21               else other than TEK?

22               A.  Ford Europe does.  They are not North America.  We are sole
                 supplier.
23

24               Q.  What about Chrysler?

25   ────────────────────

26           [3]  Because TEK had not produced financial data for 2012 or 2013 prior to trial, AMI will
     move in a separate motion for supplemental damages for TEK's infringement during those years, as
     well as prejudgment interest.  *See* Tr. Vol. IV, 465:1-10 (AMI's damages expert, John Hansen,
27   explaining that TEK produced sales records only through 2011).

28

PRINTED ON
RECYCLED PAPER

- 4 -

JMBM   Jeffer Mangels
Butler & Mitchell LLP

JMBM | Jeffer Mangels
Butler & Mitchell LLP

A.  Chrysler, we are sole supplier.

Tr. Vol. V, 654:13-20 (Marini).  TEK estimates that "more than a hundred car models are equipped"

with its tire repair kits in the United States.  Tr. Vol. V, 652:3-5 (Marini).  TEK also receives an

estimated 50-60% of the tire repair kit business at General Motors.  *See* Tr. Vol. II, 132:25-133:14

(Auerbach); Vol. IV, 438:20-439:7 (Mueller) (estimating that 50-60% of GM business goes to TEK,

30-35% to SSI, and the "balance" to Active Tools).

TEK continues to sell its infringing tire repair kits to OEMs.  *See* Tr. Vol. V, 724:22-25

(Marini).  TEK's sales of infringing tire repair kits between 2007 and 2011 comprised between

56.3% and 84.7% of its total sales.  *See* Tr. Vol. IV, 507:20-508:17 (Hansen); Tr. Exh. 77.  From

2009 through 2011, TEK's sales of infringing kits comprised at least 78% of its total sales.  *See id.*

E.  **AMI (Through SSI) Directly Competes With TEK in the OEM Market**

There is no dispute that SSI directly competes with TEK in the OEM market.  TEK's 30(b)(6)

witness, Andrzej Matuszynski, testified:

> Q.  I think when we left off we were talking about some of TEK
> Corporation's competitors with regard to the General Motors business.
> Do you recall that?
>
> A.  Yes.
>
> Q.  You had indicated that -- you testified that Active Tools and
> Sealant Systems International were direct competitors; is that right?
>
> A.  Yes.
>
> Q.  When you say they're direct competitors, what do you mean by
> that?
>
> A.  They offer the same type of product that TEK Corporation offers to
> General Motors.
>
> Q.  When you say "the same type of product," what do you mean by
> that?
>
> A.  They perform similar functions that our TEK Corporation product
> does.
>
> Q.  What are those functions?

- 5 -

PRINTED ON
RECYCLED PAPER

LA 9609427v1

A.  They use sealant to seal a puncture, and they use a compressor to inflate a tire.

Cordrey Decl., Exh. 1, 48:17-49:10 (Matuszynski).

Chris Auerbach, the General Manager of AMI and SSI, agreed:

Q.  And would you consider [TEK] to be a head-to-head direct competitor [with SSI]?

A.  Absolutely.

Tr. Vol. II, 121:13-122:9 (Auerbach).  Mr. Auerbach described TEK and SSI as "competitors" who "bid on the same platforms [such] as General Motors."  *Id.*

Indeed, SSI has lost business to TEK.  Mr. Auerbach testified:

Q.  Now has SSI lost business to TEK Corporation?

A.  Yeah, definitely, I think so.  I think that we have lost business on various platform it is where they were awarded some of it and we were awarded some of it.

Q.  When you say platforms what you're are you referring to?

A.  Such as the Chevy Malibu for example.  We got half of the business, TEK got the other half.

Q.  And that's for these tire sealant compressor kits?

A.  Yes.

Tr. Vol. II, 122:22-123:5 (Auerbach); *see also* Tr. Vol. IV, 432:20-23 (Mueller).

When SSI sells fewer kits to OEMs, AMI sells fewer kits to SSI.  *See* Tr. Vol. I, 80:8-12 (Auerbach).  Thus, even though AMI does not practice the '581 Patent, its tire repair kits are in direct competition with TEK's tire repair kits.  *See* Tr. Vol. III, 367:19-21 (Mueller).

F.  **The '581 Patent Provides Important Advances Over Prior Art**

In the product taught by the '581 Patent, as well as TEK's infringing kit, the two-piece port and receptacle system allows the user to remove and discard the sealant container and port (with the hose) without having to throw out the entire repair kit, which can still be used as an air compressor. The user can then replace the container and port (with the hose), and the kit can be reused as a tire repair kit.  As TEK's expert witness, Dr. Kazerooni, testified:

- 6 -

Q. All right. When we are talking about the '581 [Patent], the disposable tire repair device, it doesn't teach a disposable container, right?

A. The 581 teaches a disposable tire repair kit.

Q. Now you remember Mr. Marini's testimony when he says this is what you dispose of when you throw this away, right?

A. You either throw it away or send it to the manufacturer but that is the disposable part of the device.

Q. And the container and the port itself with this hose all get disposed of, correct?

A. Correct.

Tr. Vol. VII, 988:24-989:5. As Dr. Kazerooni admitted at trial, this two-piece port and receptacle system, which allows the user to discard and replace the sealant container and reuse the repair kit as a repair kit, was not contained in any prior art. *See* Tr. Vol. VII, 982:20-987:3. *See also* Dkt. No. 217 at p. 3 (Jury's verdict identifying two-piece receptacle and port system as difference between claimed invention and prior art).

**G.     AMI's Product Designs Around the '581 Patent With an Expensive Cap Design**

AMI's automatic tire repair kit that SSI sells to OEMs does not practice the '581 Patent. *See* Tr. Vol. III, 367:19-21 (Mueller). To avoid infringing on the '581 Patent (before it purchased the patent), AMI designed and incorporated an "expensive" and "elaborate" cap in its automatic kit. *See id.*, 360:6-362:2 (Mueller). The cap costs AMI $3.10 to manufacture, which is significant because the total cost of the tire repair kits is between $28 and $32. *Id.*, 360:6-16 (Mueller).

**H.     TEK Has Gained Market Share at AMI's Expense By Infringing the '581 Patent**

TEK's infringing products do not have the expensive cap, which allows TEK to undercut the prices of AMI's kits. *See id.*; Declaration of Chris Auerbach ("Auerbach Decl."), ¶ 5.

**I.     TEK's Infringement Unfairly Allows It To Continue Obtaining "Design Wins" in the OEM Market**

In the OEM market, an agreement with a particular OEM to supply a particular tire repair kit on a particular platform of vehicles is known as a "design win." Auerbach Decl., ¶ 2. Design wins

- 7 -

PRINTED ON
RECYCLED PAPER

LA 9609427v1

JMBM | Jeffer Mangels Butler & Mitchell LLP

1    are not simply sale-by-sale decisions; rather, they represent the culmination of a process that includes

2    multiple stages and carries with it ramifications that can last for years.  *Id.*; Tr. Vol. IV, 430:14-431:3

3    (Mueller - "design cycles can be anywhere from 2 to 4 years").  An OEM typically begins the design

4    win process by issuing requests for quote ("RFQs") to select suppliers, who respond with an

5    evaluation of their product in relation to the OEM's requirements.  Auerbach Decl., ¶ 2.  In some

6    circumstances, the RFQ process is followed by or includes a qualification process in which the

7    supplier and OEM's engineers work together to evaluate whether the supplier's proposed solution

8    will function to the OEM's satisfaction.  *Id.*; Tr. Vol. IV, 430:14-431:10 (Mueller) (discussing testing

9    and validation of kits).

10          Design wins in the tire repair kit market create familiarity and confidence that yields an

11   incumbency effect, which can carry over from one design cycle to the next.  Auerbach Decl., ¶ 3; Tr.

12   Vol. IV, 431:4-11 (Mueller - kits that are "already tested and validated" do not require additional

13   testing and validation).  The design win process involves a significant investment of money, time,

14   and effort on the part of both the supplier and the OEM.  Auerbach Decl., ¶ 3; Tr. Vol. IV, 430:14-

15   431:3 (Mueller - "very long design cycles").  OEMs and suppliers generally do not redesign their

16   products from the ground up from one vehicle platform to the next.  Auerbach Decl., ¶ 3; Tr. Vol. IV,

17   431:4-11 (Mueller).  This increases the likelihood that the supplier and OEM will continue to harvest

18   their initial investment through future contracts.  *See id.*  Furthermore, in the tire repair kit market,

19   OEMs tend to look to its current suppliers for future designs, rather than to suppliers to which the

20   OEMs have not already awarded business.  Auerbach Decl., ¶ 3; Tr. Vol. IV, 431:4-11 (Mueller).

21          Because TEK sells its infringing tire repair kits to OEMs, TEK receives more business from

22   those OEMs than it otherwise would if it did not have an infringing tire repair kit to offer.  *Id.*, ¶ 4.

23   Because AMI, though SSI, competes for business from those OEMs, if TEK did not receive that

24   business, AMI likely would receive some or all of that business.  *Id.*; Tr. Vol. II, 121:13-122:9;

25   122:22-123:5 (Auerbach).

26          If TEK is allowed to continue to sell its infringing tire repair kits, AMI will continue to have

27   to compete against its own patented technology.  Auerbach Decl., ¶ 5.  This may lead to additional

28

PRINTED ON

RECYCLED PAPER

LA 9609427v1

- 8 -

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1    design wins for TEK, particularly because TEK's use of the infringing technology allows TEK to sell

2    tire repair kits at a lower price than AMI's kits (which incorporate a more expensive cap design).  *Id.*

3    *See also supra* at Part II.G.  These design wins will in turn allow TEK to increase its market share

4    and its incumbency positions, which will likely harm AMI's market position for years.  Auerbach

5    Decl., ¶ 5.

6            **J.        TEK Does Not Think It Has to Design Around the '581 Patent**

7            TEK's president, Mr. Marini, testified that he does not think he has to design around the '581

8    Patent.  Tr. Vol. V, 725:1-14.

9

10   **III.    THE LAW APPLICABLE TO GRANTING PERMANENT INJUNCTIONS**

11           **A.        The Four-Factor Test for Granting Permanent Injunctions**

12           The "fundamental nature of patents" are that of "property rights granting the owner the right

13   to exclude."  *Robert Bosch*, 659 F.3d at 1149.  This right is so essential, it is embodied in the

14   Constitution.  *See* U.S. CONST., art. I, § 8, cl. 8 (providing "Inventors the exclusive Right to their . . .

15   Discoveries").  Congress buttressed this right by providing that courts "may grant injunctions in

16   accordance with the principles of equity to prevent the violation of any right secured by patent, on

17   such terms as the court deems reasonable."  35 U.S.C. § 283; Fed. R. Civ. P. 65.

18           "Of course the axiomatic remedy for trespass on property rights is removal of the trespasser."

19   *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1362 (Fed. Cir. 2012).  As

20   such, "the winner of a judgment of validity and infringement may normally expect to regain the

21   exclusivity that was lost with the infringement."  *Edwards Lifesciences AG v. Corevalve, Inc.*, 699

22   F.3d 1305, 1314 (Fed. Cir. 2012).

23           Thus, a victorious patentee is entitled to a permanent injunction upon establishing (1) that the

24   plaintiff "has suffered an irreparable injury"; (2) that "remedies available at law are inadequate to

25   compensate for that injury"; (3) that "considering the balance of hardships between the plaintiff and

26   defendant, a remedy in equity is warranted"; and (4) that "the public interest would not be 'disserved'

27   by a permanent injunction."  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861 (Fed. Cir. 2010)

28

- 9 -

PRINTED ON
RECYCLED PAPER

LA 9609427v1

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1   *citing eBay*, 547 U.S. at 391.  "This analysis proceeds with an eye to the 'long tradition of equity

2   practice' granting 'injunctive relief upon a finding of infringement in the vast majority of patent

3   cases.'"  *Presidio Components*, 702 F.3d at 1362 *quoting eBay*, 547 U.S. at 395 (Roberts, C.J.,

4   concurring).

5          **B.       Factor One:  Irreparable Injury**

6          Courts that have granted permanent injunctions have found some or all of the following

7   factors relevant to the irreparable injury inquiry:  (1) direct competition between the parties; (2)

8   patentee's loss of market share due to the infringement; (3) patentee's unwillingness to license its

9   patents; (4) the infringer's potential lack of financial wherewithal to pay an ongoing royalty; and (5)

10  the effect of the infringement on the patentee's ability to compete for design wins.

11         **1.      Courts Regularly Enter Injunctions Where the Plaintiff and Defendant**

12                 **are Competitors in the Same Market**

13         "Direct competition in the same market is certainly one factor suggesting strongly the

14  potential for irreparable harm without enforcement of the right to exclude."  *Presidio Components*,

15  702 F.3d at 1363.  The Federal Circuit recently reiterated that, although "*eBay* jettisoned the

16  presumption of irreparable harm as it applies to determining the appropriateness of injunctive relief

17  . . . that does not mean that the nature of patent rights has no place in the appropriate equitable

18  analysis."  *Robert Bosch*, 659 F.3d at 1149.  "While the patentee's right to exclude alone cannot

19  justify an injunction, it should not be ignored either."  *Id.*  To the contrary, "facts relating to the

20  nature of competition between the parties undoubtedly are relevant to the irreparable harm inquiry."

21  *Id.* at 1150.  Thus, "[w]here two companies are in competition against one another, the patentee

22  suffers the harm—often irreparable—of being forced to compete against products that incorporate

23  and infringe its own patented inventions."  *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 2013 WL

24  2158423, at *5 (Fed. Cir. May 21, 2013) (reversing denial of permanent injunction).

25         At the same time, the Federal Circuit has held that it is clear error to conclude "that the

26  presence of additional competitors, without more, cuts against a finding of irreparable harm."  *Robert*

27  *Bosch*, 659 F.3d at 1151.  To hold otherwise, the Court said, "would effectively establish a

28

PRINTED ON

RECYCLED PAPER

LA 9609427v1

- 10 -

Jeffer Mangels
Butler & Mitchell LLP

JMBM

1    presumption against irreparable harm whenever the market contains a plurality of players." *Id.*

2    "[W]ithout additional facts showing that the presence of additional competitors renders the

3    infringer's harm reparable, the absence of a two-supplier market does not weigh against a finding of

4    irreparable harm." *Id.*  And even if additional competitors exist in the marketplace, "a patentee need

5    not sue all infringers at once" to qualify for injunctive relief.  *Id.  See also Presidio Components*, 702

6    F.3d at 1363 (granting injunction when patentee and infringer "shared some of the same customers,

7    [their] two products occup[ied] the same markets, and . . . Presidio was at times seen as ATC's only

8    true competitor"); *Broadcom Corp. v. Emulex Corp.*, Case No. SACV 09-1058 JVS, 2012 U.S. Dist.

9    LEXIS 129524, at *11 (C.D. Cal. Mar. 16, 2012) ("Indeed, one need not even necessarily be a direct

10   competitor to suffer irreparable harm sufficient to support an injunction.")

11            Similarly, even if the patentee does not practice its patent, that "does not prevent [the

12   patentee] from receiving injunctive relief." *Presidio Components*, 702 F.3d at 1363.  As the Federal

13   Circuit explained in that case, "[e]ven without practicing the claimed invention, the patentee can

14   suffer irreparable injury" because it directly competed with the infringer in the same market.  *See id.

15   See also eBay*, 547 U.S. at 393 ("traditional equitable principles do not permit such broad

16   classifications" as rejecting irreparable injury simply because of a patentee's "lack of commercial

17   activity in practicing the patents"); *Qualcomm*, 543 F.3d at 703 ("Broadcom provided evidence of

18   irreparable harm, despite the fact that it does not currently practice the claimed inventions.").

19                    **2.    Loss of Market Share Supports a Finding of Irreparable Injury**

20            "Past harm to a patentee's market share, revenues, and brand recognition is relevant for

21   determining whether the patentee 'has suffered an irreparable injury.'" *i4i*, 598 F.3d at 861 (emphasis

22   removed).  This applies regardless of whether the infringement affects a "core" part of the patentee's

23   business.  *See Robert Bosch*, 659 F.3d at 1152 ("The fact that an infringer's harm affects only a

24   portion of a patentee's business says nothing about whether that harm can be rectified.")

25            On the other hand, "[s]imply because a patentee manages to maintain a profit in the face of

26   infringing competition does not automatically rebut a case for irreparable injury." *Douglas

27   Dynamics*, 2013 WL 2158423, at *5, *6 ("[T]his court again disagrees with the district court that

28

- 11 -

PRINTED ON

RECYCLED PAPER

LA 9609427v1

1    Douglas should suffer some penalty for managing through great effort to maintain market share in

2    the face of infringing competition.")

3              **3.**        **The Patentee's Non-Licensing of Its Patent Supports a Finding of**

4                          **Irreparable Injury**

5              A patentee's "unwillingness to license favor[s] finding irreparable injury." *Presidio*

6    *Components*, 702 F.3d at 1363; *i4i*, 598 F.3d at 862 (unwillingness to license patent also relevant to

7    second factor of *eBay* test).  As the Federal Circuit recently confirmed:  "Exclusivity is closely

8    related to the fundamental nature of patents as property rights.  It is an intangible asset that is part of

9    a company's reputation, and here, Douglas's exclusive right to make, use, and sell the patented

10   inventions is under attack by Buyers's infringement." *Douglas Dynamics*, 2013 WL 2158423, at *6.

11             **4.**        **An Infringer's Lack of Available Resources to Pay A Judgment Supports**

12                          **a Finding of Irreparable Injury**

13             Another factor cited as "additional evidence of irreparable harm" by the *Robert Bosch* Court

14   was "questions about [the infringer]'s ability to satisfy a judgment."  659 F.3d at 1154.  In that case,

15   the uncontradicted evidence showed that the infringer was at risk of bankruptcy, and thus might have

16   had difficulty paying an ongoing royalty.  *See id.*  The Federal Circuit found this evidence

17   "troublesome" and held that it "favors a finding of irreparable harm."  *Id.* at 1155.

18             The Federal Circuit "has held that an infringer's net profit margin is not the ceiling by which

19   a reasonable royalty is capped."  *Douglas Dynamics*, 2013 WL 2158423, at *7 (district court clearly

20   erred by limiting ongoing royalty rate to "leave some room for profit" by infringer).

21             **5.**        **The OEM Market Awards Suppliers "Design Wins" That Lead to Future**

22                          **Business**

23             In *Emulex*, the competitors in the marketplace competed for "design wins" among electronics

24   original equipment manufacturers, which would "immunize[] the winner for a period of time from

25   competitive products which may be brought to market." *Emulex*, 2012 U.S. Dist. LEXIS 129524, at

26   *7.  This competition was required because the products were complex and required an "extensive

27   period . . . to develop and bring [the] products to market."  *Id.*  The court held that the "actual and

28

- 12 -

JMBM | Jeffer Mangels
Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER

LA 9609427v1

1   potential exclusion from a fair opportunity to compete for design wins constitutes irreparable harm."

2   *Id.* at *11.

3   **C.     Factor Two:  The Inadequacy of Monetary Damages Supports an Injunction**

4           The Federal Circuit has recognized that "loss of market share, brand recognition, and

5   customer goodwill as the result of the defendant's infringing acts" "may frequently defy attempts at

6   valuation, particularly when the infringing acts significantly change the relevant market." *i4i*, 598

7   F.3d at 862.  Moreover, "money damages alone cannot fully compensate [a patentee] for these

8   harms" when "[t]here is no reason to believe that [an infringer] will stop infringing, or that the

9   irreparable harms resulting from its infringement will otherwise cease, absent an injunction." *Robert*

10  *Bosch*, 659 F.3d at 1155.  The inadequacy of monetary damages may be reinforced by the infringer's

11  questionable financial condition.  *See id.*

12  **D.     Factor Three:  The Balance of Hardships Weighs in Favor of a Patentee Forced**

13          **to Compete Against His Own Patented Invention**

14          Under this factor, "the balance considered is only between a plaintiff and a defendant."

15  *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1330 (Fed. Cir. 2008).  "[R]equiring [a patentee] to

16  compete against its own patented invention . . . places a substantial hardship on [the patentee]." *See*

17  *Robert Bosch*, 659 F.3d at 1156; *Emulex*, 2012 U.S. Dist. LEXIS 129524, at *17-*18 ("substantial

18  harm flows to Broadcom, not Emulex, when Broadcom is forced to compete against its own

19  patents").

20          On the other hand, "[a] party cannot escape an injunction simply because it is smaller than the

21  patentee or because its primary product is an infringing one." *Robert Bosch*, 659 F.3d at 1156

22  (balance weighed in favor of granting injunction for "international conglomerate" against "small"

23  competitor).  Moreover, an infringer "is not entitled to continue infringing simply because it

24  successfully exploited its infringement." *i4i*, 598 F.3d at 863   Similarly, an infringer cannot claim

25  hardship for costs it incurred in creating the infringing products, or costs it might incur in redesigning

26  those products. *Id.  See also Coloplast A/S v. Generic Med. Devices, Inc.*, Case No. C10-227 BHS,

27

28

PRINTED ON

RECYCLED PAPER

LA 9609427v1

JMBM | Jeffer Mangels
      | Butler & Mitchell LLP

2012 U.S. Dist. LEXIS 112186, at *6 (W.D. Wash. Aug. 9, 2012) (Infringer's "hardship is the result of its calculated business risk to enter the relevant market with its devices.").

### E.    Factor Four:  The Public Interest Favors Upholding Patent Rights

"[T]he touchstone of the public interest factor is whether an injunction, both in scope and effect, strikes a workable balance between protecting the patentee's rights and protecting the public from the injunction's adverse effects." *i4i*, 598 F.3d at 863.  There is a "strong public policy favoring the enforcement of patent rights." *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1567 (Fed. Cir. 1996).  Thus, "it is generally in the public interest to uphold patent rights." *Qualcomm*, 543 F.3d at 704; *Emulex*, 2012 U.S. Dist. LEXIS 129524, at *19 ("The public interest favors the enforcement of intellectual property rights") (granting permanent injunction).

### 1.    Prospective Injunctions are Met With Approval

The Federal Circuit has approved permanent injunctions that apply only to consumers who purchase the infringing products after the effective date of the injunction.  In *i4i*, for example, the patented technology involved editing custom XML computer language.  598 F.3d at 839.  After a jury found that Microsoft's Word program's custom XML editor infringed the patent, the district court issued a permanent injunction.  *Id.*  The injunction prohibited Microsoft from, among other things, "selling, offering to sell, and/or importing into the United States any infringing Word products with the capability of opening XML files containing custom XML," as well as offering instruction, support, or testing regarding Word's ability to open XML files containing custom XML.  *Id.* at 861.  The injunction "applie[d] only to users who purchase or license Word after the date the injunction takes effect." *Id.* (emphasis in original).

The Federal Circuit affirmed the district court's issuance of this injunction, stating that the "scope of this injunction is narrow" (*id.*), and explaining that "the injunction's narrow scope substantially mitigates the negative effects on the public, practically and economically." *Id.* at 863. "By excluding users who purchased or licensed infringing . . . products before the injunction's effective date," the Federal Circuit explained, "the injunction greatly minimizes adverse effects on the public." *Id.*

PRINTED ON
RECYCLED PAPER

LA 9609427v1

AMI'S NOTICE OF MOTION AND
MOTION FOR PERMANENT INJUNCTION
CASE NO. 11-cv-774-PSG (Lead case)

JMBM Jeffer Mangels
Butler & Mitchell LLP

**2.      Patentees are Entitled to Higher Royalties During Sunset Periods**

In *Emulex*, the jury had "implicitly" found a 3% royalty rate on infringing sales.  2012 U.S. Dist. LEXIS 129524, at *28.  The Court issued a permanent injunction that included an 18-month sunset period to allow infringers to redesign their products or to allow customers to purchase non-infringing substitutes.  *Id.* at *26.  But the Court found that the jury's royalty rate "is not the appropriate royalty where the Court in essence affords a license for what now is willful infringement."  *Id.* at *29.  Therefore, the "Court order[ed] a trebled royalty of 9% on all sales made during the Sunset Period."  *Id.*

In this case, AMI satisfies all four factors of the *eBay* test, and, consequently, the Court should issue a permanent injunction prohibiting TEK's continued infringement of the '581 Patent.

## IV.   AMI IS ENTITLED TO A PERMANENT INJUNCTION TO PREVENT TEK'S CONTINUED INFRINGEMENT OF AMI'S '581 PATENT

### A.      AMI Will Suffer Irreparable Competitive Injury Absent an Injunction

TEK's continued infringement of AMI's '581 Patent will irreparably injure AMI because:  (1) AMI, through SSI, directly competes with TEK in the OEM market; (2) TEK's infringement lessens AMI/SSI's market share in that market; (3) AMI does not license the '581 Patent; (4) TEK may lack the financial resources to pay the current judgment; and (5) TEK's infringing tire repair kits allow it to unfairly reap the benefits of "design wins" in the OEM market.

#### 1.      AMI, Through SSI, and TEK are Direct Competitors in the OEM Tire Repair Kit Market

"Direct competition in the same market is certainly one factor suggesting strongly the potential for irreparable harm without enforcement of the right to exclude."  *Presidio Components*, 702 F.3d at 1363; *Robert Bosch*, 659 F.3d at 1151; *Douglas Dynamics*, 2013 WL 2158423, at *5.

In *Robert Bosch*, the patentee (Bosch) developed and sold windshield wiper "beam blades."  659 F.3d at 1145.  The infringer (Pylon) also sold beam blades.  *Id.*  Bosch sued Pylon for infringing its beam blade patents, and the jury found that Pylon infringed certain valid claims of Bosch's

- 15 -

PRINTED ON RECYCLED PAPER

LA 9609427v1

JMBM | Jeffer Mangels Butler & Mitchell LLP

1    patents.  *Id.*  Bosch moved for a permanent injunction, but the trial court denied it, finding that Bosch

2    failed to show irreparable harm.  *Id.* at 1146.

3            In reversing the district court, the Federal Circuit analyzed the direct competition between

4    Bosch and Pylon.  The Court first noted that neither Bosch nor Pylon sold directly to consumers.  *Id.*

5    at 1153.  "Instead, both offer[ed] their blades to intermediaries, who then sell the same to

6    consumers."  *Id.*  Notwithstanding that the parties made sales through intermediaries, the Federal

7    Circuit found that the parties directly competed in "three channels of distribution in the relevant

8    market," including "(1) mass merchandisers, such as Wal-Mart; (2) automotive specialty retailers,"

9    such as AutoZone, and (3) OEMs.  *Id.* at 1153.

10           The Court specifically found that Bosch and Pylon:  (1) "competed for Wal-Mart's business,"

11   (2) "sold beam blades to AutoZone" and "competed . . . for business from at least five of AutoZone's

12   competitors," and (3) although Bosch sold "its blades to most of the major car manufacturers," Pylon

13   also sold beam blades "to at least one OEM, and attempted to sell beam blades to at least two" more.

14   *Id.*  On this basis, the Federal Circuit held that the evidence was "undisputed" that "the parties

15   **directly compete for customers** in each of the relevant distribution channels."  *Id.* (emphasis

16   added).

17           In this case, there is no dispute that SSI directly competes with TEK for the same customers

18   in the OEM market.  Both SSI and TEK's witnesses admit that SSI and TEK are direct competitors

19   who "bid on the same platforms [such] as General Motors."  *See* Tr. Vol. II, 121:13-122:9

20   (Auerbach); Cordrey Decl., Exh. 1, 48:17-49:10 (Matuszynski).  For example, SSI and TEK each

21   have substantial business at GM.  *See* Tr. Vol. II, 132:25-133:14 (Auerbach); Vol. IV, 438:20-439:7

22   (Mueller) (estimating TEK at 50-60% of GM business and SSI at 30-35%); Tr. Vol. II, 122:22-123:5

23   (Auerbach) (SSI and TEK each got one-half of the Chevrolet Malibu platform).

24           AMI's sales are indisputably directly connected to the sales of its closely-related sister

25   company.  Tr. Vol. I, 79:24-80:12 (Auerbach).  *See id.*, 67:17-69:5 (AMI and SSI share the same

26   employees, facilities and resources).  When SSI sells fewer kits to OEMs, AMI sells fewer kits to

27   SSI.  *See* Tr. Vol. I, 80:8-12 (Auerbach).  Thus, even though AMI does not practice the '581 Patent,

28

- 16 -

PRINTED ON

RECYCLED PAPER

LA 9609427v1

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1  its tire repair kits are in direct competition with TEK's tire repair kits.[4]  *See* Tr. Vol. III, 367:19-21

2  (Mueller).  As a result, like the parties in *Robert Bosch*, AMI directly competes with TEK in the

3  OEM market.

4  Consequently, this factor weighs heavily in favor of finding irreparable injury.[5]

5  **2.   AMI, Through SSI, Has Lost Market Share and Customers to TEK**

6  A patentee's loss of market share due to a competitor's infringement supports a finding of

7  irreparable injury.  *Robert Bosch*, 659 F.3d at 1152; *i4i*, 598 F.3d at 861.

8  In *Robert Bosch*, the infringer, Pylon, argued that the patentee, Bosch, did not prove that it

9  was Pylon's competition that caused Bosch to suffer lost market share.  659 F.3d at 1154.  The

10  Federal Circuit disagreed.  While acknowledging that "at least some of Bosch's loss of market share

11  is attributable to other competitors," the Federal Circuit found that it was "undisputed that it was

12  Pylon that secured the Wal-Mart account, which alone accounts for a substantial portion of the entire

13  market." *Id.*  Bosch provided evidence that it had previously had the Wal-Mart account until Pylon

14  received it, which the Federal Circuit accepted "as circumstantial evidence that it would reclaim Wal-

15  Mart's business were Pylon enjoined." *Id.*

16  Here, TEK and SSI compete for the same sales in the OEM market.  *See* Tr. Vol. I, 79:24-

17  80:7 (Auerbach); Vol. II, 122:19-21 (Auerbach).  SSI has lost business to TEK, including on the

18  Chevrolet Malibu platform.  Tr. Vol. II, 122:22-123:5 (Auerbach).  In addition to having an

19  estimated 50-60% of the GM business, TEK is also the "sole supplier" to both Chrysler and Ford.

20  *See* Tr. Vol. II, 132:25-133:14 (Auerbach); Vol. IV, 438:20-439:7 (Mueller); Tr. Vol. V, 654:13-20

21  (Marini).

22  As previously explained, fewer sales by SSI mean fewer sales by AMI.  Tr. Vol. I, 80:8-12

23

24  [4]  As the Federal Circuit has explained, "[e]ven without practicing the claimed invention, the patentee can suffer irreparable injury" because it directly competed with the infringer in the same market.  *Presidio Components*, 702 F.3d at 1363; *Qualcomm*, 543 F.3d at 703; *eBay*, 547 U.S. at 393.

25

26  [5]  Even if SSI and TEK are not the sole competitors for OEM business, it is clear error to conclude "that the presence of additional competitors, without more, cuts against a finding of irreparable harm."  *Robert Bosch*, 659 F.3d at 1151.  Nothing about additional competitors in the marketplace "renders the infringer's harm reparable" to AMI.  *Cf. id.*

27

28

AMI'S NOTICE OF MOTION AND
MOTION FOR PERMANENT INJUNCTION
CASE NO. 11-cv-774-PSG (Lead case)

PRINTED ON
RECYCLED PAPER

LA 9609427v1

1   (Auerbach). Thus, TEK's sales of infringing tire repair kits necessarily reduce AMI's and SSI's

2   sales, market share, and revenues. *See Robert Bosch*, 659 F.3d at 1154. As TEK's witness

3   explained, TEK competes with SSI and Active Tools for GM's business. *See Cordrey Decl.*, Exh. 1

4   at 48:17-49:10 (Matuszynski). Mr. Matuszynski did not point to any other competitors who sold

5   products similar to TEK's. Thus, although SSI had not previously sold to either Chrysler or Ford, it

6   is logical to conclude that (like the patentee in *Robert Bosch*), if TEK was not selling its infringing

7   kits to those OEMs, then SSI would receive at least a portion of their business.

8        Furthermore, because OEMs tend to give repeat business to their current tire repair kit

9   suppliers, TEK's infringement allows it to take market share from AMI. The design wins that TEK

10  has achieved by infringing the '581 Patent "carry over from one design cycle to the next." Auerbach

11  Decl., ¶ 3. Thus, the infringing tire repair kits that got TEK in the door with OEMs will produce

12  future benefits for TEK, including future business with those and other OEMs. *See id.* TEK will

13  receive that future business at the expense of AMI, especially since TEK's infringement allows it to

14  sell its tire repair kits at a lower price than AMI's kits, which incorporate an expensive cap that was

15  specifically designed to avoid infringing the '581 Patent. *Id.*, ¶ 5. TEK's future design wins will

16  allow TEK to increase its market share and its incumbency positions at OEMs, which will likely

17  harm AMI's market position for years. *Id.*

18       Accordingly, this factor strongly weighs in favor of a finding of irreparable harm.

19                    **3.     AMI Does Not License Its Patents**

20       A patentee's "unwillingness to license favor[s] finding irreparable injury." *Presidio*

21  *Components*, 702 F.3d at 1363; *i4i*, 598 F.3d at 862; *Douglas Dynamics*, 2013 WL 2158423, at *6.

22       Here, AMI has not offered to license either the '581 Patent or any of its multiple other patents

23  on related technologies. Tr. Vol. I, 73:15-19 (Auerbach); Vol. IV, 434:13-17 (Mueller). Thus, this

24  factor also weighs in favor of finding irreparable injury.

25

26

27

28

JMBM | Jeffer Mangels Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER

LA 9609427v1

1          **4.      TEK's Evidence Shows That It Might Lack the Financial Wherewithal to**

2                 **Satisfy the Current Judgment**

3          The Federal Circuit has considered "questions about [the infringer]'s ability to satisfy a

4   judgment" as support for issuing a permanent injunction rather than ordering an ongoing royalty.

5   *Robert Bosch*, 659 F.3d at 1154.  In *Robert Bosch*, publicly available filings indicated that "Pylon

6   posed a moderate risk of severe financial stress, such a[s] bankruptcy, over the next 12 months," and

7   that Pylon's 100% owner "obtained a five million dollar loan at a rate of 8.46%."  *Id.* (internal

8   quotations omitted).

9          Here, TEK's tax returns show that, between 2004 and 2010, TEK operated at a net loss for

10  four of those years (2004, 2005, 2007 and 2009) and made net income of a **total** of $189,357

11  ($36,270 + $101,306 + $51,781) for the years 2006, 2008 and 2010.  *See* Cordrey Decl., Exh. 4 (Tr.

12  Exh. 81) (summarizing TEK's income tax returns).  Based on this alone, it does not appear that TEK

13  would be able to satisfy the current judgment.

14         Moreover, TEK transfers money out of the country to TEK Automotive Shanghai to purchase

15  the tire repair kits it sells and to TEK Global in the form of a 2% royalty on all tire repair kits (plus

16  1% on parts).  *See* Cordrey Decl., Exh. 1 at 84:16-86:18; Tr. Exh. 46 (TEK licensing agreement with

17  TEK Global requires 1% and 2% royalty rates).  This money is taken out of TEK before AMI could

18  ever recognize it as a royalty payment, which further limits TEK's potential ability to pay an ongoing

19  royalty.

20         Accordingly, AMI is concerned that anything less than a permanent injunction would render

21  AMI less than fully compensated for future infringement.[6]

22  _____

23         [6]  TEK may argue that its profit margins affect the reasonable royalty damages awarded by
    the jury.  As the Federal Circuit very recently reiterated, "an infringer's net profit margin is not the

24  ceiling by which a reasonable royalty is capped."  *Douglas Dynamics*, 2013 WL 2158423, at *7.  In
    that case, the district court "limit[ed] the ongoing royalty rate based on [the infringer's] profit

25  margins."  *Id.*  In holding that this constituted clear error, the Federal Circuit stated that "[t]he
    infringer's selling price can be raised if necessary to accommodate a higher royalty rate, and indeed,

26  requiring the infringer to do so may be the only way to adequately compensate the patentee for the
    use of its technology."  *Id.  See also Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1338

27  (Fed. Cir. 2004) ("There is no rule that a royalty be no higher than the infringer's net profit margin.")

28

PRINTED ON

RECYCLED PAPER

LA 9609427v1

JMBM | Jeffer Mangels
Butler & Mitchell LLP

5.      **By Supplying Infringing Tire Repair Kits to OEMs, TEK Unfairly Reaps**
**the Incumbency Benefits of Design Wins in the OEM Market**

The *Emulex* Court held that the "actual and potential exclusion from a fair opportunity to compete for design wins constitutes irreparable harm." 2012 U.S. Dist. LEXIS 129524, at *11. This is precisely the case here.

TEK's infringement has allowed it to obtain crucial design wins with OEMs. Auerbach Decl., ¶¶ 2-4. Those design wins will allow TEK to continue increasing its market share and incumbency position in the market. *Id.*, ¶ 5. As a result, AMI will continue to have to compete against its own technology, which may lead to even more design wins for TEK, particularly because TEK's use of the infringing technology allows TEK to sell tire repair kits at a lower price than AMI's kits (which incorporate a more expensive cap design). *Id.* These further design wins will continue to harm AMI's market position for years to come. *Id. See also* Tr. Vol. IV, 430:14-431:11.

Consequently, this factor weighs strongly in favor of a finding of irreparable injury.

6.      **To the Extent It is Required for a Permanent Injunction, a Causal Nexus**
**Exists Between AMI's Irreparable Injury and TEK's Infringement**

The jury found that the '581 Patent contained an advancement over prior art in that it teaches a two-piece port and receptacle system. *See* Dkt. No. 217 at p. 3. TEK's kits infringe this feature of the patent. *See id.* Use of this feature allows TEK's sealant containers to be removed from the tire repair kit, disposed of, and replaced, without having to replace the entire tire repair kit. *See* Tr. Vol. VII, 988:24-989:20 (TEK's expert, Dr. Kazerooni, admitting that container with the port is disposable). This constituted an advance over the prior art, which did not teach a disposable container. *See* Tr. Vol. VII, 982:20-987:3 (Dr. Kazerooni admitting that prior art does not have separate structures with removable port on the container).

Because TEK's kits use this critical feature of the '581 Patent -- and, indeed, could not operate without this feature -- TEK's infringement is directly tied to its products' success, which causes irreparable injury to AMI. Recent Federal Circuit cases do not analyze whether a causal nexus must be found between the injury and the infringement to issue a permanent injunction. *See*

- 20 -

PRINTED ON
RECYCLED PAPER

LA 9609427v1

1   *Presidio Components*, 702 F.3d at 1362-64 (no mention of causal nexus requirement for permanent

2   injunction); *Edwards Lifesciences*, 699 F.3d at 1314-15 (same); *Robert Bosch*, 659 F.3d at 1150-57

3   (same).  *See also Brocade Comms. Systems, Inc. v. A10 Networks, Inc.*, 2013 WL 140039, at *3

4   (N.D. Cal. Jan. 10, 2013).  For the reasons explained above, however, even if a casual nexus is

5   necessary, it exists in this case.

6           **B.        The Harm to AMI From TEK's Infringement Defies Monetary Compensation**

7           The evidence also shows that monetary damages would not adequately compensate AMI for

8   future infringement by TEK.

9           In *Robert Bosch*, the Federal Circuit held that, because there was no evidence that the

10  infringer, Pylon, would stop infringing, and no evidence that the patentee, Bosch, would not continue

11  to suffer irreparable harm due to lost market share and business opportunities, "money damages

12  alone cannot fully compensate Bosch for these harms."  659 F.3d at 1155.  Similarly, in *i4i*, the

13  Federal Circuit found that monetary damages would be inadequate when the patentee "sought to

14  retain exclusive use of its invention," and would "suffer a loss of market share, brand recognition,

15  and customer goodwill as the result of the defendant's infringing acts."  598 F.3d at 862.  The

16  situation is the same here.

17          First, TEK has violated AMI's right to exclude and there is no reason to conclude that TEK

18  will stop producing its infringing tire repair kits.  TEK's sales of infringing tire repair kits between

19  2007 and 2011 comprised between 56.3% and 84.7% of its total sales.  *See* Tr. Vol. IV, 507:20-

20  508:17 (Hansen); Cordrey Decl., Exh. 5 (Tr. Exh. 77).  Since 2009, TEK's sales of infringing kits

21  have comprised at least 78% of its total sales.  *See id.*  Given that the majority of TEK's business

22  comes from selling these infringing kits, there is no reason to conclude that TEK will stop infringing

23  without an injunction.

24          Second, TEK's infringement has allowed it to obtain crucial design wins with OEMs, which,

25  as explained, may lead to future design wins and business from those OEMs.  Auerbach Decl., ¶¶ 2-

26  4.  Those design wins will come at AMI's expense, particularly because TEK's use of the infringing

27  technology allows TEK to sell tire repair kits at a lower price than AMI's kits, which incorporate a

28

- 21 -

PRINTED ON
RECYCLED PAPER

LA 9609427v1

*Jeffer Mangels*
*Butler & Mitchell* LLP

JMBM

1    more expensive cap design. *Id.*, ¶ 5. The value of incumbency that derives from design wins cannot

2    be adequately compensated by a compulsory license, which would permit TEK to continue to forge

3    relationships with OEMs using products containing AMI's patented technology.

4           Next, TEK's president, Mr. Marini, specifically testified that he does not think he has to

5    design around the '581 Patent. Tr. Vol. V, 725:1-14 (Marini). This fact further demonstrates TEK's

6    likely unwillingness to stop infringing.

7           Moreover, because SSI and TEK are two of the primary players in the relevant market, TEK's

8    infringing acts significantly alter that market, especially at GM and the other OEMs. *See* Tr. Vol. II,

9    132:25-133:14 (Auerbach); Vol. IV, 438:20-439:7 (Mueller).

10          Thus, money damages will not adequately compensate AMI for TEK's future infringement.

11         **C.**     **The Balance of Hardships Strongly Favors an Injunction**

12          The balance of hardships also weighs in favor of issuing a permanent injunction.

13          AMI suffers substantial hardship from TEK's infringement. TEK is SSI's primary competitor

14    in the OEM market. Because TEK's TEK400 and TEK500 kits infringe the '581 Patent, AMI is

15    forced to compete against its own patented invention, which "places a substantial hardship" on AMI.

16    *See Robert Bosch*, 659 F.3d at 1156 ("requiring Bosch to compete against its own patented invention

17    . . . places a substantial hardship on Bosch"); *Douglas Dynamics*, 2013 WL 2158423, at *5

18    ("patentee suffers the harm—often irreparable—of being forced to compete against products that

19    incorporate and infringe its own patented inventions"); *Emulex*, 2012 U.S. Dist. LEXIS 129524, at

20    *17-*18 ("substantial harm flows to Broadcom, not Emulex, when Broadcom is forced to compete

21    against its own patents").

22          On the other hand, the relative hardship to TEK is not great: It has to stop selling an

23    infringing product. TEK cannot argue that its size compared to AMI (or AMI's grandparent

24    company, ITW) is relevant. To the contrary, "[a] party cannot escape an injunction simply because it

25    is smaller than the patentee or because its primary product is an infringing one." *Robert Bosch*, 659

26    F.3d at 1156 (balance weighed in favor of granting injunction for "international conglomerate"

27    against "small" competitor).

28

PRINTED ON

RECYCLED PAPER

LA 9609427v1

AMI'S NOTICE OF MOTION AND
MOTION FOR PERMANENT INJUNCTION
CASE NO. 11-cv-774-PSG (Lead case)

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1    Moreover, TEK cannot argue hardship just because its infringing kits are successful. *i4i*, 598

2 F.3d at 863 ("Microsoft is not entitled to continue infringing simply because it successfully exploited

3 its infringement").  Similarly, TEK cannot claim hardship for costs it incurred in creating the

4 infringing products, or costs it might incur in redesigning those products. *Id.*  In fact, TEK's

5 president does not think he has to design around the '581 Patent.  Tr. Vol. V, 725:1-14.

6    Rather, here, "[TEK's] hardship is the result of its calculated business risk to enter the

7 relevant market with its devices." *Coloplast*, 2012 U.S. Dist. LEXIS 112186, at *6.

8    Accordingly, this factor also weighs in favor of granting a permanent injunction.

9    **D.    The Public Interest Would Be Served By the Narrow, Forward-Looking**

10       **Permanent Injunction That AMI Requests**

11       **1.    AMI Seeks a Narrow Permanent Injunction**

12    There is a "strong public policy favoring the enforcement of patent rights." *PPG Indus.*, 75

13 F.3d at 1567.  Thus, "it is generally in the public interest to uphold patent rights." *Qualcomm*, 543

14 F.3d at 704; *Emulex*, 2012 U.S. Dist. LEXIS at *19.

15    In this case, AMI proposes a narrow permanent injunction that prohibits TEK from selling

16 tire repair kits that infringe the claims of the '581 Patent found valid and infringed by the Jury.

17 Specifically, AMI proposes that the Court order a permanent injunction that:

18  • Seeks only prospective relief; the injunction does not, for example, require the destruction

19    or return of infringing products already sold.

20  • Prohibits only domestic activity; it does not apply to extraterritorial conduct.

21  • Permits designing around the '581 Patent and the design, development and testing

22    undertaken to further that cause.

23  • Applies only to those specific products found to infringe and those not colorably different

24    therefrom.

25  • Has a nine-month sunset provision that will allow TEK's current customers sufficient

26    time to switch to non-infringing alternatives.

27

28

PRINTED ON
RECYCLED PAPER

LA 9609427v1

AMI'S NOTICE OF MOTION AND
MOTION FOR PERMANENT INJUNCTION
CASE NO. 11-cv-774-PSG (Lead case)

1        AMI's requested permanent injunction comports with the Federal Circuit's guidance in *i4i* in

2 that it is narrowly tailored to address only future sales of TEK products. *See also Brocade*, 2013 WL

3 140039, at *8. Thus, any harm to the public in its inability to purchase vehicles containing TEK's

4 infringing products will be limited to customers who have not yet purchased a product. OEMs who

5 have already purchased infringing products can keep selling them, and members of the public who

6 already own an infringing product may continue using it.

7        In addition, AMI's proposed injunction includes a sunset provision that will allow TEK's

8 current customers to continue purchasing infringing tire repair kits for nine months for those

9 platforms for which the TEK kit is already supplied, and will allow those current customers to place

10 orders for, and transition to, non-infringing substitutes, without a substantial impact on the general

11 public's ability to obtain tire repair kits.

12        In connection with the requested injunction, AMI also requests that the Court order TEK to

13 provide, within 15 business days, notice of the injunction to all distributors, customers or third parties

14 who have ordered, received or purchased any TEK 400 or TEK500 tire repair kits from TEK or any

15 affiliated entity.

16        Because AMI's proposed injunction is tailored to only affect future sales of TEK's infringing

17 tire repair kits, it properly balances the rights of AMI and the public. *See i4i*, 598 F.3d at 863.

18 Whereas TEK will not suffer any hardship from entry of this injunction, failure to enter the

19 injunction will substantially affect AMI as well as negatively impact the public's trust in protection

20 of its property rights. *See id.*

21        **2.**     **AMI Seeks a 14% Royalty on Sales Made During the Sunset Period**

22        AMI requests a sunset royalty rate of 14% on all infringing sales during the sunset period --

23 twice the Jury's 7% reasonable royalty rate for pre-verdict infringing sales. AMI believes that this

24 rate will adequately compensate AMI for TEK's future (and effectively willful) infringement of

25 AMI's patent rights, but is not overly burdensome to TEK. *See* Cordrey Decl., Exh. 4 (Tr. Exh. 81)

26 (showing TEK's gross profit margins of approximately 20%). This rate falls within the reasonable

27 range applied by courts. *See Emulex*, 2012 U.S. Dist. LEXIS 129524, at *26-29 (trebling jury's

28

PRINTED ON
RECYCLED PAPER

LA 9609427v1

AMI'S NOTICE OF MOTION AND
MOTION FOR PERMANENT INJUNCTION
CASE NO. 11-cv-774-PSG (Lead case)

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1    reasonable royalty to determine sunset royalty).  *See also Douglas Dynamics*, 2013 WL 2158423, at

2    *7 ("[A]n infringer's net profit margin is not the ceiling by which a reasonable royalty is capped.").

3

4    **V.      CONCLUSION**

5          For the foregoing reasons, AMI requests that the Court enter the proposed permanent

6    injunction.

7

8    DATED:  June 14, 2013              JEFFER MANGELS BUTLER & MITCHELL LLP
                                        STANLEY M. GIBSON
9                                       GREGORY S. CORDREY
                                        ANDREW I. SHADOFF
10

11                                      By: */s/ Stanley M. Gibson*
                                            STANLEY M. GIBSON
12                                      Attorneys for Plaintiffs SEALANT SYSTEMS
                                        INTERNATIONAL, INC. and ACCESSORIES
13                                      MARKETING, INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 25 -

LA 9609427v1

PRINTED ON
RECYCLED PAPER

JMBM | Jeffer Mangels
      | Butler & Mitchell LLP