United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| SEALANT SYSTEMS INTERNATIONAL, INC. and ACCESSORIES MARKETING, INC., Plaintiffs, v. TEK GLOBAL S.R.L. and TEK CORPORATION, Defendants. | ) | Case No. 5:11-cv-00774-PSG (Consolidated with Case No. 5:11-cv-01649-PSG) **ORDER GRANTING-IN-PART POST-TRIAL MOTIONS** **(Re: Docket Nos. 243, 244, 245, 246 and 247)** |

Before the court in this patent case remain various post-trial motions. Accessories Marketing Inc. moves for (1) judgment as a matter of law that TEK's marking defense does not limit its damage recovery,[1] (2) supplemental damages and prejudgment interest,[2] (3) a permanent injunction[3] and (4) attorney's fees.[4] TEK Global S.R.L. and TEK Corporation

[1] *See* Docket No. 243.

[2] *See* Docket No. 244.

[3] *See* Docket No. 246.

[4] *See* Docket No. 247.

United States District Court
For the Northern District of California

(collectively, "TEK") in turn seek JMOL or a new trial based on (1) non-infringement of the asserted claims of U.S. Patent No. 6,789,581 ("the '581 patent"), (2) invalidity of the '581 pursuant to 35 U.S.C. §§ 102 and 103, (3) failure to prove damages, (4) failure to mark products and (5) remittitur.[5] Each motion is opposed. The court appreciates the well-considered arguments presented by the parties – in their papers and at a hearing on these motions. After considering these arguments, the court GRANTS-IN-PART the motions, as set forth below.

**I. BACKGROUND**

AMI and Sealant Systems International, Inc. are California corporations engaged in the manufacture and sale of onboard tire repair kits. TEK is an Italian limited liability company involved in the same.[6] On November 10, 2010, TEK initially sued AMI and SSI for infringement of U.S. Patent No. 7,789,110 ("the '110 patent") in the Southern District of New York. The '110 patent discloses "a kit for inflating and repairing inflatable articles, in particular, tires."[7] The kit includes "a compressor assembly, a container of sealing liquid and connectors for connecting the container to the compressor assembly and to an inflatable article for repair or inflation."[8] On February 18, 2011, AMI and SSI responded with suit against TEK in this district, seeking a declaratory judgment of noninfringement of the '110 patent. AMI and SSI moved successfully to transfer the New York case here[9] and consolidate the two cases.[10] AMI and SSI later amended their complaint to include an affirmative claim against TEK for infringement of the '581 patent.[11]

---

[5] *See* Docket No. 245.

[6] *See* Docket No. 37.

[7] *See* Docket No. 101-2 at 1.

[8] *See id.*

[9] *See* Docket No. 37.

[10] *See* Docket No. 8.

[11] *See* Docket No. 37.

United States District Court
For the Northern District of California

In advance of trial, the parties moved for summary judgment on a number of key issues – certain motions were granted, others were denied.

**A. Clear and Convincing Evidence Established the Asserted Claims of the ’110 Patent Are Invalid as Obvious**

In its summary judgment order, the court held that even with all genuine factual disputes resolved in TEK’s favor, the record established by “clear and convincing evidence” that asserted claims 1-5, 11-15 and 21-31 of the ’110 patent are “obvious in light of Eriksen, Bridgestone, and other prior art references.”[12] Among other things, the court found that no reasonable jury could find other than that Bridgestone disclosed two key limitations, “a three-way valve” and “an additional hose.” In light of the court’s invalidity determination regarding the asserted claims of the ’110 patent, the court denied-as-moot the parties’ cross-motions on the issue of infringement of those same claims.[13]

**B. The Asserted Claims of the ’581 Patent Survived Summary Judgment**

In that same summary judgment order, the court weighed TEK’s motion for summary judgment that the ’581 patent was anticipated by or, in the alternative, obvious in light of the prior art. Based on a variety of genuine issues of disputed fact, the court held that summary judgment of invalidity based on anticipation or obviousness was not warranted.[14]

[12] *See* Docket No. 134 at 18.

[13] *See id.* (citing *Typeright Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1157 (Fed. Cir. 2004) (“a judgment of invalidity necessarily moots the issue of infringement”)).

[14] *See id.* at 2.

United States District Court
For the Northern District of California

**1. A Genuine Dispute Existed Whether U.S. ’282 Discloses “A Receptacle Formed in the Housing”**

The patented apparatus described in claims 1-3, 8, 10, 11, 13, 15, 17, 21-24, 27-31, 34, 36, 40 and 43 of the ’581 patent includes “a receptacle formed in said housing.”[15] The court construed this term as having its plain and ordinary meaning.[16] The court further held that word “receptacle” connotes depth such that the device can receive a tire sealant container and provide for sealant to leave the container and enter the air flow path.[17] Additionally, the court held the receptacle’s function was “to connect to the flow of compressed air and to sealingly receive a container of sealant.”[18]

The court found a genuine dispute of material fact as to whether U.S. Patent Publ. No. U.S. 2004/0173282 (“US ’282”) disclosed the receptacle required by the ’581 patent. This dispute was drawn out through conflicting testimony from the parties’ experts, Dr. King and Dr. Kazerooni. After considering this conflicting testimony, a “jury might properly conclude that due to the differences between the receptacles in the two inventions, a person skilled in the art would not have found” the’581 patent anticipated.[19]

**2. A Genuine Dispute Existed Whether U.S. ’282 Discloses the Claimed Port**

Claims 27-28, 30-31, 37-41 and 45-47 all claim a port.[20] The court construed “port” to mean “an enclosure that may be formed within and as an integral part of the housing or a separate structure that sealingly receives air and/or tire sealant.”[21] Because of the conflicting

---

[15] *See* Docket No. 111-2 at cols. 8-12.

[16] *See* Docket No. 88 at 6.

[17] *See id.* at 7.

[18] *Id.*

[19] *See* Docket No. 134 at 21-22.

[20] *See* Docket No. 111-2 at cols. 9-12.

[21] *See* Docket No. 100 at 45-46.

4

Case No. 5:11-cv-00774-PSG (Consolidated with Case No. 5:11-cv-01649-PSG)
ORDER GRANTING-IN-PART POST-TRIAL MOTIONS

testimony presented on the sealing of the bottle of tire sealant and the presence of an intake and exhaust, the court held that AMI and SSI had raised "a triable issue of fact," regarding anticipation.[22]

**3. A Genuine Dispute Existed Whether U.S. '282 Discloses a Reservoir**

Claim 42 requires a "reservoir formed in said housing in communication with said air flow path adapted to receive tire sealant."[23] The claim also states that "when said air compressor is activated and tire sealant is received in said reservoir, air from said air compressor is forced into said reservoir and pushes tire sealant out of said reservoir, into said air path, and into the tire."[24] Here, the court held that the testimony of Dr. King that "the hole in US '282 is not configured to receive sealant without leaking" the sealant was sufficient to create a genuine dispute as to whether U.S. '282 discloses a reservoir.[25]

**C. SSI Does Not Possess Standing To Seek Damages For Infringement of the '581 Patent**

TEK next urged the court to hold that SSI lacked standing to seek infringement damages, because, unlike AMI, SSI is neither an owner nor an assignee of the '581 patent. In response, the court first observed the Federal Circuit has held that "a party has standing to receive damages only if it shows it has legal title to the patent – either by way of title to the entire patent, an undivided share of the entire patent, or exclusive rights to the patent in a specific geographical region of the

[22] *See* Docket No. 134 at 22. The court further denied TEK's summary judgment motion on obviousness because TEK offered no supporting evidence or analysis under the *Graham* factors. *See Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966) ("Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.") The scant evidence offered consisted of conclusory and therefore insufficient language in Kazerooni's declaration. *See, e.g.*, Docket No. 100-1 at ¶ 30.

[23] Docket No. 111-2 at col. 11 l. 35-36.

[24] *Id.* at col. 11 l. 37-41.

[25] *See* Docket No. 111-15 at ¶ 23.

United States District Court
For the Northern District of California

United States."[26] After further observing that TEK's motion was essentially unopposed, the court concluded that "as agreed upon by the parties, only AMI has standing to seek damages from TEK on the '581 patent."[27]

**D. A Genuine Dispute Existed Whether AMI Could Claim Pre-Suit Damages**

Relying on 35 U.S.C. § 287(a), TEK moved for summary judgment that AMI could not recover damages prior to the filing of this suit because they did not provide notice – actual or constructive – to TEK. Without addressing who bears the burden of proof on the issue, the court observed that "AMI and SSI stated in their interrogatory responses that their products do not practice the '581 patent."[28] The court further noted that where a patentee's products do not practice the product, no marking or notice obligation is triggered.[29] Because a reasonable jury could find that that neither AMI nor SSI practiced the '581 patent, summary judgment limiting damages based on the marking statute was not warranted.

**E. The Jury Found Claims 27-31, 34, 38, 40 and 42 of the '581 Patent Valid and Infringed**

On April 15, 2013, the court empanelled a nine-person jury to try all issues that remained in

---

[26] Docket No. 134 at 23-24 (citing *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1551-52 (Fed. Cir. 1995)).

> Generally, one seeking money damages for patent infringement must have held legal title to the patent at the time of the infringement. *Crown Die & Tool Co. v. Nye Tool & Machine Works*, 261 U.S. 24, 40-41 (1923). A conveyance of legal title by the patentee can be made only of the entire patent, an undivided part or share of the entire patent, or all rights under the patent in a specified geographical region of the United States. *Waterman v. Mackenzie*, 138 U.S. 252, 255 (1891). A transfer of any of these is an assignment and vests the assignee with title in the patent, and a right to sue infringers. *Id.* A transfer of less than one of these three interests is a license, not an assignment of legal title, and it gives the licensee no right to sue for infringement at law in the licensee's own name. *Id.*

[27] *Id.* at 24.

[28] *Id.* at 25 (citing Docket No. 105-3 at 4-5; Docket No. 105-6 at 47:14-15, 114:16-20).

[29] *See Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1219 (Fed. Cir. 2002) (marking requirement inapplicable "where there are no products to mark").

6

Case No. 5:11-cv-00774-PSG (Consolidated with Case No. 5:11-cv-01649-PSG)
ORDER GRANTING-IN-PART POST-TRIAL MOTIONS

United States District Court
For the Northern District of California

genuine dispute.[30] AMI asserted sixteen claims at trial.[31] At the close of the case both TEK and AMI brought Rule 50(a) motions. TEK moved for JMOL on the issues of infringement, validity, damages, marking and willfulness.[32] AMI moved for JMOL on the issues of no anticipation, no willfulness, infringement and marking.[33] All Rule 50(a) motions were denied and the case was then submitted to the jury. Twelve claims were found infringed.[34] Four were invalidated as anticipated.[35] None were deemed obvious.[36] The jury found eight of the twelve infringed claims of the '581 patent valid.[37] As part of its obviousness findings, the jury found that the two-piece port and receptacle system was not disclosed in the prior art.[38] The jury invalidated as anticipated claims 22, 23, 24 and 38.[39] Claims 22, 23 and 24 require only a receptacle (but not a port) and claim 38 requires only a port (but not a receptacle). The claims that were infringed, but not invalidated, required either (1) a receptacle and a port (claims 27-31, 34, and 40) or (2) a reservoir (claim 42). The jury applied a 7% royalty rate to a royalty base of $17,965,000 and awarded damages of $1,256,920 to compensate AMI for TEK's infringement.[40]

---

30 *See* Docket No. 192 at 1.

31 *See* Docket No. 217 at 1 (claims 22-24, 27-31, 34, 36, 38, 40, 42 and 45-47 were asserted).

32 *See* Docket No. 212 at 1277-83.

33 *See id.* at 1284-86.

34 *See* Docket No. 217 at 1.

35 *See id.* at 2 (claims 22-24 and 38 were invalidated as anticipated).

36 *See id.* at 4.

37 *See id.* at 1-4 (finding claims 27-31, 34, 40 and 42 valid and infringed).

38 *See id.* at 3.

39 *See id.* at 4.

40 *See id.*

7

Case No. 5:11-cv-00774-PSG (Consolidated with Case No. 5:11-cv-01649-PSG)
ORDER GRANTING-IN-PART POST-TRIAL MOTIONS

**AMI v. TEK (Case No. 11-CV-774) VERDICT FORM**

Based on the evidence admitted at trial and in accordance with the instructions as given by the Court, we, the jury, unanimously agree to the answers to the following questions and return them under the instructions of this court as our verdict in this case.

**FINDINGS ON INFRINGEMENT CLAIMS**

(The questions regarding infringement should be answered regardless of your findings with respect to the validity or invalidity of the patent.)

AMI has asserted infringement of claims 22, 23, 24, 27, 28, 29, 30, 31, 34, 36, 38, 40, 42, 45, 46, and 47.

1. **Direct Infringement**

a) Has AMI proven that it is more likely than not that every requirement of any asserted claim of U.S. Patent No. 6,789,581 is included in TEK's accused products?

YES X NO ______

If yes, which claim(s)? 22, 23, 24, 27, 28, 29, 30, 31, 34, 38, 40, 42

**FINDINGS ON INVALIDITY DEFENSES**

(The questions regarding invalidity should be answered regardless of your findings with respect to infringement.)

TEK has asserted claims 22, 23, 24, 27, 28, 29, 30, 31, 34, 36, 38, 40, 42, 45, 46, and 47 are invalid either through anticipation or obviousness.

3. **Anticipation**

a) Has TEK proven that it is highly probable that any claim of U.S. Patent No. 6,789,581 was "anticipated," or in other words, not new?

YES X NO ______

If yes, which claim(s)? 22, 23, 24, 38

United States District Court
For the Northern District of California

4. **Obviousness**

The ultimate legal conclusion on the obviousness question will be made by the court. To aid the court, however, you are asked to deliver an advisory opinion as to obviousness. However, before you do so, you must answer the following preliminary factual questions:

a) Does the scope and content of the prior art at the time of the claimed invention include the following? (check all that apply)

_X_ U.S. Patent Publication No. US 2004/0173282
_X_ Japanese Patent Publication 2002-212883883
_X_ U.S. Patent No. 6,736,170
_X_ German Patent DE 101 06 468

b) What difference, if any, existed between the claimed invention and the prior art at the time of the claimed invention?

The two ~~recepta~~ piece system (receptacle and port)

c) Which of the following factors has been established by the evidence with respect to the claimed invention: (check those that apply):

_____ Commercial success of a product due to the merits of the claimed invention;

_____ A long felt need for the solution provided by the claimed invention;

_____ Unsuccessful attempts by others to find the solution provided by the claimed invention;

_____ Copying of the claimed invention by others;

_____ Unexpected and superior results from the claimed invention;

_____ Acceptance by others of the claimed invention as shown by praise from others in the field or from the licensing of the claimed invention;

_____ Other evidence tending to show nonobviousness;

_____ Independent invention of the claimed invention by others before or at about the same time as the named inventor thought of it; and

_____ Other evidence tending to show obviousness.

United States District Court
For the Northern District of California

**FINDINGS ON DAMAGES (IFAPPLICABLE)**

(If you answered questions 1 yes and question 3 no, proceed to answer the remaining question. If you did not so answer, do not answer the remaining question and proceed to check and sign the verdict form.

5. AMI is entitled to a reasonable royalty in the following amount:

a) Royalty payment:

i. Royalty rate 7 %, multiplied by
ii. Royalty base $17,956,000, equals
iii. Total royalty damages: $ 1,256,920

## II. LEGAL STANDARDS

### A. Judgment as a Matter of Law and New Trial

Fed. R. Civ. P. 50(b) provides that, upon a renewed motion for judgment as a matter of law, the court may: (1) "allow judgment on the verdict, if the jury returned a verdict," (2) "order a new trial" or (3) "direct the entry of judgment as a matter of law." To grant a Rule 50(b) motion, the court must determine that "the evidence, construed in the light most favorable to the non-moving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's."[41] In other words, to set aside the verdict, there must be an absence of "substantial evidence" – meaning "relevant evidence that a reasonable mind would accept as adequate to support a conclusion" – to support the jury's verdict.[42] "Substantial evidence is more than a mere" scintilla;[43] it constitutes "such relevant evidence as reasonable minds might accept as adequate to support a conclusion even

[41] *Callicrate v. Wadsworth Mfg.*, 427 F.3d 1361, 1366 (Fed. Cir. 2005) (quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002)) ("The Ninth Circuit upholds any jury verdict supported by substantial evidence.").

[42] *Id.*

[43] *Chisholm Bris. Farm Equip. Co. v. Int'l Harvester Co.*, 498 F.2d 1137, 1140 (9th Cir. 1974) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

10
Case No. 5:11-cv-00774-PSG (Consolidated with Case No. 5:11-cv-01649-PSG)
ORDER GRANTING-IN-PART POST-TRIAL MOTIONS

if it is possible to draw two inconsistent conclusions from the evidence."[44] In reviewing a motion for judgment as a matter of law, the court "must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."[45] "In ruling on such a motion, the trial court may not weigh the evidence or assess the credibility of witnesses in determining whether substantial evidence exists to support the verdict."[46]

Fed. R. Civ. P. 59 states that the court "may, on motion, grant a new trial on all or some of the issues." The "trial court may grant a new trial, even though the verdict is supported by substantial evidence, if 'the verdict is contrary to the clear weight of the evidence or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice.'"[47]

**B. Permanent Injunctive Relief Following a Finding of Patent Infringement**

There is no presumption in favor of an injunction in patent infringement cases.[48] Instead, a patentee retains the burden of showing that the four traditional equitable factors support entry of a permanent injunction: (1) that the patentee has suffered irreparable harm; (2) that "remedies available at law are inadequate to compensate for that injury"; (3) that "considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted"; and (4) that "the

---

[44] *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987).

[45] *Transbay Auto Serv., Inc. v. Chevron U.S.A., Inc.*, Case No. 3:09-cv-04932-SI, 2013 WL 496098, at *2 (N.D. Cal. Feb. 7, 2013) (quoting *Josephs v. Pacific Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006) ("We must view the evidence in the light most favorable to the nonmoving party – here, Josephs, – and draw all reasonable inferences in that party's favor.")).

[46] *Id.* (citing *Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 877 (9th Cir. 1984) ("Neither the district court nor this court may weigh the evidence or order a result it finds more reasonable if substantial evidence supports the jury verdict.")).

[47] *Wordtech Sys. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1313 (Fed. Cir. 2010) (quoting *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999)).

[48] *See eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 392-93 (2006) (The "Court has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed.").

United States District Court
For the Northern District of California

public interest would not be 'disserved' by a permanent injunction."[49] Because the Supreme Court has cautioned that an "injunction is a drastic and extraordinary remedy, which should not be granted" as a matter of course,[50] if "a less drastic remedy" is sufficient to redress a patentee's injury, "no recourse to the additional and extraordinary relief of an injunction" is warranted.[51]

**C. Supplemental Damages and Prejudgment Interest**

35 U.S.C. § 284 provides:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.
>
> When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed. Increased damages under this paragraph shall not apply to provisional rights under section 154(d).
>
> The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances.

Patentees are entitled to supplemental damage awards "for any infringement prior" to the entry of a permanent injunction that were not considered by the jury.[52] "Courts routinely grant motions for further accounting where the jury did not consider certain periods of infringing activity."[53] Courts have applied this reasoning to the situation in which an infringer provides sales

---

[49] *See i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 861 (Fed. Cir. 2010) (citing *eBay*, 547 U.S. at 391); *see also Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, Case No. 5:10-cv-03428-PSG, 2013 WL 140039, at *2 (N.D. Cal. Jan. 10, 2013).

[50] *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-12 (1982)).

[51] *Id.*

[52] *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1212-13 (Fed. Cir. 2010) (awarding damages for infringing sales for 17 months between entry of judgment and injunction at jury's royalty rate).

[53] *Metso Minerals, Inc. v. Powerscreen Int'l Distribution Ltd.*, 833 F. Supp. 2d 333, 347 (E.D.N.Y. 2011) ("Courts routinely grant motions for a further accounting where the jury did not consider certain periods of infringing activity post-verdict."); *see also Itron, Inc. v. Benghiat*, Case No. 99-cv-501-JRT-FLN), 2003 WL 22037710, at *15 (D. Minn. Aug. 29, 2003) (internal quotation omitted) (citing *Stryker v. Davol, Inc.*, 75 F. Supp. 2d 746, 747 (W.D. Mich. 1999) (granting motion for accounting of infringing activities during period after the jury's verdict); *Maxwell v. J. Baker, Inc.*, 879 F. Supp. 1007, 1011 (D. Minn. 1995) (finding that plaintiff was

12

Case No. 5:11-cv-00774-PSG (Consolidated with Case No. 5:11-cv-01649-PSG)
ORDER GRANTING-IN-PART POST-TRIAL MOTIONS

data that does not cover all sales made prior to trial.[54] Where the jury was unable to consider all infringing sales, its damages award is insufficient.[55] In calculating supplemental damages to correct this deficiency, courts may apply the reasonable royalty rate found by the jury.[56]

Prejudgment "interest should ordinarily be awarded" to a victorious patentee[57] and "is ordinarily awarded from the date of the infringement to the date of judgment."[58] The

---

entitled to accounting for sales during period not considered by the jury); *Mikohn Gaming Corp. v. Acres Gamin, Inc.*, Case Nos. S-97-cv-1383, S-98-cv-1462, 2001 U.S. Dist. LEXIS 23416, at *52-54 (D. Nev. Aug. 1, 2001) (noting that "accountings appear to be standard practice," based on authorities in which accountings were granted for periods not considered by juries).

[54] *See Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951, 960-61 (N.D. Cal. 2009) (awarding supplemental damages for infringement occurring between verdict and entry of judgment, which could not have been considered by jury); *Activevideo Networks, Inc. v. Verizon Comms.*, Inc., 2011 WL 4899922, at *4 (E.D. Va. Oct. 14, 2011) (Supplemental "damages may take into account pre-verdict infringing sales that were not covered by the jury verdict due to deficiencies in the discovery production.").

[55] *See, e.g.*, *Metso Minerals*, 833 F. Supp. 2d at 351 (awarding supplemental damages for pre-verdict infringement not considered by jury); *Itron*, 2003 WL 22037710, at *15-16 (awarding damages for pre-verdict period of infringement for which infringer provided no sales data); *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 2001 WL 34778689, at *22 (D. Nev. Aug. 2, 2001) ("To deny the Motion for an Accounting would be to allow" the infringer "to evade its obligation to pay damages for the remainder of the period of infringement and would contradict the patent law's purpose of compensating patent holders for the damage suffered due to infringement.").

[56] *See Hynix*, 609 F. Supp. 2d at 964-65 (applying jury's royalty determination to all infringement); *Metso Minerals*, 833 F. Supp. 2d at 351-52 (same); *Mondis Tech. Ltd. v. Chimei Innolux Corp.*, 822 F. Supp. 2d 639, 643 (E.D. Tex. 2011) ("The Court holds that the proper rate for the supplemental damages is the same rates the jury answered were applicable, which are 0.5% for monitors and 0.75% for televisions.").

[57] *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655-56 (1983) ("In the typical case an award of prejudgment interest is necessary to ensure that the patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement. An award of interest from the time that the royalty payments would have been received merely serves to make the patent owner whole, since his damages consist not only of the value of the royalty payments but also of the foregone use of the money between the time of infringement and the date of the judgment." (citation omitted)).

[58] *Junker v. HDC Corp.*, Case No. 3:07-cv-05094, 2008 WL 3385819, at *6 (N.D. Cal. July 28, 2008) (citing *Informatica Corp. v. Bus. Objects Data Integration, Inc.*, 489 F. Supp. 2d 1075, 1087 (N.D. Cal. 2007) ("The circumstances of this case do not, however, merit departure from the normal procedure of awarding prejudgment interest from the date of infringement to the date of payment.") (citing *Bio-Rad Labs., Inc. v. Nicolet Instrum. Corp.*, 807 F.2d 964, 967 (Fed. Cir. 1986) ("An award of interest from the time that the royalty payments would have been received merely serves to make the patent owner whole, since his damages consist not only of the value of the royalty payments but also of the foregone use of the money between the time of the infringement and the date of the judgment."))).

Federal Circuit has accepted the prime rate to calculate prejudgment interest.[59] This court, too, "has held that the prime rate is appropriate for a calculation of prejudgment interest in a patent"[60] because "the prime rate was the most accurate estimate of the interest rate the patentee would have charged the infringer for a loan since it is the rate charged by banks to its most credit-worthy customers."[61]

A patentee does not have to make any "affirmative demonstration, i.e., proof of borrowing at or above prime" to "be entitled to an award of prejudgment interest at the prime rate."[62] In "applying prejudgment interest, courts have recognized that compounding is necessary to fully compensate the patentee."[63] "Because a patentee's damages include the foregone use of money, compounding is needed to account for the time value of money."[64] Thus, "courts have approved annual compounding and even daily compounding."[65] In *Atmel*, for example, the court ordered

---

[59] *See Lam v. Johns-Manville Corp.*, 718 F.2d 1056, 1066 (Fed. Cir. 1983) ("The district court may 'fix' the interest and select an award above the statutory rate, or select an award at the prime rate.") (internal citation omitted); *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991) ("A trial court is afforded wide latitude in the selection of interest rates" and the "trial court is afforded wide latitude in the selection of interest rates.").

[60] *Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, 2008 WL 928535, at *3 (N.D. Cal. Apr. 4, 2008) (applying prime rate) (internal quotations and citations omitted).

[61] *Id.* (citing *Atmel Corp. v. Silicon Storage Tech., Inc.*, 202 F. Supp. 2d 1096, 1101 (N.D. Cal. June 21, 2002) ("The court therefore concluded that the prime rate is the most accurate estimate of the interest rate Atmel would have charged SST, a corporation, for a $20 million loan. As the rate charged by banks to its most credit-worthy customers, Atmel would have been more than generous in applying the rate to a fellow corporation, particularly given the fact that SST was a start-up at around the time infringement began.").

[62] *Studiengesellschaft Kohle, m.b.H. v. Dart Indus.*, Inc., 862 F.2d 1564, 1579-80 (Fed. Cir. 1988); *Uniroyal*, 939 F.2d at 1545 (affirming district court's selection of prime rate; noting that "it is not necessary that a patentee demonstrate that it borrowed at the prime rate in order to be entitled to prejudgment interest at that rate"); *Fresenius*, 2008 WL 928535, at *3.

[63] *Fresenius*, 2008 WL 928535, at *2 (quoting *AMP Inc. v. Lantrans Inc.*, 22 U.S.P.Q. 2d 1448, 1453 (C.D. Cal. 1991)).

[64] *Id.* (quoting *AMP*, 22 U.S.P.Q. 2d at 1453).

[65] *Id.* (quoting *AMP*, 22 U.S.P.Q. 2d at 1453).

prejudgment interest on the reasonable royalty judgment to be compounded quarterly, because the evidence showed that "royalty agreements are typically paid on a quarterly basis."[66]

**D. Exceptional Case Awards**

"The court in exceptional cases may award reasonable attorney fees to the prevailing party."[67] "When deciding whether to award attorney fees under § 285, a district court engages in a two-step inquiry. First, the court must determine whether the prevailing party has proved by clear and convincing evidence that the case is exceptional."[68] "If the district court finds that the case is exceptional, it must then determine whether an award of attorney fees is justified."[69]

Litigation "misconduct and unprofessional behavior may suffice, by themselves, to make a case exceptional under § 285."[70] "Absent litigation misconduct or misconduct in securing the patent, sanctions under § 285 may be imposed against the patentee only if both (1) the patentee brought the litigation in bad faith; and (2) the litigation is objectively baseless."[71] When the "the alleged infringer prevails in the underlying action, factors relevant to determining whether a case is exceptional include 'the closeness of the question, pre-filing investigation and discussions with the

[66] *Atmel*, 202 F. Supp. 2d at 1101.

[67] 35 U.S.C. § 285.

[68] *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 916 (Fed. Cir. 2012) (citing *Forest Labs., Inc. v. Abbott Labs.*, 339 F.3d 1324, 1327 (Fed. Cir. 2003); *Aspex Eyewear Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305, 1314 (Fed. Cir. 2010) ("The party seeking attorney fees under § 285 must establish, by clear and convincing evidence, that the case is exceptional.").

[69] *Id.* (citing *Cybor Corp. v. FAS Techs. Inc.*, 138 F.3d 1448, 1460 (Fed. Cir. 1998))

[70] *Eon-Net LP v. Flagstar Bancorp.*, 653 F.3d 1314, 1324 (Fed. Cir. 2011) (quoting *Rambus Inc. v. Infineon Techs. AG*, 318 F.3d 1081, 1106 (Fed. Cir. 2003)).

[71] *Id.* (citing *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005); *see also ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1379 (Fed. Cir. 2009) ("Attorney fees may be warranted for litigation misconduct or if both (1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless.") (internal quotations and citation omitted)).

defendant, and litigation behavior.'"[72] "Where a patentee 'prolongs litigation in bad faith, an exceptional finding may be warranted.'"[73]

## III. DISCUSSION

### A. Substantial Evidence Supports the Jury's Finding that TEK Did Not Prove the '581 Patent Invalid by Clear and Convincing Evidence

TEK initially challenges the sufficiency of the evidence supporting the jury's verdict that claims 27-31, 34, 40, and 42 of the '581 patent were all not invalid and infringed.[74]

#### 1. TEK Bore the Burden of Proving the '581 Patent Invalid by Clear and Convincing Evidence

Section 282 "creates a presumption that a patent is valid and imposes the burden of proving invalidity on the attacker. That burden is constant and never changes and is to convince the court of invalidity by clear evidence."[75]

---

[72] *MarcTec*, 664 F.3d at 916 (quoting *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1379 (Fed. Cir. 2008)).

[73] *Id.* (quoting *Computer Docking Station Corp*, 519 F.3d at 1379 (Fed. Cir. 2008)).

[74] *See* Docket No. 217 at 1-4.

[75] *Microsoft Corp. v. i4i Limited P'ship*, 131 S.Ct. 2238, 2243 (2011) (*quoting Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360 (Fed. Cir. 1984)); *see also Alexsam, Inc. v. IDT Corp.*, 715 F.3d 1336, 1346 (Fed. Cir. 2013) ("The party challenging the patent bears the burden of proving invalidity by clear and convincing evidence."); *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1377 (Fed. Cir. 2001) (citing *Verdegaal Bros. v. Union Oil Co.*, 814 F.2d 628, 631 (Fed. Cir. 1987) ("From the jury's verdict of patent validity, we must presume that the jury concluded that Union Oil failed to prove by clear and convincing evidence that claims 1, 2, and 4 were anticipated by the Stoller patent."). At one point AMI risked confusion of the standard in its choosing to analogize to the burden of proof in child custody cases.
Docket No. 262-2, Ex. 1, Vol III at 1190:6-14 ("How much higher? The clear and convincing evidence standard or the highly probable standard is the one the United States Supreme Court has said you use for determining whether a parent should have parental rights terminated if they've done something wrong. That's how high that standard is of clear and convincing evidence. United States Supreme Court, terminating parental rights. That's what you have to find in order to find a patent not valid."); *id.* at 1243:13-16 ("When we had this patent, it's presumed valid and the clear and convincing evidence standard. You have to find the same level of evidence that would justify taking a child away from a parent to know [sic] invalidate this patent."). But in failing to object, TEK waived any objection. *See Mitchell v. Black & Decker (USA) Inc.*, 6 F. App'x 652, 653 (9th Cir. 2001) ("Because [a party] failed to object to any of these statements [during closing arguments] before the case went to the jury, he waived his objections to them, absent a showing of gross injustice or an explanation of the failure to object.") (citing *Kaiser Steel Corp. v. Frank Coluccio Constr. Co.*, 785 F.2d 656, 658 & n.2 (9th Cir.1986) (recognizing "high threshold" party must meet where no objection made to improper closing argument); 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2805 (2d ed. 1995) ("A principle that strikes

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

**2. Substantial Evidence Supports the Jury's Finding that TEK Did Not Prove Anticipation by Clear and Convincing Evidence**

**a. TEK Relied Solely on U.S. '282 to Establish Anticipation**

"Anticipation requires a showing that each element of the claim at issue, properly construed, is found in a single prior art reference."[76] At trial, TEK relied on only four pieces of prior art and Kazerooni admitted that three of them – (1) Japanese Patent Pub. 2002-212883883,[77] (2) U.S. Patent No. 6,736,170[78] and (3) German Patent DE 10106468[79] – do not anticipate asserted

---

very deep is that a new trial will not be granted on grounds not called to the court's attention during the trial unless the error was so fundamental that gross injustice would result."). In any event, in its final instructions to the jury, the court confirmed the appropriate standard. *See* Docket No. 215 at 21.

[76] *Zenith Electronics Corp. v. PDI Commc'n Sys., Inc.*, 522 F.3d 1348, 1363 (Fed. Cir. 2008).

[77] Docket No. 262-2, Ex. 1, Vol VII at 959:3 ("[Claim 27] is not anticipated by 883."); *id.* at 959:24-960:4 ("Q: Does the 883 figure show anticipation of claim 28? A: No. By itself. Q: All right. What about claim 29? A: The same answer. Q: And the same would also be true for claim 30, correct? A: Correct"); *id.* at 961: 12-13 ("Q: So it was incorrect to say [claim 31 was] anticipat[ed], correct? A: Based on what I see now, yes."); *id.* at 962:5-12 ("Q: My question is, is 34 anticipated by the 883 figure? A: No, sir. Q: And what about 36, is that anticipated by the figures in 883? A: Again, no because 883 and others make that obvious, not anticipate by itself. Q: Claim 40, would you agree with me that is also not anticipated? A: Correct."); id at 963:7-19 ("Q: And if you look at claim 42, would you agree that also is not anticipated? A: No, I don't agree with you. Q: Really? You believe that claim 42, that there's a reservoir disclosed in the 883 figures? A: I'm sorry, this is 42 is the one that has a reservoir in there and I think -- 42 is anticipated by 883, yes. Q: You think 883 has a reservoir? A: It's obvious. Q: My question is, anticipation. 883 -- you testified on Friday that it didn't have a reservoir, don't you remember that sir? A: Yeah.").

[78] *See id.* at 965:1-966:18 ("Q: And this also does not anticipate claim 27, correct? A: Correct. Q: And it does not anticipate claim 29, correct? A: Correct. Q: Or claim 28? Correct. Q: It does not anticipate claim 30? A: These are all depending on claim 27, correct? A: Correct. All the dependent claim on 27 are making -- all of them are obvious. Q: I'm asking you about anticipation. A: Well either obvious or anticipation when I say it's not anticipated. Q: So you would agree with me that claims 29, 30, 31 are not anticipated, correct? A: Correct. 34, 36, not anticipated, correct? A: If they depend on 27, they are not anticipated -- this patent is not anticipated. Q: And the reason again is because these figures here that you discussed only have one piece, they don't have two pieces, correct? A: You are talking about the structures of the ports versus receptacle. So I have to make sure we are clear what we are talking about as far as pieces here. Q: Right. So we've got a receptacle, right? A: Correct. Q: And we've got a port, right? A: Well, that's not a port, that's a container. Q: Well, this piece right here? A: Correct. Q: This is a port? A: Correct. Q: So there's two pieces, right? A: Correct. Q: And then the 170, there's only one piece, right? A: Correct. And that's what I said 170 in view of 170 and others that's obvious. I did not say anticipated. Q: Because claim 27 has two pieces, correct? A: Correct. Q: It has a port and a receptacle just like this does, right? A: Correct.

[79] *See id.* at 965:25-966:21 ("Q: And you would also agree that [the German Patent DE468] does not anticipate claim 27, correct? A: Correct. Q: It does not anticipate claim 30? A: Correct. Q:

claims 27-31, 34, 36, 40 and 42. TEK's anticipation argument thus turned entirely on the teaching of the fourth prior art reference: U.S. '282.[80]

**b. Substantial Evidence Supports the Jury's Finding that U.S. '282 Does Not Anticipate Independent Claim 27 and Dependent Claims 28-31, 34, 36 and 40 of the '581 Patent**

With respect to the so called "port and receptacle" claims, independent claim 27, and dependent claims 28-31, 34, 36 and 40, King first testified that the prior art did not disclose a receptacle as the term was construed by the court.[81] King explained that U.S. '282 lacked any such receptacle because it merely provided a hole into which socket 18 was inserted.[82] King's testimony alone is substantial evidence supporting the jury's verdict of no anticipation. In any event, Kazerooni also confirmed that U.S. '282 does not disclose a "receptacle." On cross-

---

34, no anticipation? A: If they depend on 27, correct. Q: Same with 36, correct? A: Correct. Q: And again, that's because claim 27 discloses a receptacle, and a port, right? A: Correct. Q: And the 170, I'm sorry, the German one we are looking at now only has one structure, correct? A: Correct. I said the German appellant in view of 282 it makes it obvious because 282 has two structures. Q: Well, I'm just talking about this patent here right now, okay? A: Correct. Q: This patent only has figures that disclose a single structure, correct? A: Correct.").

[80] *See* Docket No. 245 at 17-22 (arguing JMOL based on U.S. '282).

[81] *See* Docket No. 262-2, Ex. 1, Vol VII at 1039:21-1040:10 ("Q: Let's look at the first one you identified. No receptacle formed in the housing. What did you mean by that? A: If you recall from prior testimony the receptacle that the patent describes is a receptacle formed in the housing. So you've got the housing, there's a receptacle formed in it that receives the container. You see. In this case receives the port which as the container of sealant. Q: And what did you do with respect to the prior art in this feature. A: I looked at -- I examined, read all the pieces of prior art and looked at the arguments that TEK had claimed were a receptacle. And I concluded that there was no piece of prior art that showed a receptacle formed in the housing."); *id.* at 1095:3-5 (explaining that the '581 patent does have a receptacle formed in the housing).

[82] *See id.* at 1106:25-1107:7 ("Q: And why wasn't the receptacle of the 282 patent formed in the housing when you put the receptacle inside of the housing through a hole on the top and you maintain it inside the housing with the floor? A: Because you don't have a receptacle formed in the housing, you just have a hole where you have the absence, you've got the wall and you have absence [of] material there that's a hole, you don't have a receptacle that's formed in the housing."); *id.* at 1078:1-7 ("Q: Do you see 27.4 is a receptacle formed in said housing, correct? A: Correct. Q: Does that claim say a receptacle with a wall? A: It says formed. A receptacle formed in said housing. It doesn't say a hole where you just have part of the housing missing to provide a hole."); *id.* at 1112:20-24 ("Q: So if there's flexibility as to the structure of this wall, why doesn't that flexibility cover the design of the receptacle in the U.S. 282? All that 282 has is just a hole. It doesn't have a receptacle that's formed in the housing.").

examination, Kazerooni admitted that his theory was that "the hole in the housing forms" a receptacle[83] and that the hole did not perform the function of sealingly receiving sealant.[84]

As to the required "port," as noted earlier, the court construed the term to mean "an enclosure that may be formed within and as an integral part of the housing or as a separate structure that sealingly receives air and/or tire sealant."[85] King testified that U.S. '282 does not disclose any separate piece that is disposed or seated in the receptacle.[86] King's testimony, even if contradicted by Kazerooni, supports the jury's verdict.[87] This is a classic example of a patent jury crediting one expert's opinion over another, something it is perfectly entitled to do.

Because substantial evidence supports the finding that U.S. '282 does not disclose both a receptacle and a port that satisfies the claim limitations of claim 27 of the '581 patent, there also is substantial evidence that U.S. '282 does not anticipate dependent claims 28, 29, 30, 31, 34, 36 or

---

[83] *See id.* at 978:20-979:1 ("Q: And we have inside the housing is just a hole, correct? A: Well, it's -- that the hole in the housing forms a receptacle. So you can put something like a cup holder, you can put it in. So I don't know hole. Hole means go through. I want to be very precise here. There's a cup, there's a hole. It's a receptacle. It receives the cup and that's what you would see.").

[84] *See id.* at 981:3-6 ("Q: Okay. What I'm asking you is different. If you just put a bottle of sealant into that hole, it's not sealingly received, correct? It's going to leak? A: Correct.").

[85] Docket No. 88 at 10.

[86] *See* Docket No. 262-2, Ex. 1, Vol VII at 1040:11-22 ("Q: Let's take a look at the second item you've identified which is no port disposed or received seated in the receptacle? A: Yes, if you look at the prior testimony the patent describes a port which is, if you recall, this piece which is disposed or seated in the receptacle so that basically the port disposed in the receptacle gives you this two-piece arrangement that we talked about earlier so that it's two pieces. You have a receptacle, you have a port that's disposed in the receptacle."); *id.* at 1045:10-20 (Q: Now let's turn to the next item which is the no port having an intake and exhaust. Can you explain what you meant when you said that that feature is missing from the prior art? A: Yes. This claim, if you will recall the prior testimony says that you have a port and that the port has to have an intake which gets air from upstream and it has to have an exhaust that sends fluid and sealant downstream. However, none of the prior art has disclosed a port. So if you don't have a port, you can't have an intake to the port and exhaust from the port because there's no port there to have an intake and exhaust.").

[87] *Kinetic Concepts*, 688 F.3d at 1362, 1364 (*quoting Streber v. Hunter*, 221 F.3d 701, 726 (5th Cir. 2000) ("Because of this conflicting expert testimony, the jury was free to 'make credibility determinations and believe the witness it considers more trustworthy.'").

40, all of which require both.

**c. Substantial Evidence Supports the Jury's Finding that U.S. '282 Does Not Anticipate Claim 42 of the '581 Patent**

The court construed the claim term "a reservoir formed in said housing" to mean a "cavity where sealant collects separate from the container."[88] Kazerooni specifically testified that none of the prior art disclosed such a reservoir.[89] King, too, testified that "none of the prior art discloses a reservoir."[90] Testimony from both parties' experts constitutes substantial evidence supporting the jury's verdict on anticipation.[91]

TEK cites King's testimony that "even one milliliter of sealant" collecting separately from the bottle could constitute a reservoir.[92] On that basis TEK claims U.S. '282 discloses a reservoir because sealant collected outside the bottle. But TEK ignores King's explanation of his testimony that one milliliter would be sufficient "if you have a reservoir that meets the requirements of the patent."[93] And, as noted above, both experts agreed at trial that U.S. '282 does not disclose any such reservoir.

---

[88] Docket No. 88 at 12.

[89] *See* Docket No. 262-2, Ex. 1, Vol. V at 827:7-16 ("Q: Does – does U.S. 282 teach a reservoir? [] The Witness: Obviously none of these patents have a reservoir they have a container. I'm not saying this is a reservoir, this is a container. This also had a container. However an engineer who will see that, they will see a cap, someone put a cap in there. Once you put a cap in there, there's a cavity.").

[90] *See id.*, Vol. VII at 1045:23-1046:5 ("Q: Okay. Looking at the next item on your list, no reservoir. What does that mean? A: Well again recalling from prior testimony a reservoir as defined by the court is a cavity into this sealant is received which is separate from the container. None of the prior art discloses a reservoir. Dr. Kazerooni did not find a reservoir, does not claim that any of the prior art discloses a reservoir in the prior art."); *id.* at 1097:3-4 ("Q: Does U.S. 282 disclose a reservoir? A: No.").

[91] *See Mentor H/S*, 244 F.3d at 1377.

[92] Docket No. 245 at 20:11-14 ("Since, according to Dr. King, even one milliliter of sealant would infringe this element of claim 42 [Tr. 273:14-17; 1073:10-13], the sealant collecting separate from the bottle of US '282 would also qualify as a reservoir under his definition of a reservoir.").

[93] *See* Docket No. 262-2, Ex. 1, Vol. VII at 1073:10-13 ("Q: So based on your testimony, even one milliliter would be a sufficient amount to have a reservoir, correct? A: If you have a -- yes -- a reservoir that meets the requirements of the patent.").

United States District Court
For the Northern District of California

TEK also claims that the jury found that a reservoir was disclosed in prior art because it was not listed among the differences between the '581 patent and the prior art in the obviousness inquiry.[94] But TEK's reliance on the jury's factual findings is misplaced in part at least because the nature of the question within the questionnaire is properly read to be open-ended. For example, the jury also did not list the "disposable" feature of claims 45-47 as missing in the prior art. Yet, that feature was the only pertinent difference between claim 38, which the jury found invalid, and claims 45-47, which it did not. The jury thus determined that this feature was not disclosed in the prior art. Because of the open-ended nature of the question, the court finds the jury's factual findings consistent.

**d. Substantial Evidence Supports the Jury's Finding that U.S. '282 Does Not Anticipate Claims 45-47 of the '581 Patent**

The jury's verdict reflects its finding that U.S. '282 does not anticipate claims 45 through 47 of the '581 patent.[95] TEK argues that the jury should have found anticipation of these claims because the prior art devices "are all disposable devices."[96] To support this argument TEK leans on Kazerooni's testimony that "the prior art devices, including that of U.S. '282, are all disposable devices" because they have "a bottle having a seal that is to be broken and requiring change of the device."[97] But the testimony cited by TEK either discusses (1) different prior art[98] or provides only

---

[94] *See* Docket No. 245 at 20:18-22 ("The Jury's verdict as to anticipation is also inconsistent with its factual findings. Despite the request by AMI's counsel that it should specifically find a reservoir as a missing element in the prior art, [Tr. 1200:4], the jury refused to do so. Dkt. 217 at 3. Instead, the jury's factual finding is consistent with the claimed reservoir being present in the prior art (claim 42 does not have a two part system of a port and receptacle). *Id.*").

[95] *See* Docket No. 217 at 1-4.

[96] Docket No. 245 at 21-22.

[97] *Id.*

[98] *See* Docket No. 262-2, Ex. 1, Vol. V at 831:13-834:18 (discussing only the '170 reference in detail).

21

Case No. 5:11-cv-00774-PSG (Consolidated with Case No. 5:11-cv-01649-PSG)
ORDER GRANTING-IN-PART POST-TRIAL MOTIONS

United States District Court
For the Northern District of California

Kazerooni's unsupported conclusion that this claim element is anticipated.[99] The jury's verdict shows that it found this testimony insufficient to meet the clear and convincing standard.[100] In any event, King offered testimony that U.S. '282 and the other references did not disclose any kit that is disposable.[101] TEK's attempt to apply the jury's obviousness findings, which did not list the "disposable device" limitation as a difference between the patent and the prior art, to contradict the anticipation verdict also is unavailing. As explained above, because of the open-ended nature of the question put to the jury, TEK cannot rely on the jury's factual findings regarding obviousness to dispute its verdict on anticipation.[102]

**3. Substantial Evidence Supports the Jury's Factual Findings on Obviousness**

The jury concluded that the port and receptacle the two-piece port and receptacle system was not obvious.[103] TEK argues asserted claims 27-31, 34, 36, 40, 42 and 45-47 of the '581 patent are invalid as obvious. A patent is invalid as obvious "if the differences between the subject matter

---

[99] *See id.*, Vol. VII at 919:6-20 ("Q: What is your view as to anticipation of claim 45 based on your testimony last week? A: Again, this is claim 45, it discusses the repair, tire repair and all the elements in this claim we have seen before, the only elements here which is added and it gives a new definition talks about disposable tire repair device, all the elements as far as the container, port, air flow valve, compressor, all the issues that I've already talked about are present in all four prior arts. Prosecute it is my opinion all those four prior arts. Prosecute it is my opinion all those four prior arts individually anticipate claim 45. And if there's any elements missing in the prior arts, it would have been naturally obvious for a skilled in the art to actually figure that out. It's not -- it wouldn't be obvious. So I think claim 45 is anticipated or mostly obvious for skilled in the art to see.").

[100] *See* Docket No. 217 at 1-4.

[101] *See* Docket No. 262-2, Ex. 1, Vol VII at 1040:20-1041:8 ("Q: In looking at the prior art, did you find this two-piece arrangement in any of the prior art identified by TEK's expert? A: I didn't find that in any of the prior art. Q: Now is this an important feature in the '581 patent over the prior art? A: Yes, it is. Q: Can you elaborate on that? A: This is an important feature because this two-piece arrangement of the port being disposed in this receptacle provides a very convenient, easy, clean way to dispose of the container and it's just a very easy way to get the container off of there. You dispose of this container in a very easy way to just buy a new container with the sealant and put it in the device.").

[102] *Cf. Cohesive Technologies, Inc. v. Waters Corp.*, 543 F.3d 1351, 1363-64 (Fed. Cir. 2008) (holding anticipation and obviousness are distinct inquiries).

[103] *See* Docket No. 217 at 3-4.

22
Case No. 5:11-cv-00774-PSG (Consolidated with Case No. 5:11-cv-01649-PSG)
ORDER GRANTING-IN-PART POST-TRIAL MOTIONS

United States District Court
For the Northern District of California

sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."[104] "Whether a patent claim is obvious is a question of law based on four underlying facts: (1) the scope and content of the prior art; (2) the level of ordinary skill in the pertinent art; (3) the differences between the prior art and the claims at issue; and (4) such secondary considerations as commercial success, long felt but unsolved need, and the failure of others."[105] "Generally, a party seeking to invalidate a patent as obvious must demonstrate by clear and convincing evidence that a skilled artisan would have had reason to combine the teaching of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success from doing so."[106]

"The Supreme Court has warned, however, that, while an analysis of any teaching, suggestion, or motivation to combine known elements is useful to an obviousness analysis, the overall obviousness inquiry must be expansive and flexible."[107] The obviousness inquiry must be "expansive and flexible" accounting for the fact that a person having ordinary skill in the art is also "a person of ordinary creativity, not an automaton."[108] There need not be "precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ."[109] "Almost

---

[104] 35 U.S.C. § 103(a).

[105] *Endo Pharm. Inc. v. Mylan Pharm. Inc.*, Case No. 11-cv-00717-RMB-KW, 2014 WL 334178, at *13 (D. Del. Jan. 28, 2014) (citing *Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1259 (Fed. Cir. 2012); *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966)).

[106] *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1068-69 (Fed. Cir. 2012) (citing *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009) (quotation omitted)).

[107] *Id.* (citing *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 415, 419 (2007)).

[108] KSR, 550 U.S. at 415, 421.

[109] *Id.* at 418.

any invention, no matter how nonobvious at the time, will appear obvious when looking backward from the solution. It is for that reason that '[c]are must be taken to avoid hindsight reconstruction by using the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit.'"[110]

Even though advisory obviousness verdicts are not binding, the court is "required to accept all implicit factual findings supporting the jury's conclusion with respect to the ultimate conclusion of obviousness" that are "supported by substantial evidence."[111] Here, substantial evidence supports the jury's findings.

**a. Substantial Evidence Supports the Jury's Finding that TEK Did Not Prove a Motivation to Combine the Prior Art to Achieve the Two-Piece Port and Receptacle System Required by Claims 27-31, 34, 36, and 40**

AMI urges, and the court agrees, that the proper obviousness inquiry in this case centers on whether there was a motivation in the art to combine known, existing elements in the way accomplished by the patent.[112] Courts must guard against hindsight bias by grafting an unsupported motivation to combine references.[113] Because the jury specifically rejected TEK's

[110] *Janssen Pharmaceutica N.V. v. Mylan Pharm., Inc.*, 456 F. Supp. 2d 644, 662 (D.N.J. 2006) (quoting *Grain Processing Corp. v. Am. Maize–Prods. Co.*, 840 F.2d 902, 907 (Fed. Cir. 1988) (citation and quotations omitted, alteration for clarity).

[111] *Kinetic Concepts*, 688 F.3d at 1360

[112] *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 148 (2007) ("A patent composed of several elements is not proved obvious merely by demonstrating that each element was, independently, known in the prior art. Although common sense directs caution as to a patent application claiming as innovation the combination of two known devices according to their established functions, it can be important to identify a reason that would have prompted a person of ordinary skill in the art to combine the elements as the new invention does. Inventions usually rely upon building blocks long since uncovered, and claimed discoveries almost necessarily will be combinations of what, in some sense, is already known.").

[113] *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1351 (Fed. Cir. 2001) ("When the art in question is relatively simple, as is the case here, the opportunity to judge by hindsight is particularly tempting. Consequently, the tests of whether to combine references need to be applied rigorously.") (citing *In re Dembiczak*, 175 F.3d 994, 999 (Fed. Cir. 1999) ("Close adherence to this methodology is especially important in the case of less technologically complex inventions, where the very ease with which the invention can be understood may prompt one to fall victim to the insidious effect of a hindsight syndrome wherein that which only the inventor taught is used against its teacher." (internal quotations and citation omitted))).

United States District Court
For the Northern District of California

argument that U.S. '282 disclosed both a receptacle and a port – i.e. the '282 reference did not anticipate the '581 patent[114] – TEK was obligated to prove that the person of ordinary skill possessed a motivation to modify or combine prior art to create the two-piece structure claimed in the '581 patent. Substantial evidence supports the jury's finding that TEK's efforts were unsuccessful.

"Expert testimony of a lack of motivation to combine and the use of hindsight by opposing experts constitutes substantial evidence of nonobviousness."[115] King testified that a person of ordinary skill in the art would not be motivated to modify prior art to create a two-piece receptacle and port system. In particular, King explained the lack of motivation to modify the prior art by tying it to cost, complexity, the function of tire repair kits and the '581 patent.[116] This is substantial evidence to support the jury's factual findings of nonobviousness.[117]

---

[114] *See* Docket No. 217.

[115] *Group One*, 407 F.3d at 1304 (alterations in original) (citing *Teleflex, Inc., v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1334 (Fed. Cir. 2002)).

[116] *See* Docket No. 262-2, Ex. 1, Vol. VII at 1043:16-1044:9 ("Q: Dr. King, so following up on the discussion, why would it -- is it your opinion as to using a two-piece construction, would that be obvious to do over a one piece construction? A: No, no, it would not be obvious. Q: Why is that? A: Generally what you do when you design something is one of your goals is that you want it to be simple. You don't want it to be complicated. And there's various reasons for that. Of course one of the big reasons is cost. Two pieces are generally more expensive than one piece. It's more expensive to manufacture. You might have to have two different people to make the different parts. You've got two parts now you've got to inspect them. And particularly in this case you've got two pieces, and the two pieces have to seal with each other. So now by having the two-piece arrangement you've added a seal. So that's a place that it might leak. So that's not an obvious thing to do. I wouldn't obviously think to do that. So the idea of doing that is an innovation."); *id.* at 1100:15-1101:10 ("Q: Dr. King, do you regard this as a within piece or two-piece structure, this prior art? A: One piece. Q: Would a person of ordinary skill in the art have any reason to add a second piece to this? A: No. Q: Does this piece of prior art talk about anywhere in the disclosure talk about adding a second piece? A: No. Q: Can you -- does it talk about any motivation or reason or advantage to adding a second piece? A: No. Q: In looking at all the prior art that TEK's expert presented, did any of that prior art have a two-piece arrangement? A: No. Q: Okay. And would it be obvious to add a second piece? A: No. Q: Would that be because of the reasons you previously gave? A: Yes.").

[117] *See Retractable Technologies*, 653 F.3d at 1310-11 ("Having concluded that substantial evidence supported the jury's factual findings, there only remains the ultimate legal conclusion of obviousness."). Claims depending from claim 27 cannot be invalidated because independent

25

Case No. 5:11-cv-00774-PSG (Consolidated with Case No. 5:11-cv-01649-PSG)
ORDER GRANTING-IN-PART POST-TRIAL MOTIONS

United States District Court
For the Northern District of California

**b. Substantial Evidence Supports the Jury's Finding that Claimed Features of Claims 42 and 45-47 Were Missing in the Prior Art and There Was No Motivation to Combine the Prior Art**

TEK also failed to specifically identify the claimed features of claims 42 and 45-47 in the prior art or offer clear and convincing evidence that a person of ordinary skill in the art would be motivated to modify prior art to include them. Kazerooni admitted no prior art disclosed a reservoir.[118] Kazerooni's admission constitutes substantial evidence supporting the jury's findings on non-obviousness as to claim 42.

As to claims 45-47, TEK does not clearly articulate what prior art combinations would have been obvious to try. Instead, TEK argues that because the jury invalidated claim 38, then any reasonable jury should have also found claims 45-47 obvious, based on the jury's obviousness findings. But the question put to the jury was open-ended and not exclusive. TEK's papers do not provide the court with a clear argument for why it believes claims 45-47 should be invalidated as obvious. Indeed, no argument as to claims 45-47 is included in TEK's reply briefing.[119]

No finding of obviousness is warranted on claims 42 and 45-47.[120]

---

claim 27 is valid. *See Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1344 (Fed. Cir. 2009) (error to find dependent claim obvious when independent claim was not).

[118] *See* Docket No. 262-2, Ex. 1, Vol V at 827:7-16 ("Q: Does – does U.S. 282 teach a reservoir? [] The Witness: Obviously none of these patents have a reservoir they have a container. I'm not saying this is a reservoir, this is a container. This also had a container. However an engineer who will see that, they will see a cap, someone put a cap in there. Once you put a cap in there, there's a cavity.").

[119] *See* Docket No. 265.

[120] The court does not reach other arguments raised in TEK's papers without record support or for the first time in its reply brief. *See, e.g.*, *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990) (holding a logical argument that "pops up" is in a reply brief is untimely and deemed waived); *infra* note 121. The court further observes that while it may rely on common sense to inform its obviousness inquiry, in this case common sense does not controvert the substantial evidence of absence of motivation to combine that the relevant prior art. *See Perfect Web Technologies, Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1328 (Fed. Cir. 2009) ("Common sense has long been recognized to inform the analysis of obviousness if explained with sufficient reasoning.").

26

Case No. 5:11-cv-00774-PSG (Consolidated with Case No. 5:11-cv-01649-PSG)
ORDER GRANTING-IN-PART POST-TRIAL MOTIONS

United States District Court
For the Northern District of California

**B. Substantial Evidence Supports a Finding of Infringement**

**1. TEK Waived Its Claim Construction Arguments Related to Airflow Path**

TEK's moving papers make no mention whatsoever of an improper construction. "Generally, '[i]t is improper for a moving party to introduce new facts or different legal arguments in the reply brief than those presented in the moving papers' and such arguments are deemed waived."[121] Because TEK challenges the court's claim construction for the first time in its reply brief, TEK waived its argument for the purposes of this motion. Nonetheless, even a substantive evaluation of TEK's construction arguments, demonstrates that judgment as a matter of law is not warranted in this case.

**2. The Court's Construction of "Airflow Path" Did Not Prejudice TEK**

TEK claims its noninfringement arguments ripened at trial as the parties clearly focused their attention on the definition of airflow path. The key disputed term "an airflow path from said compressor adapted to be connected to a tire" was construed by the court as "a route from a compressor to a tire into which, when sealant is received, a mixture of sealant and air is directed."

King testified that if at any discrete point in the airflow route the jury found a mixture of air and sealant, that would be enough to find infringement. Kazerooni took the opposite position: for AMI to establish infringement there must have been a mixture found at every cross-section along the route all the way into the tire. The parties thus dispute where the two substances – air and sealant – needed to constitute a mixture. The contentions between the parties on this point first surfaced at the charging conference when each side submitted competing further constructions

[121] *Dynetix Design Solutions Inc. v. Synopsys Inc.*, Case No. 11-cv-05973-PSG, 2013 WL 772670, at *2 (N.D. Cal. Feb. 28, 2013) (quoting *Dytch v. Yoon*, Case No. 10-cv-02915-MEJ, 2011 WL 839421, at *3 (N.D. Cal. Mar. 7, 2011); *see also Bazuaye v. I.N.S.*, 79 F.3d 118, 120 (9th Cir. 1996) ("Issues raised for the first time in the reply brief are waived.") (citing *Eberle*, 901 F.2d at 818 (9th Cir. 1990)); *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001) (explaining that "issues which are not specifically and distinctly argued and raised in a party's opening brief are waived" and that "a bare assertion does not preserve" a claim) (quotations omitted) (citing *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1110, n.1 (9th Cir. 2000)).

**United States District Court**
For the Northern District of California

interpreting airflow path as part of their debate over jury instruction number 18.[122]

AMI proposed:

> I have interpreted the meaning of "an air flow path from said compressor adapted to be connected to a tire" in patent claims involved in this case, except claims 38, 45-47. This phrase means "a route from a compressor to a tire into which, when tire sealant is received, a mixture of air and tire sealant is directed." The specification explains how one skilled in the art might understand the device: "[w]hen a container of tire sealant is received in the receptacle, the intake directs air from the air flow path substantially into the container, and the exhaust receives air and tire sealant from the container and directs the air and tire sealant into the air flow path." Accordingly, these claims explain that air and sealant travel through the same air flow path.[123]

TEK proposed:

> I have interpreted the meaning of "an air flow path from said compressor adapted to be connected to a tire" in patent claims involved in this case, except claims 38, 45-47. This phrase means "a route from a compressor to a tire into which, when tire sealant is received, a mixture of air and tire sealant is directed." The claim language, written description, embodiments, and examiner's statements in the Notice of Allowability all contemplate an air flow path into which air and tire sealant are being mixed. The examiner's statement in the Notice of Allowability moreover suggests that this understanding of the invention, predicated on the mixing of air and sealant, is essential to the design's patentability. One of ordinary skill in the art would understand that the air flow path is a route for the compressed air to take, which may include or encompass air being diverted through the container, and which does include air that is being mixed with tire sealant. The specification explains how one skilled in the art might understand the device: "[w]hen a container of tire sealant is received in the receptacle, the intake directs air from the air flow path substantially into the container, and the exhaust receives air and tire sealant from the container and directs the air and tire sealant into the air flow path." Accordingly, these claims explain that air and sealant travel through the same air flow path and are mixed while traveling through the air flow path.[124]

Ultimately, the court concluded that the term "airflow path" required no additional construction.[125]

---

[122] The dispute over jury instruction number 18 did not touch upon, in any manner, what the phrase "into which" modifies. That argument was not raised until the reply brief in this case. *See* Docket No. 207 at 868-73.

[123] *See* Docket No. 180 at 3

[124] *See id.* at 7.

[125] The construction issued in table form. *See* Docket No. 215 at 13.

| TERM | COURT'S INTERPRETATION |
|---|---|
| "an air flow path from said compressor adapted to be connected to a tire" | A route from a compressor to a tire into which, when tire sealant is received, a mixture of air and tire sealant is directed. |

At bottom, the court finds the jury verdict was supported by substantial evidence that the air and sealant mixed. Two alternatives are supported by substantial evidence. Mixing either occurred in the container or in the hose leading to the tire. Even accepting TEK's preferred construction of airflow path, requiring a mixture downstream of the container, there was testimony from both experts that there was a mixture in the hose downstream from the container.

**i. The Path Runs From the Compressor to the Container And Down Through the Container And Out the Hose to the Tire**

King and Kazerooni agreed that the path runs from the compressor to the container, then down through the container and out the hose to the tire.[126] Both the container and hose therefore are part of the air flow path.[127] Because the container and hose are both part of the air flow path, both experts agreed that a mixture in either the container or hose satisfies this limitation.[128] Mr. Mueller testified that, "by definition," a mixture is "two substances that occupy the same volume."[129] Kazerooni further testified that the presence of air and droplets of sealant together

---

[126] *See* Docket No. 262-2, Exh. 1, Vol. II, 171:22-172:10 (Q: So let's focus on, let's be very clear here on what you understand to be the air flow path. Starting with the compressor, what's your understanding of the different parts of the airflow path? A: Well, the air flow path starts out at the compressor. It comes out at the top of the compressors which has a cylinder head on it and it goes through a hose up to -- so the compressor is like right here in the middle of the unit. It comes through a hose up to a valve and then it goes through a hose which goes down underneath the container of sealant and the air flows up into the container of sealant, goes through the container, and then comes back out and it comes out of this sealant air hose and goes to the tire from there."); Vol. VII, 991:15- 17 ("Q: And the air flow path goes into the container, out of the container and into the tire, correct? A: Correct.").

[127] *See id.*

[128] *See id.*, Vol. III, 307:19-308:4 (Dr. King) ("Q: So what is your opinion then regarding whether the mixture of air and sealant in the container is sufficient to constitute infringement of this element? A: My opinion is that in mixture of air and sealant in the container is sufficient to satisfy this element. Q: And what is your opinion regarding whether the mixture of air and sealant in the hose by itself is sufficient to constitute infringement. A: My opinion is that the air, the mixture of air and sealant in the hose by itself is sufficient to satisfy this requirement."); *id.*, Vol. VII at 992:11-19 ("Q: And you would agree that at any point in that air flow path you would see droplets and of sealant and air you would call[ ] that mixed? [A:] That's what I said. If you have any cross section a mix. If you see all of those we call that a mixture. If you see lots of bubbles on any cross section, we call that mix.").

[129] *See id.*, Vol. IV at 441:4-16 ("Q: And what's your understanding of what a mixture is? A: A mixture very simply by definition is two substances that occupy the same volume. Q: Okay. And

United States District Court
For the Northern District of California

constitutes a mixture[130] and that air and sealant do not need to mix at a molecular level to satisfy this claim limitation.[131]

#### ii. Substantial Evidence Supports a Finding that There Was a Mixture in the Container

King testified that air and sealant mix in the container because air "[b]ubbles up through the sealant and flows back out the sealant bottle."[132] Kazerooni agreed that air flows up through the sealant in the container.[133] Mr. Marini also admitted that air travels through the sealant.[134] Any of this expert testimony, taken alone, is sufficient to support the jury's finding that TEK infringed the

---

why do you say that? A: Well -- Q: Or can you give us an example? A: I say that because that is the definition of a mixture. An example -- an example of a simple mixture would be you throw 15 red balls in a bag with 15 blue balls that constitutes a mixture. Q: And in that example that you are using would there be any kind of a chemical reaction between those balls? A: There would not. Q: And I don't think this came out earlier but what is your background, what is your education? A: I'm a chemical engineer by trade. Q: And do you have a degree in chemical engineering? A: I do I have a bachelor's of science in chemical engineering.").

[130] *See id.*, Vol. VII at 991:18-992:3 ("Q: And the air flow path goes into the container, out of the container and into the tire, correct? A: Correct. Q: And you would agree that if at any point in time you see droplets of sealant and air in the air flow path then you would call that mixed, correct? . . . [A:] What I mean is at any cross section throughout this path, if someone goes to that cross section and take a photograph they would see not only fluid but also gas. We call that a mixture."); *id.* at 992:11-19 ("Q: And you would agree at any point in that air flow path you would see droplets and of sealant and air you would calling that mixed? . . . [A:] That's what I said. If you have any cross section a mix. If you see all of those we call that a mixture. If you see lots of bubbles on any cross section, we call that mix.").

[131] *See id.*, Vol. VII at 992:5-10 ("Q: Well, you would agree that we are not talking about a chemical mixture in which the physical properties of the air and sealant actually change, correct? A: No, we just look at, we are talking about bubbles of air or depending if there are a lot of air then you have little materials then it turns out to be mixed, yes.").

[132] *See id.*, Vol. II at 173:1-10.

[133] *See id.*, Vol. VII at 1009:8-11 (referencing Tr. Ex. 49) (Q: And in this one we, again, see there is air going through the sealant, correct? The air has to go through the sealant to get to the top, right? A: Correct."); *id.* at 1028:1-8 (Q: So now I think you are changing your testimony. Do you remember before when you were just asked by your counsel that you said there was no contact in the container between the air and the sealant? A: Well I meant there is no -- no, no. Maybe we should read that again. Obviously, air goes there. I mean we all know air goes into it, but there's no mixture in there.").

[134] *See id.*, Vol. V at 701:19-21 ("Q: You do agree that air has to travel through the sealant to get to the top of the canister? A: Yes.").

"air flow path" claim limitation.[135] Together they are more than sufficient.

**iii. Substantial Evidence Supports a Finding that there Was a Mixture in the Hose**

**a. TEK's 2005 Video**

In 2005, TEK created a video "to illustrate" how its tire repair kits function.[136] Marini testified that the video was "close enough" to the accused products and was an "accurate enough" representation of those products for purposes of the litigation.[137] As King explained, TEK's video shows air in the hose, then sealant entering the hose, then air again entering the hose, and then more sealant.[138] Marini admitted that "there's air in between the sealant" on the video.[139] Thus,

---

[135] *Revolution Eyewear*, 563 F.3d at 1370-71 (Substantial evidence is "relevant evidence reasonable minds might accept as adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion.").

[136] *See* Docket No. 262-2, Ex. 1 at Vol. V at 655:1-14 (Q: Now let's go back if it's okay with you. We will go back to the video we showed yesterday I want to describe a little bit more about the operation of your device about the differences in mixing and then finally about what Dr. King's test you talked about when we were here a few days ago, what you thought about that. Let's go back to the video showing the operation of the device. . . . [A:] We made the video of this, it was in 2005, I believe."); *see also* Trial Exhibit 110.

[137] *See id.*, Vol. V at 696:2-13 ("Q: Now would you agree that both the air and the sealant travel together into the tire because air has to push the sealant into the tire, correct? A: Correct. Q: And the still that this was taken from the video, the video is close to your real product, correct? A: Close enough. It's a 3-D production it's a 3-D video, yes. They did try to represent for marketing purpose. This was not done for lawyer purpose it was for marketing purpose. Q: But for our purposes it's accurate, correct? A: Accurate enough. The accurate one was supposed to be from approximate Mr. King.").

[138] *See id.*, Vol. II at 176:16-177:18 ("Q: So can you describe the operation as you understand it from the point that the air is pushing down on the sealant and then what's the next thing that happens? A: There's -- so the air bubbles up to the top of the sealant and the air is filling the container and putting pressure on the sealant and so the sealant begins to flow out towards the bottom of the container. And goes through a set of holes and out into the air sealant hose. Q: Now when it's flowing out the air sealant hose as you described it, what's your understanding as to whether there's air in that hose? A: Well, you start out with the hose full of air. You hook it on to the tire so everything is full of air. And then the sealant starts to go into the hose. So at that point you have sealant and air in the hose. Q: Okay. And what's happening here? A: So here the sealant has filled up the hose. It's now going into the tire and we are putting sealant into the tire.").

[139] *See id.*, Vol. V at 695:20-21 ("Q: There's air in between those two pieces of sealant. A: There's no bubble, there's air, yes.").

United States District Court
For the Northern District of California

TEK's video shows air and sealant mixing in the hose at the same time.[140]

**b. King's Testimony and Test**

King performed a test of TEK's infringing tire repair kits, which corroborated the mixture shown in the video.[141] While reviewing the video for the jury, King pointed out that "you can see a couple of times where there were bubbles in the sealant."[142] King's test also showed that sealant was "sputtering out of the hose," which indicated "a mixing between air and sealant."[143] Kazerooni's testimony agreed that the presence of "droplets" of air and sealant together at any point in the air flow path would be a mixture.[144] While discussing King's test, Kazerooni initially claimed that the hose tested by King should not contain sealant.[145] Only after he was shown the hose from King's test, which contained air and dozens of droplets of sealant,[146] did Kazerooni

---

[140] In considering TEK's JMOL motion the court does not balance how much weight the jury should have given this evidence – the court does not "substitute its judgment" for the jury's. *Mentor H/S*, 244 F.3d at 1376.

[141] *See* Docket No. 262-2, Ex. 1, Vol. II at 177:19-25 ("Q: Now I believe you testified also that you had operated these devices? A: Yes. Q: And is this, these features that we have been looking at consistent with what you observed when you operated the devices?"); *see also* Tr. Ex. 125. Dr. King explained, this test confirmed "that you do have sealant and air in the sealant air hose at the same time." *See* Docket No. 262-2, Ex. 1, Vol. II at 187:22-25.

[142] *Id.* at 188:1-13.

[143] *Id.* at 183:11-20.

[144] *Id.*, Vol. VII at 992:11-19 ("Q: And you would agree that at any point in that air flow path you would see droplets and of sealant and air you would call[ ] that mixed? [A:] That's what I said. If you have any cross section a mix. If you see all of those we call that a mixture. If you see lots of bubbles on any cross section, we call that mix.").

[145] *See id.* at 935:18-936:8 ("Mr. Moradian: Before starting it, Dr. Kazerooni, in your opinion is this test by Dr. King an accurate representation of how the TEK product works? The Witness: No, it's not. Again, what we discussed here, please bear in mind the designer, Mr. Marini, designed the entire testimony as you see here with the particular size of the hose, and the particular surface finish, everything was designed so no mixing would take place. Based on the fluid mechanics and gas dynamics you might come up with a different configuration. If the length is long or the materials are different to create more friction or more pressure drops or again if these two holes are close to each other or any other configuration you might get mixing. Here we have, let's see several things happen. First of all, the tire hose, I'm sorry the hose for this container is not open it's actually a sealed, it's still inside.").

[146] *Id.*, Vol. VII at 997:17-998:2 ("Q: Do you see inside the clear hose what, several hundred droplets of sealant in there? A: Oh, no oh, no there are just a few. Come on, man, just a few drops

United States District Court
For the Northern District of California

change course. He then changed his mixture definition.[147]

In its renewed JMOL, TEK challenges the accuracy of King's test,[148] but its challenge fails for several reasons. First, the challenges go to the evidentiary weight of King's test, not its admissibility.[149] Even crediting TEK's criticisms, the jury was entitled to consider King's test.[150] Second, King was specifically cross-examined about each of these criticisms, and he testified that none of them had any effect on the reliability of his test.[151] When an expert testifies that any

---

left in there. Several hundred. Q: Just a few? A: Just a few left. And there's a residual left because of the experiments you did because he added so much resistance that fluid can't go. You can't really ask me to count several hundred. The reason it's left there is because he did the wrong experiment, he added a tube in there, the fluid couldn't go anywhere. There's one more reason.").

[147] *Id.*, 1005:1-23 ("Q: Now would you agree with me that the sealant that we see in the hose, as we see the sealant and air in this hose that there is a mixture right now? A: There is air and there is fluid flow stuck to the wall. There is no fluid of any sort. They are statistically entrapped. They are in there but there's no fluid flow. Q: Is there a mixture of air and sealant in this air hose I'm showing you? A: Then the definition of mixture would go away in the context of the court. I can't use that word arbitrarily as you wish. There's no mixture here, we can't define it. Areas there sitting -- the droplets have been sitting around in the -- several weeks or months. So I can't really use that word mixture here, sir. Q: Okay. So you would say there is no mixture of air and sealant in this air hose that we are looking at that has both sealant and air in it, is that your testimony? A: My testimony is the clear definition. Air is in there obviously, and there's some residual sealant perhaps or stuck, so that's all I can tell you at this time. Q: You would not consider this to be a mixture, right? It's not a foam thing and it's not misting. I can't tell you what it is. It's not a mixture.").

[148] Docket No. 245 at 10-11.

[149] *See Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1221 (Fed. Cir. 2006) (holding that a challenge as to parameters of test model goes to weight of the evidence).

[150] *See Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1362 (Fed. Cir. 2012) (when expert testimony conflicts, "the jury [i]s free to make credibility determinations and believe the witness it considers more trustworthy").

[151] *See* Docket No. 262-2, Ex. 1, Vol. II at 226:14-227:12 (Q: So Dr. King when you did your test, you testified earlier that you left the actual sealant hose which is on the left hand of the red clip, partially wrapped around the device; is that correct? A: Yes. Q: Wouldn't leaving the hose partially wrapped around the device create additional pressure on the fluid as it leaves the device? A: No, I don't believe so. The hose wasn't kinked or anything it was still fully open so I didn't do anything to cause a pressure. . . . Q: So when you look at this hose when it's actually in the device, it actually pops out a bit because it is restricted some, isn't that correct? A: It's very slightly squeezed but not enough to, not enough to restrict the volume or the area of the hose. It might be squeezed in a little on the top which leaves it with two channels a bit on the sides but the area is the same or substantially the same. I don't believe there would be enough difference to make any difference that you could measure on the pressure drop of it."); *id.* at 229:10-25 ("Q: And the plastic hose is actually coated in the sealant; is that correct? A: It appears to be, yes. Q: So the use of the plastic hose is not a direct simulation of how the product would actually operate;

United States District Court
For the Northern District of California

differences in the design of his test versus the precise operation of an accused product would not affect the test's reliability, and the expert's test is subject to cross-examination. The Federal Circuit is clear that trial courts must not "contravene the province of the jury by reweighing [the expert's] testimony."[152]

Accordingly, King's test provides an additional, independent basis to support the jury's verdict of infringement and deny the motion for new trial.[153]

**c. Mueller's Testimony**

Mueller testified that AMI measured the density of the sealant both before and after it goes through the air flow path.[154] Mueller testified that the discharged sealant has a lower density than the sealant in the container, which indicates that the discharged sealant "contains entrapped air."[155] Thus, air and sealant mix in the air flow path. AMI has analyzed "all of the competitive products on the market," including TEK's products, and that the operation of TEK's products and SSI's

---

is that correct? A: The plastic hose appears to be wetted by the sealant more than the silicon hose is. So that does affect the way that the plastic is sticking to the inside of the hose. It doesn't really [affect] the way that the bulk of the fluid moving through that hose behaves, though. I mean possibly right at the surface of the hose, the wedding of it would be a little different. Q: But what you are calling the wedding of the sealant to the plastic hose is actually sealant left as remnants in the plastic hose; is that correct? A: Yes."); 252:18-253:5 ("Q: And as an engineer, a person who studied the sciences, you are aware that silicon and vinyl have different molecular properties, correct? A: Correct. Q: So it follows from the difference in molecular properties that they would operate differently on a fluid; is that correct? A: I would expect them to have different characteristics of how the fluid wets them, whether the fluid would get them wet or whether it would just roll off. I would expect that to be different. As far as having a tube and having fluid flowing through the middle of it, I would not expect that to be different."); 254:3-256:9 (explaining the impact of test kit being turned on and off).

[152] *Liquid Dynamics*, 449 F.3d at 1220-22 (affirming JMOL denial despite infringer's claim that test used "inaccurate" modeling parameters).

[153] *Revolution Eyewear*, 563 F.3d at 1370.

[154] *See* Docket No. 262-2, Ex. 1, Vol. VIII at 1153:3-14 ("Q: Now as the comes out of the container you have both air and sealant? A: Yes. Q: Why do you say that? A: We have tested the sealant as it is discharged from the fully automatic tire repair kit for density and if you compare the density of the sealant at that point to the sealant in the container before use, the density is lower in the discharge sealant. Q: What is a lower density in the discharge sealant tell you about whether there's a mixture? A: It contains entrapped air. Q: As the air and the sealant move through the tube, at that point do you consider that a mixture? A: Yes.").

[155] *See id.*

products are the same with respect to the mixing of air and sealant.[156] Mueller's testimony thus applied to TEK's products and was not confusing or misleading.

Although Marini testified at length that air and sealant do not "mix" in TEK's tire repair kits, he admitted that air and sealant "travel together" in both the container and the hose.[157] Marini also did not marshal test data or other documentary evidence.[158] In any event, Mueller countered that testing reveals that air is "entrapped" within the sealant, and thus air and sealant mix in the air flow path.[159] Even if Marini's statements were not undermined, Mueller's testimony constitutes substantial evidence that there was a mixture of air and sealant in the hose.[160]

**iv. The Reservoir**

TEK argues that its products do not satisfy the reservoir element within certain asserted claims. The court construed the term "reservoir" as a "cavity where sealant collects separate from the container."[161] King testified that, in TEK's tire repair kits, the sealant collects in a cavity separate from the container before going out of a hole into the hose.[162] Although TEK urges that

[156] *See* Docket No. 262-2, Ex. 1, Vol. VIII at 1151:15-23 ("A: We have analyzed all of the competitive products on the market, TEK Active, Dunlop, Sumitomo, Continental, so we do thorough competitive analysis of all of our competitors. Q: Are these automated tire repair kits? A: We test all three, manual, semi-automatic, and fully automatic. Q: With respect to the process you're describing, does the operation of these kits differ? A: No").

[157] *See, e.g.*, Docket No. 262-2, Ex. 1, Vol. V at 689:22-690:21, 691:9-696:5, 696:14-697:16.

[158] *See id.* at 703:2-22, 703:19-707:9.

[159] *See id.*, Ex. 1, Vol. VIII at 1150:9-15 (Q: So I think you were describing for us what is occurring when the air is injected into the container then the air and sealant -- so what is occurring at that point when the air is injected into the container? A: When the air is injected into the sealant container it's bubbling up through and some of the air is being entrapped inside the sealant container.").

[160] TEK's arguments with respect to the Scott reference were not addressed at trial and are not properly considered by the court now – especially because they were raised for the first time in reply briefing. *See supra* note 121.

[161] Docket No. 88 at 12.

[162] *See* Docket No. 262-2, Ex. 1, Vol. III at 295:22-297:4 ("Q: Dr. King can you point out where the sealant collects then where it exists the part that you are holding? A: Yes. So this bore here between this top ledge and the bottom ledge, forms a cavity. So the sealant forms a cavity then it t

United States District Court
For the Northern District of California

the reservoir in its tire repair kits "would not hold sufficient volume of sealant to fix" a tire,[163] King explained that this position is not persuasive because neither the '581 patent nor the court's construction specifies any size requirement for the reservoir.[164] Moreover, when expert testimony conflicts and the jury finds for the patentee, the court "must infer that the jury found" the patentee's "experts to be credible and persuasive," which provides substantial evidence supporting the jury's factual finding.[165] Even when there is "sufficient evidence to support each position argued to the jury," "the jury's factual conclusion may not be set aside by a JMOL order."[166] Consequently, the

---

forms a hole which goes out into the hose. The hose is kind of hard to see because everything is black. . . . Q: And Dr. King can you explain in operation how this works then with this part, how they work together? A: Okay. So the device has this receptacle formed in the housing. This part as you recall is the port. The port seats down into this device I'm sorry it seeps down into the receptacle. So the air comes through the compressor up through the center of the receptacle, goes into the container, up through the sealant, then the sealant and air come out the container back down into the receptacle. And if I may -- if you recall, this part is called the path device which sits down into the port. And so the sealant comes down into this cavity and so this bore that I just showed you that's the outside of the cavity. The inside of the cavity is defined by this cylindrical surface on the valve of the device. So this is the outside of the cavity. This part goes into it so this is the inside of the cavity so the sealant collects in that cavity then goes out this hole into the hose. Q: So in operation, is the reservoir then part of the port in the receptacle? A: Yes."); *id.* at 298:9-18 ("Q: Can you explain to us how the TEK tire repair kit satisfy this limitation? A: Yes, the cavity that we just or that I just showed the jury, it is a cavity and it's separate from the container. And the cavity is down here. The cavity is entirely on top of it is so the cavity is on top of the container. The sealant does collect there, it comes directly down from the container into this cavity[.] Q: So what did you conclude about claim 42? I concluded that claim 42 is infringed by the TEK device.").

[163] Docket No. 245 at 14:3-6; Docket No. 262-2, Ex. 1, Vol. VII at 945:2-946:14.

[164] *See id.* at 1103:8-23 ("Q: So when Dr. Kazerooni did not say that U.S. 282 anticipates the claim to the reservoir, that was because he believed that you needed to have a large cavity where you pour sealant from a bottle into that cavity, correct? A: I recall that he gave an opinion that the prior art did not have a reservoir according to the claims of the patent. As far as what his mind set was, I don't know. Q: You -- so it is your position, sir, that even one milliliter of sealant can create a reservoir, correct? A: My opinion is that if you have a structure that meets the claim elements of the patent, then that is a reservoir. Q: Even if it were -- even if that structure would have capacity for one milliliter of sealant, that would under your definition be a reservoir? A: That's correct because the claims do not specify size, it just specifies structure.").

[165] *See Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1362 (Fed. Cir. 2012) (affirming denial of infringer's JMOL).

[166] *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1355 (Fed. Cir. 2001).

United States District Court
For the Northern District of California

jury's credibility determination cannot be set aside on JMOL.[167] Because King's opinion is in line with the clear weight of the evidence, TEK is not entitled to a new trial on this issue.[168]

As to TEK's arguments that the court's construction of reservoir was off-target because it "impermissibly expanded the scope of the claim" by using the term "collect" rather than "pour," TEK waived its construction argument on this issue because "at no time before or during trial" did TEK "object to the district court's claim construction, request clarification, or offer the construction" it now advances.[169]

In sum, substantial evidence supports the jury's infringement verdict.

**C. Permanent Injunction**

As explained above, in "accordance with the principles of equity, a plaintiff seeking a permanent injunction 'must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'"[170] The court considers each factor in turn.

---

[167] *See id.*

[168] *See Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1374 (Fed. Cir. 2001) (quoting *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir.1999) ("The trial court may grant a new trial, even though the verdict is supported by substantial evidence, if the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice.")).

[169] *Enovsys LLC v. Nextel Commc'ns, Inc.*, 614 F.3d 1333, 1344 (Fed. Cir. 2010); *see also* Docket No. 62 at 13 (suggesting that "a reservoir formed in said housing" be construed to mean "an enclosure formed within and as an integral part of the housing that sealingly receives air and/or tire sealant").

[170] *Apple Inc. v. Samsung Electronics Co., Ltd.*, 735 F.3d 1352, 1359 (Fed. Cir. 2013) ("*Apple III*") (quoting *eBay*, 547 U.S. at 391).

### 1. Irreparable Injury

#### a. Causal Nexus

The Federal Circuit recently recognized a "preexisting" requirement that the party seeking injunctive relief identify a causal nexus between infringement and the alleged harm.[171] The court has explained:

> To show irreparable harm, it is necessary to show that the infringement caused harm in the first place. Sales lost to an infringing product cannot irreparably harm a patentee if consumers buy that product for reasons other than the patented feature. If the patented feature does not drive the demand for the product, sales would be lost even if the offending feature were absent from the accused product. Thus, a likelihood of irreparable harm cannot be shown if sales would be lost regardless of the infringing conduct.[172]

To show a causal nexus a patent owner is not "necessarily required to show that a patented feature is the sole reason" for consumers' purchases, but rather must "show that the infringing feature drives consumer demand for the accused product."[173] A patent owner does not have to "show that a patented feature is the one and only reason for consumer demand. Consumer preferences are too complex—and the principles of equity are too flexible—for that to be the correct standard. Indeed, such a rigid standard could, in practice, amount to a categorical rule barring injunctive relief in most cases involving multi-function products, in contravention of

---

[171] *Id.* at 1360 (quoting *Apple, Inc. v. Samsung Electronics Co., Ltd.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012) ("*Apple I*") ("As in the preliminary injunction context, '[w]e hold that the district court was correct to require a showing of some causal nexus between Samsung's infringement and the alleged harm to Apple as part of the showing of irreparable harm.'")).

[172] *Id.* (quoting *Apple I*, 678 F.3d at 1324); *see also id.* at 1360-61 (quoting *Apple Inc. v. Samsung Electronics Co., Ltd.*, 695 F.3d 1370, 1374-75 (Fed. Cir. 2012) ("*Apple II*") ("[I]t may very well be that the accused product would sell almost as well without incorporating the patented feature. And in that case, even if the competitive injury that results from selling the accused device is substantial, the harm that flows from the alleged infringement (the only harm that should count) is not. Thus, the causal nexus inquiry is indeed part of the irreparable harm calculus: it informs whether the patentee's allegations of irreparable harm are pertinent to the injunctive relief analysis, or whether the patentee seeks to leverage its patent for competitive gain beyond that which the inventive contribution and value of the patent warrant.")).

[173] *Id.* at 1364 (quoting *Apple II*, 695 F.3d at 1375).

United States District Court
For the Northern District of California

*eBay*."[174]

Patent owners "must show some connection between the patented feature and demand" and there are "a variety of ways to make this required showing, for example, with evidence that a patented feature is one of several features that cause consumers to make their purchasing decisions. It might also be shown with evidence that the inclusion of a patented feature makes a product significantly more desirable. Conversely, it might be shown with evidence that the absence of a patented feature would make a product significantly less desirable."[175]

In this case, the jury found that the '581 patent contained an advancement over prior art in that it teaches a two-piece port and receptacle system.[176] Use of this feature allows TEK's sealant containers to be removed from the tire repair kit, disposed of, and replaced, without having to replace the entire tire repair kit.[177] Because TEK's kits rely on this feature of the '581 patent – and, indeed, could not operate without this feature – TEK's infringement is traceably tied to its products' success causing irreparable injury.

**b. AMI and SSI Directly Compete with TEK Within the Same Market**

"Direct competition in the same market is certainly one factor suggesting strongly the

---

[174] *Id.* (citing *eBay*, 547 U.S. at 393 (rejecting "expansive principles suggesting that injunctive relief could not issue in a broad swath of cases")).

[175] *Id.*

[176] *See* Docket No. 217 at 3.

[177] *See* Docket No. 246-4, Ex. 2, Vol. V at, 988:24-989:20 (Q: Now you remember Mr. Marini's testimony when he says this is what you dispose of when you throw this away, right? A: You either throw it away or send it to the manufacturer but that is the disposable part of the device. Q: And the container and the port itself with this hose all get disposed of, correct? A: Correct. Q: Now when you don't have this part, you've disposed of this, this device like this doesn't operate as a tire repair device, right? A: Well, you need that container, yes. Q: So right now all I have is an compressor, right? A: I don't think so. I don't think so. This wouldn't work. Would it work? Q: You don't know whether this would work or not? A: Oh, because you have two different hoses. Yes it will work as a compressor, correct. Q: All right. So when we've disposed of the part of the device that aids in the repair of the tire, we don't have a tire repair device anymore, we have an air compressor, correct? A: You have an air compressor. Yeah, this device has two different hoses one for air one for -- yes).

39
Case No. 5:11-cv-00774-PSG (Consolidated with Case No. 5:11-cv-01649-PSG)
ORDER GRANTING-IN-PART POST-TRIAL MOTIONS

United States District Court
For the Northern District of California

potential for irreparable harm without enforcement of the right to exclude."[178] Facts "relating to the nature of the competition between the parties" are therefore "undoubtedly are relevant to the irreparable harm" inquiry.[179] "Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions."[180] It is also "well-established that the 'fact that other infringers may be in the marketplace does not negate irreparable harm.'"[181] "The notion that a firm sustains irreparable harm only" if it "offers a precise product-for-product replacement is too narrow and ignores that true scope of competition in the market place. Indeed, one need not even necessarily be a direct competitor to suffer irreparable harm sufficient to support an injunction."[182] "Even without practicing the claimed invention, the patentee can suffer irreparable

---

[178] *Presidio Components, Inc. v. Am. Technical Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012) (citing *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 703 (Fed. Cir. 2008)).

[179] *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1150 (Fed. Cir. 2011)

[180] *Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013).

[181] *Robert Bosch*, 659 F.3d at 1151 (quoting *Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364, 1381 (Fed. Cir. 2005)).

[182] *Broadcom Corp. v. Emulex Corp.*, Case No. SACV 09-1058-JVS, 2012 U.S. Dist. LEXIS 129524, at *11 (C.D. Cal. Mar. 16, 2012) (citing *eBay*, 547 U.S. 393-94; *Commonwealth Scientific & Indus. Research Organisation v. Buffalo Tech. Inc.*, 492 F. Supp. 2d 600, 604 (E.D. Tex. 2007)).

> While CSIRO does not compete with Buffalo for marketshare, CSIRO does compete internationally with other research groups—such as universities—for resources, ideas, and the best scientific minds to transform those ideas into realities. CSIRO's reputation is an important element in recruiting the top scientists in the world. Having its patents challenged via the courts not only impugns CSIRO's reputation as a leading scientific research entity but forces it to divert millions of dollars away from research and into litigation costs. Delays in funding result in lost research capabilities, lost opportunities to develop additional research capabilities, lost opportunities to accelerate existing projects or begin new projects. Once those opportunities have passed, they are often lost for good, as another entity takes advantage of the opportunity. Delays in research are likely to result in important knowledge not being developed at all or CSIRO being pushed out of valuable fields as other research groups achieve critical intellectual property positions. Thus, the harm of lost opportunities is irreparable. They cannot be regained with future money because the opportunity that was lost already belongs to someone else. *Id.*

United States District Court
For the Northern District of California

injury."[183] At bottom, "traditional equitable principles do not permit" broad classifications that a patent owner has – or has not been – irreparably harmed.[184] A more nuanced approach is called for.

In this case, SSI directly competes with TEK for the same customers in the OEM market. Both SSI and TEK's witnesses admit that SSI and TEK are direct competitors who "bid on the same platforms [such] as General Motors."[185] For example, SSI and TEK each derive substantial business from GM.[186] AMI's sales are bound at the hip to SSI's sales,[187] such that when SSI sales

[183] *Presidio Components*, 702 F.3d at 1363 ("While Presidio conceded during this litigation that its BB capacitors do not practice the '356 patent, this does not prevent Presidio from receiving injunctive relief, as the district court properly noted.").

[184] *eBay*, 547 U.S. at 393.

[185] *See* Docket No. 246-4, Ex. 2, Vol. II at 121:13-122:9 (Q: Now you mentioned yesterday TEK Automotive Shanghai and selling sealant to TEK Automatic Shanghai. The defendant in this case, TEK Corporation, when did you become aware of TEK Corporation? A: When I joined the company in 2004 I became aware of TEK Corporation in the US. Q: How did you become aware of them? A: We were competitors we bid on the same platforms as General Motors. Q: And would you consider them to be a head-to-head direct competitor? A: Absolutely. Q: Why is that? A: Because typically at General Motors we will bid and then we do bid against each other directly. And the history is we would get half the business and TEK wou ld get the other half. Q: In terms of the product they sell do you remember the tire sealant compressor kit I showed yesterday? A: Yes. Q: Is that the product that they sell to General Motors, to your knowledge? A: To the best of your knowledge, yes.); Docket No. 246-3, Ex. 1, 48:17-49:10 ("Q: I think when we left off we were talkinga bout some of TEK Corporation's competitors with regard to the General Motors business. Do you recall that? A: Yes. Q: You had indicated that -- you testified that Active Tools and Sealant Systems International were direct competitors; is that right? A: Yes. Q: When you say they're direct competitors, what do you mean by that? A: They offer the same type of product that TEK Corporation offers to General Motors. Q: When you say "the same type of product," what do you mean by that? A: They perform similar functions that our TEK Corporation product does. Q: What are those functions? A: They use sealant to seal a puncture, and they use a compressor to inflate a tire.").

[186] *See* Docket No. 246-4, Ex. 2, Vol. IV at 438:20-439:7 ("Q: Who sells the tire repair kits to General Motors? A: I know of three which would be TEK, SSI, and Active Tools. Q: Does Dunlop sell to General Motors? A: Not to my knowledge. Q: Bridgestone? A: Not to my knowledge. Q: Of the three listed how [would] you characterize the distribution or the allocation of the sales what percents would each get? A: Our market intelligence says that TEK would have somewhere between 50 to 60 percent of the business at General Motors. SSI would be somewhere between 30 to 35 percent and the balance would be Active Tools."); *id.*, Vol. II, 122:22-123:5 ("Q: Now has SSI lost business to TEK Corporation? A: Yeah, definitely, I think so. I think that we have lost business on various platform it is where they were awarded some of it and we were awarded some of it. Q: When you say platforms what you're are you referring to? A: Such as the Chevy Malibu for example. We got half of the business, TEK got the other half. Q: And that's for these tire sealant compressor kits? A: Yes.").

41

Case No. 5:11-cv-00774-PSG (Consolidated with Case No. 5:11-cv-01649-PSG)
ORDER GRANTING-IN-PART POST-TRIAL MOTIONS

United States District Court
For the Northern District of California

to OEMs lag, AMI feels the pain.[188] Thus, even though AMI does not practice the ’581 patent, its tire repair kits directly compete with TEK’s infringing repair kits.[189] The only significant dispute here is whether the patentee (AMI) can be irreparably harmed by infringing sales even though it competes with the infringer (TEK) through an intermediary (SSI). The Federal Circuit’s decision in *Robert Bosch* credited a finding of irreparable harm based, in part, on such indirect competition.[190] While TEK is right that *Robert Bosch* involved a different type of indirect competition, it nevertheless affirmed that indirect competition generally can support a finding of irreparable harm. Here, it is clear that AMI and TEK compete for the same market – even if indirectly.

---

[187] *See id.*, Vol. I at 79:24-80:12 (“Q: Now in terms of AMI’s role in this, what is AMI’s role with respect to the kit we see there the tire sealant compressor kit? A: AMI is the manufacturing arm for SSI. We manufacture the sealant and the compressor and we combine the two together and SSI sells it to the OEM manufacturers. Q: How does SSI acquire it from AMI? A: We do it through an inner company sale between the two sister companies. Q: And as a result of that inner company sale what happens to AMI’s sales when SSI sales go up? A: They go up. Q: So AMI sales go up? A: AMI sales go up.”); *id.* at 67:17-69:5 (Q: What do you do for a living? A: I’m the general manager of Accessories Marketing Inc. and Seal Sealant Systems International. Q: And what is your role as general manager of AMI? A: I manage all aspects of the business from sales operations product development marketing. I manage the entire business. Q: And in terms of marketing what are you managing, what are you doing? A: All promotional activities, advertising strategies, product development. I manage all of it. Q: And as general manager of SSI, what do you do? A: I have the same responsibilities as I do with Accessories Marketing Inc. We are sister [] companies and we share the same resources. Q: In terms of sales and marketing what do you do for SSI or? A: The same the organizations are shared so the resources that are part of Accessories Marketing Inc. support our SSI International Business. Q: How long have you worked for AMI? A: I started working for AMI in 2004. Q: Where is AMI located? A: In San Luis Obispo, California. Q: All right. Thank you. Where is SSI located? A: In San Luis Obispo, California. Q: And do they share any facilities? A: We do. We share the same office the same team in San Luis Obispo. Q: Do you share any other resources in addition to the office facilities? A: We do. We share product development resources, operational resources, and quality resources. Q: And in terms of employees, do you share, what kind of employees do you share? A: Approximately ten employees are shared between both organizations. Q: And do those ten employees do? A: Quality, quality assurance, product development, engineering, seams support, customer service. Those roles are shared between both of our positions.”).

[188] *See id.*

[189] *See id.*, Vol. III at 367:19-21 (“Q: To be clear, do the current integrated tire repair kits embody the technology in the ’581 patent. A: They do not.”).

[190] *Robert Bosch*, 659 F.3d at 1153-54 (finding irreparable harm based on indirect competition through (1) mass merchandisers (e.g. Wal-Mart), (2) automotive specialty retailers, and (3) original equipment manufacturers (“OEMs”)).

**c. AMI, Through SSI, Has Lost Market Share to TEK**

A patentee's loss of market share due to a competitor's infringement supports a finding of irreparable injury.[191] Because TEK and SSI compete for the same sales in a constrained OEM market, SSI has lost business to TEK.[192] As discussed above, fewer sales for SSI mean fewer sales for AMI.[193] AMI thus has lost market share to TEK, favoring a finding of irreparable injury.

**d. TEK Has Obtained Unfair Incumbency Benefits From Design Wins**

Actual "and potential exclusion from a fair opportunity to compete for design wins constitutes irreparable harm."[194] Because OEMs tend to give repeat business to their current tire repair kit suppliers,[195] TEK's infringement allows it to take market share from AMI. Design wins

---

[191] *See Robert Bosch*, 659 F.3d at 1151 (finding loss "in market share and access to potential customers resulting" from sales of infringing product supports a finding of irreparable injury); *i4i*, 598 F.3d at 861 (quoting *eBay*, 547 U.S. at 391) ("Past harm to a patentee's market share, revenues, and brand recognition is relevant for determining whether the patentee 'has suffered an irreparable injury.'").

[192] *See supra* notes 186- 187. In addition to having an estimated 50-60% of the GM business, TEK is also the "sole supplier" to both Chrysler and Ford. *See* Docket No. 246-4, Ex. 2, Vol. V at 654:13-20 ("Q: Okay. Let's go back just a couple questions about some of these OEMs. Does Ford buy from anybody, these products from anybody else other than TEK? A: Ford Europe does. They are not North America. We are the sole supplier. Q: What about Chrysler? A: Chrysler, we are sole supplier.").

[193] *See* Docket No. 246-4, Ex. 2, Vol. I at 80:8-12 ("Q: And as a result of that inner company sale what happens to AMI's sales when SSI sales go up? A: They go up. Q: So AMI sales go up? A: AMI sales go up.").

[194] *Emulex*, 2012 U.S. Dist. LEXIS 129524, at *11; *see also Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951, 981 (N.D. Cal. 2009)

> While Rambus may collect royalties from such licensing [when it loses a design win to an infringing alternative], Rambus is shut out of the 'innovation loop.' This prevents Rambus from working closely with the users of its technology and hampers Rambus's ability to identify technical problems and direct its research efforts to solve them. Though the phrase 'innovation loop' may sound corny, Rambus's exclusion from it is precisely the type of harm that money damages cannot remedy. Losing at the design stage also harms Rambus's ability to cultivate the goodwill it might have garnered had its design been adopted. This loss of potential goodwill caused by Rambus's loss of market share unquantifiably impacts Rambus's business relationships going forward.

[195] *See* Docket No. 246-1 at ¶¶ 2-5 ("Design wins in the tire repair kit market create familiarity and confidence that yields an incumbency effect, which can carry over from one design cycle to the next. The design win process involves a significant investment of money, time, and effort on the part of both the supplier and the OEM. OEMs and suppliers generally do not redesign their

United States District Court
For the Northern District of California

TEK obtained by infringing the '581 patent "carry over from one design cycle to the next."[196] The infringing tire repair kits thus let TEK align itself with OEMs generating unwarranted additional business.[197] Absent equitable relief, AMI and SSI face an uphill battle to retake market share it should not have ceded. The incumbency benefits springing from design wins based on sales of infringing product favor a finding of irreparable harm.

**e. TEK Did Not Offer to License the '581 Patent Beyond This Case**

AMI's "unwillingness to license" favors "finding irreparable injury."[198] That the patentee may have engaged in settlement discussions during the case is of no moment: to hold otherwise would contravene the spirit of Fed. R. Evid. 408 and broader policy concerns encouraging parties to resolve their disputes. As Judge Koh recently observed, settlement discussions between AMI and TEK are of "minimal probative value, as they are 'tainted by the coercive environment of patent litigation.'"[199] Nevertheless, the probativeness of AMI's unwillingness to license the '581 patent – and others in its portfolio – in this case is near de minimis in this case, because as TEK correctly points out, AMI controlled the rights to the '581 patent for only a brief period of time before litigation ensued. Both sides concede there are only a few competitors in this market, so additional opportunities to license the patents in this space are limited.

On balance, the court finds this factor neutral.

---

products from the ground up from one vehicle platform to the next. This increases the likelihood that the supplier and OEM will continue to harvest their initial investment through future contracts. Furthermore, in the tire repair kit market, OEMs tend to look to its current suppliers for future designs, rather than to suppliers to which the OEMs have not already awarded business.").

[196] Docket No. 246-1, ¶ 3.

[197] *See id.*

[198] *Presidio Components*, 702 F.3d at 1363; *i4i*, 598 F.3d at 862 (unwillingness to license patent also relevant to second factor of *eBay* test).

[199] *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, Case No. 5:11-cv-01846-LHK-PSG, Docket No. 3015 at 35 (Mar. 6, 2014) (citing *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012) (holding "that license fees that are tainted by the coercive environment of patent litigation are unsuitable to prove a reasonable royalty").

**f. TEK Appears to Have the Financial Wherewithal to Satisfy the Current Judgment**

Uncertainty whether an infringer may satisfy a judgment support a finding of irreparable harm and the ultimate issuance of an injunction.[200] In contrast to its earlier claims, AMI's papers question TEK's ability to pay up.[201] TEK counters with adequate assurances of its financial resources. In light of AMI's shifting positions on this issue,[202] the court finds that TEK should not be prejudiced by AMI's assertions that it lacks the financial resources to satisfy the judgment. This factor does not favor a finding of irreparable harm.

No matter the neutrality of certain factors, TEK's infringement clearly and causally bred unwarranted gains in market share and incumbency benefits in a competitive market. In so doing only one reasonable conclusion may be arrived at: TEK irreparably harmed AMI.

**2. Inadequate Remedies at Law**

Where there "is no reason to believe" that infringement or the irreparable harm resulting from infringement will otherwise cease, absent an injunction, money damages are inadequate.[203] "While competitive harms theoretically can be offset by monetary payments in certain circumstances, the likely availability of those monetary payments helps define the circumstances in which this is so."[204] Here, the availability of prospective money damages is disputed. More

---

[200] *See Robert Bosch*, 659 F.3d at 1155 (An inability "to satisfy an award of money damages" favors a finding of irreparable harm.").

[201] *See* Docket No. 259-3, Ex. 1, Vol. IV at 617:10-13 ("Mr. Hansen explained they have a 20 percent profit margin. And they can easily absorb in that situation a 6 to 8 percent reasonable royalty, so there's no need for any price elasticity analysis."); 501:20-22 ("So looking at all of that information, it's my opinion that" focusing "on a profit range in the neighborhood of 20 percent would be appropriate.").

[202] *See id.*

[203] *Robert Bosch*, 659 F.3d at 1155 (citing *Reebok Int'l, Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1557 (Fed. Cir. 1994) (recognizing that "future infringement . . . may have market effects never fully compensable in money").

[204] *Id.*

United States District Court
For the Northern District of California

fundamentally, TEK's infringement is significant – TEK's sales of infringing kits comprise a majority of TEK's sales.[205] The losses AMI through SSI incurred "defy attempts at valuation" because TEK's infringing acts have significantly changed the market.[206] As sketched above, TEK reaped unwarranted design wins and market share. Those unquantifiable benefits leave AMI without an adequate remedy at law.

### 3. The Balance of Hardships Favors Equitable Relief

AMI faces substantial hardship because it must compete with its own patented invention in the marketplace.[207] In opposition, TEK may not point to its relative size,[208] the success of its infringing product,[209] or costs flowing from the design-around.[210]

---

[205] TEK's sales of infringing tire repair kits between 2007 and 2011 comprised between 56.3% and 84.7% of its total sales. *See* Docket No. 246-4, Ex. 2, Vol. IV at 507:20-508:17; Docket No. 246-7. Since 2009, TEK's sales of infringing kits have comprised at least 78% of its total sales. *See id.*

[206] *i4i*, 598 F.3d at 862 (Fed. Cir. 2010).

[207] *See Robert Bosch*, 659 F.3d at 1156 (holding that requiring a patentee "to compete against its own patented invention," places "a substantial hardship" on the patentee and therefore "favors entry of an injunction"); *Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013) ("Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions."); *Emulex*, 2012 U.S. Dist. LEXIS 129524, at *17-18 ("Indeed, substantial harm flows to Broadcom, not Emulex, where Broadcom is forced to compete against its own patents.") (citing *Robert Bosch*, 659 F.3d at 1156).

[208] *See Robert Bosch*, 659 F.3d at 1156 ("A party cannot escape an injunction simply because it is smaller than the patentee or because its primary product is an infringing one.").

[209] *See i4i*, 598 F.3d at 863 ("Microsoft is not entitled to continue infringing simply because it successfully exploited its infringement.") (citing *Broadcom*, 543 F.3d 683; *Windsurfing Int'l v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986) ("That sailboards are Downwind's primary product, and that an injunction might therefore put Downwind out of business, cannot justify denial of that injunction. One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected.").

[210] *See i4i*, 598 F.3d at 863 ("Similarly irrelevant are the consequences to Microsoft of its infringement, such as the cost of redesigning the infringing products.") (citing *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1330 (Fed. Cir. 2008) ("Similarly, we see no abuse of discretion regarding the court's discussion of the straight nail alternative. The court acknowledged that the straight nail was not presently offered in the United States, but characterized Stryker's decision that it was not 'feasible to offer a straight-nail design in the United States' as a business decision that did not 'tip the balance of hardships in Defendants' favor.'" (citation omitted))).

United States District Court
For the Northern District of California

TEK's claim that "AMI will not suffer if TEK is not enjoined because AMI does not sell '581-enabled" products is not compelling.[211] Nor, too, is TEK's overreach that its infringing sales will actually *grow* AMI's market.[212] As spelled out above, AMI and TEK compete for the same sales even though AMI markets its kits through its sister company SSI. Any sale that TEK makes is therefore a sale that AMI through SSI necessarily cannot make. While it may be true that TEK will be harmed by an injunction because a significant portion of its current sales infringe the '581 patent, any hardship TEK faces is the product of its actions and the result of a "calculated business risk to enter the relevant market with its [potentially infringing] devices."[213] Put another way, one "who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against a continuing infringement destroys the business so elected."[214]

At bottom, the balance of hardships favors AMI.

**4. Public Interest**

Narrowly tailored injunctive relief paired with the public's general interest in upholding patent rights favors equitable relief in this case.[215] The proposed injunction:

- Seeks prospective relief, as infringing products need not be destroyed.
- Prohibits domestic conduct, but does not apply to extraterritorial conduct.
- Permits designing around the '581 patent and will not prohibit incidental infringement in furtherance of such a design-around.

---

[211] Docket No. 259 at 16.

[212] *See id.* ("TEK's selling products as AMI's licensee can only enlarge AMI's footprint in the market.").

[213] *Coloplast A/S v. Generic Med. Devices, Inc.*, Case No. 10-cv-227-BHS, 2012 WL 3262756, at *2 (W.D. Wash. Aug. 9, 2012) (finding the balance of hardships favors entry of an injunction).

[214] *Telebrands Direct Response Corp. v. Ovation Commc'ns, Inc.*, 802 F. Supp. 1169, 1179 (D.N.J. 1992) (quoting *Windsurfing International, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986))).

[215] *See id.* (citing *Broadcom*, 543 F.3d at 704 (quoting *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1547 (Fed. Cir. 1995) ("it is generally in the public interest to uphold patent rights")).

United States District Court
For the Northern District of California

- Applies only to products found to infringe and those not colorably different.
- Includes a nine-month sunset provision to enable TEK's current customers time to switch to non-infringing alternatives.[216]

Following the Federal Circuit's guidance in *i4i* that injunctive relief be narrowly-tailored, it has become common for patentee's to include sunset provisions to tip the public interest factor of the *eBay* test in its favor.[217] Recently, the Circuit endorsed a "the district court's selection of an eighteen month sunset" period.[218] An eighteen-month period "allowed for time to remove the infringing product from the market without causing significant downstream disturbance for OEMs and consumers."[219] Here, too, the right balance is struck. Because the equitable relief is forward-looking and does not bar continued use of products already in the hands of the consuming public, the public interest is well cared for. The court thus adopts the proposed injunction, with one change. A 7% royalty rate during the sunset period rather than the requested 14% is more appropriate. This percentage was identified by the jury as a reasonable royalty rate for past infringement that fell within the 6-8% rate requested by AMI at trial.[220]

In sum, equitable relief is warranted. A permanent injunction will be entered.

**D. Marking**

Both AMI and TEK believe judgment as a matter of law is warranted on the issue of marking pursuant to 35 U.S.C. § 287. AMI moves for judgment as a matter of law that TEK did not produce sufficient evidence such that a reasonable jury could credit TEK's marking defense. AMI's damages should therefore not be limited on account of TEK's marking defense. TEK

---

[216] *See* Docket No. 246 at 23.

[217] *i4i*, 598 F.3d at 863 (The "touchstone of the public interest factor is whether an injunction, both in scope and effect, strikes a workable balance between protecting the patentee's rights and protecting the public from the injunction's adverse effects.") (citing *Broadcom*, 543 F.3d at 704).

[218] *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1339 (Fed. Cir. 2013).

[219] *Id.*

[220] Docket No. 217 at 4.

United States District Court
For the Northern District of California

counters that it was AMI that failed to meet its burden that the marking statute had been complied with. The parties' marking arguments fall into two categories: (1) IDQ's sale in 2008 and (2) AMI's offer for sale to Honda at some time in 2011.

**1. TEK Bore the Burden to Show AMI Failed to Satisfy the Marking Requirement**

35 U.S.C. § 287(a), provides:

> Patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them, or importing any patented article into the United States, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or by fixing thereon the word "patent" or the abbreviation "pat." together with an address of a posting on the Internet, accessible to the public without charge for accessing the address, that associates the patented article with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

The parties initially dispute who bears the burden of satisfying the marking requirement where it is disputed whether a patentee has ever made, offered for sale, sold or imported the patented product within the United States. Both sides agree that the court is without clear guidance from the Federal Circuit on this issue. TEK urges the court to impose an affirmative burden on AMI to satisfy the marking requirement.[221] Although TEK finds several district court cases from beyond this district persuasive,[222] it concedes the case law is split.[223] At oral argument and in its

[221] In particular, TEK argues AMI must establish either (1) that the disputed IDQ products complied with the marking requirement or (2) that those products were not subject to the marking requirement because they do not practice the '581 patent. Under TEK's analysis, AMI must also prove that the purported RFQ did not constitute a sale pursuant to 35 U.S.C. § 287 or that the semi-automatic kit was marked in compliance with the statute.

[222] "Some courts hold that this burden requires the patentee to prove that it never made, offered for sale, sold, or imported the patented product within the United States." Docket No. 257 at 4 (citing *PACT XPP Techs., AG v. Xilinx, Inc.*, 2012 WL 1029064, at *3 (E.D. Tex. Mar. 26, 2012); *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Products, LLC*, 2013 WL 1821593, at *3 (M.D. Pa. Apr. 30, 2013); *WiAV Solutions LLC v. Motorola, Inc.*, 732 F. Supp. 2d 634, 641 (E.D. Va. 2010); *DR Systems, Inc. v. Eastman Kodak*, 2009 WL 2632685, at *4 (S.D. Cal. Aug. 24, 2009)). "These cases are grounded on the idea that the patentee's compliance with the marking statute is 'peculiarly within his own knowledge,' a foundational principle that underlies United States Supreme Court case law interpreting Section 287(a) going all the way back

United States District Court
For the Northern District of California

papers, TEK suggested that the issue is one of first impression in this district;[224] AMI's papers, however, refocus the court to a recent case on point from this district – *Oracle v. Google*.[225]

In *Oracle v. Google*, Google raised a defense based on the patent-marking statute. Judge Alsup found that "in order to limit patent-infringement damages to infringement that post-dated actual notice, *Google must show* that Oracle failed to mark patented articles offered for sale, sold, or imported into the United States before" the date it was put on notice.[226] The court held that Google "failed to produce evidence establishing acts by Oracle that would trigger the damages limitation in the patent-marking statute" and therefore Google "did not show that the statute" applied.[227] The burden of production thus did not shift to Oracle and the court held that summary judgment was not warranted on the issue.

This is the better view. "The marking statute serves three related purposes: 1) helping to

---

to *Dunlap v. Schofield*." (quoting *DR Sys., Inc. v. Eastman Kodak Co.*, Case No. 08-cv-0669H-BLM, 2009 WL 2632685, at *4 (S.D. Cal. Aug. 24, 2009)). *Id.* at 4-5.

[223] "Other courts take a narrower view, holding that the accused infringer must first come forward with proof that the patentee sold or offered for sale a 'patented product'–absent a 'patented product,' of course, there would be nothing to mark—and only upon that threshold showing does the burden shift to the patentee to show compliance with the marking statute." *Id.* at 5 (citing *Laitram Corp. v. Hewlett-Packard Co., Inc.*, 806 F. Supp. 1294, 1296 (E.D. La. 1992); *In re Katz Interactive Call Processing Patent Litig.*, 821 F. Supp. 2d 1135, 1158-59 (C.D. Cal. 2011); *Unova Inc. v. Hewlett-Packard*, 2006 WL 5434534, at *1 (C.D. Cal. Feb. 16, 2006)).

[224] *See id.* ("The question whether a patentee fully bears the burden to prove compliance with the marking statute in the face of a contention from the accused infringer that damages should be limited under Section 287(a) – including on the threshold issues of whether the patentee produced, sold or offered for sale a patented article prior to filing its lawsuit – appears to be an open question in the Northern District" of California.).

[225] *Oracle Am., Inc. v. Google Inc.*, Case No. 3:10-cv-03561-WHA, 2011 WL 5576228, (N.D. Cal. Nov. 15, 2011).

[226] *Id.* at *2 (emphasis added) (citing *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1212-20 (Fed. Cir. 2002) (explaining that the actual-notice requirement of Section 287 applies only after it is triggered by a patentee's opportunity and failure to mark patented articles in commerce)).

[227] *Id.* at 3.

United States District Court
For the Northern District of California

avoid innocent infringement,[228] 2) encouraging patentees to give notice to the public that the article is patented,[229] and 3) aiding the public to identify whether an article is patented."[230] Although the "law is clear that the notice provisions of § 287 do not apply where the patent is directed to a process" or method, "a party that does not mark a patented article is not entitled to damages for infringement prior to actual notice."[231] In this case, TEK has not produced sufficient evidence that AMI or its predecessor-in-interest triggered the obligations housed within the marking statute. AMI thus did not have to comply with Section 287.

It would be an odd result to require AMI to bear the burden to show that its predecessor-in-interest either did not sell any product embodying the patent or, if it did, it complied with the marking statute. Absent guidance from the other side as to which specific products are alleged to have been sold in contravention of the marking requirement, a patentee like AMI is left

---

228 *See Wine Ry. Appliance Co. v. Enterprise Ry. Equip. Co.*, 297 U.S. 387, 395 (1936); *Motorola, Inc. v. United States*, 729 F.2d 765, 772 (Fed. Cir. 1984).

229 *See Amsted Industries v. Buckeye Steel Castings*, 24 F.3d 178, 185 (Fed. Cir. 1994); *American Medical Systems v. Medical Eng'g Corp.*, 6 F.3d 1523, 1537 (Fed. Cir. 1993).

230 *Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1443 (Fed. Cir. 1998) (as modified)

> The early patent statutes contained no marking requirement. As explained in *Boyden v. Burke*, 55 U.S. (14 How.) 575, 582-83 (1852), patents were public records and all persons were "bound to take notice of their contents." A duty to mark was imposed by the Patent Act of 1842, which required "all patentees and assignees of patents . . . to stamp . . . on each article vended, or offered for sale, the date of the patent." Act of 1842, 5 Stat. 543, 544. If the patentee failed to mark each article, the penalty was a fine of "not less than one hundred dollars." *Id.* In 1861 the statute was amended to delete the statutory penalty, and instead to place a limitation on the patentee's right to recover for infringement. The Patent Act of 1861, 12 Stat. 246, 249, provided that "no damage shall be recovered by the plaintiff" unless that person marked the article as patented or the infringer received actual notice of the patent.

*See also Bonito Boats Inc. v. Thunder Craft Boats Inc.*, 489 U.S. 141, 162 (1989).

231 *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1316 (Fed. Cir. 2009); *see also Mformation Techs., Inc. v. Research in Motion Ltd.*, 830 F. Supp. 2d 815, 837 (N.D. Cal. 2011) ("The marking requirements of § 287(a) do not apply to patents containing only method claims. Thus, where a patent containing only method claims is at issue, a defendant may be liable for the entire period of infringement, even if it lacked any notice of its alleged infringement.") (citing *Bandag, Inc. v. Gerrard Tire Co.*, 704 F.2d 1578, 1581 (Fed. Cir. 1983)).

51
Case No. 5:11-cv-00774-PSG (Consolidated with Case No. 5:11-cv-01649-PSG)
ORDER GRANTING-IN-PART POST-TRIAL MOTIONS

United States District Court
For the Northern District of California

to guess exactly what it must prove up to establish compliance with the marking statute. Without some notice of what marketed products may practice the invention, AMI's universe of products for which it would have to establish compliance with, or inapplicability of, the marking statute would be unbounded. TEK therefore bore the initial burden to put AMI on notice that IDQ may have sold specific products practicing the '581 patent. Only then would the question of whether those products were properly marked be implicated.

The parties also dispute whether AMI or TEK bore the burden to establish whether or not AMI's purported offer to Honda constituted a sale pursuant to the marking statute. Here, too, the court finds that TEK bore an initial burden to show that AMI made an offer before the filing of the first amended complaint in this case. Through discovery TEK could have served interrogatories and RFAs or noticed depositions to draw out commercial activity by AMI that could be interpreted to be an offer for sale. With that information in hand TEK could have then brought its case that Section 287 should apply. Absent particularized notice of the specific commercial activity in question, AMI would be left to prove a negative – something that is not easily accomplished. In this case, the only temporal record evidence on point suggests that AMI's disputed offer to Honda occurred in mid-2011.[232] Because the clouded record does not establish that the purported offer occurred prior to the amended complaint or that the commercial negotiations constituted an offer for sale pursuant to Section 287, TEK did not meet its initial burden to show that the marking statute was implicated.

**2. IDQ's Sale in 2008**

TEK presented demonstratives at trial – not admitted into evidence – relating to a tire repair

[232] The open-ended nature of Mueller's testimony, too, does not trigger the marking requirement. *See* Docket No. 201, Trial Tr. at 421-22 ("Q: But it's your testimony today that semi-automatic tire repair kits bids have been received? A: We have bid the semi-automatics, yes. Most recently, Honda. Q: And what was the date of that bid? A: We would have bid that in Mid-2011.").

United States District Court
For the Northern District of California

kit manufactured by IDQ.[233] TEK did not, however, present admissible evidence that the kit was sold in the U.S., embodied the claims of the '581 patent, or was not marked. The only testimony on this issue was provided by Mueller who stated that IDQ's product looked "like a product embodying the '581 patent."[234] But Mueller also pointed out that AMI performed a market analysis and concluded that no commercial products embodied the '581 patent. Because TEK had an initial burden to show that a commercial product subject to the marking requirement was on sale in the United States and failed to do so, judgment as a matter of law is warranted on this point.

**3. AMI's Offer to Honda**

The parties also disagree whether AMI offered a product embodying the patent or merely offered a request for quotation ("RFQ") to Honda. The parties do not contest the underlying facts of the purported offer, the dispute lies in whether the offer constituted an offer for sale or a mere RFQ. AMI argues that it was merely communicating to Honda that it had two different repair kits for which Honda could request an RFQ: an automatic or semi-automatic repair kit. Honda elected a RFQ for the fully automatic kit and not the semi-automatic kit embodying the '581 patent. Thus, no subsequent offer for sale of the semi-automatic kit issued. The key battle before the court is whether the disclosure of the prototype and the RFQ process were themselves an offer for sale.

Mueller provided the only testimony on the purported offer at trial.[235] After hearing Mueller's testimony, the jury had to make a call and it necessarily found in favor of AMI – the jury

---

[233] *See* Docket No. 201, Trial Tr. at 416:20-420:5.

[234] *Id.*, Trial Tr. at 417:3-6 (Q: And based on your knowledge of the '581 patent, does the product depicted here look like a product embodying the '581 patent? A: It certainly does, yes.").

[235] *See id.* Trial Tr. at 421:16-422:8. (Q: But it's your testimony today that semi-automatic tire repair kit bids have been received? A: We have bid the semi-automatics, yes. Most recently, Honda. Q: And what was the date of that bid? A: We would have bid that in mid-2011. Q: Mid-2011. Do you recall testifying at your deposition that AMI in fact had not received any bids for semi-automatic tire repair kits? A: Well as a bid we are giving our customers choices, between you could have a manual system you could have a semi-automatic system or a fully integrated system. So we give the opportunity to our customer of any of those three models for an upcoming flat form. Q: So did Honda request it or did you just provide an alternative? A: We provided the alternative and Honda ended up going with the fully integrated system.).

United States District Court
For the Northern District of California

did not limit damages before the filing of the amended complaint in this case. Because the court finds that this is a fact-bound inquiry, judgment as a matter of law on this point is not warranted for either side.

**E. AMI Sits at the Hypothetical Negotiating Table**

At trial AMI sought damages based on "the hypothetical negotiation or the 'willing licensor-willing licensee' approach" that "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began."[236] "The hypothetical negotiation tries, as best as possible, to recreate the ex ante licensing negotiation scenario and to describe the resulting agreement. In other words, if infringement had not occurred, willing parties would have executed a license agreement specifying a certain royalty payment scheme. The hypothetical negotiation also assumes that the asserted patent claims are valid and infringed."[237] In its motion for JMOL TEK claims AMI improperly focused the jury upon the wrong parties to the hypothetical negotiation at the dawn of the infringement in this case: only TEK and IDQ may properly be considered within the negotiation. AMI counters that the interests of TEK, IDQ, AMI and SSI may all inform the negotiation.

As a preliminary matter, the Federal Circuit has cautioned that parties must "accept that any reasonable royalty analysis 'necessarily involves an element of approximation and uncertainty.'"[238] At bottom, jurors must place a value on the patented technology to the parties in the marketplace

[236] *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324-25 (Fed. Cir. 2009) (citing *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 n.13 (Fed. Cir. 1995); *Radio Steel & Mfg. Co. v. MTD Prods., Inc.*, 788 F.2d 1554, 1557 (Fed. Cir. 1986) ("The determination of a reasonable royalty, however, is based not on the infringer's profit, but on the royalty to which a willing licensor and a willing licensee would have agreed at the time the infringement began."); *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1159 (6th Cir. 1978) ("Among the relevant facts are: what plaintiff's property was, to what extent defendant has taken it, its usefulness and commercial value as shown by its advantages over other things and by the extent of its use, and the commercial situation." (citations and quotation marks omitted)).

[237] *Id.* at 1325.

[238] *Id.* (quoting *Unisplay, S.A. v. Am. Elec. Sign Co., Inc.*, 69 F.3d 512, 517 (Fed. Cir. 1995)).

when infringement began through evaluation of the fifteen *Georgia-Pacific* factors with an understanding that the "parties had full knowledge of the facts and circumstances surrounding the infringement at that time."[239] "Indeed, the basic question posed in a hypothetical negotiation is: if, on the eve of infringement, a willing licensor and licensee had entered into an agreement instead of allowing infringement of the patent to take place, what would that agreement be? This question cannot be meaningfully answered unless we also presume knowledge of the patent and of the infringement at the time the accused inducement conduct began."[240] Courts are advised "to pin down how the prospective infringement might have been avoided via an out-of-court business solution."[241]

To this end, the Circuit has instructed – in line with Supreme Court case law – "that factual developments occurring after the date of the hypothetical negotiation can inform the damages" calculation.[242] The "hypothetical negotiation analysis 'permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators.'"[243] "Consideration of evidence of usage after infringement started can, under appropriate circumstances, be helpful to the jury and the court in assessing whether a royalty is reasonable. Usage (or similar) data may provide information that the parties would frequently

---

239 *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 76 (Fed. Cir. 2012).

240 *Id.*

241 *Id.* (citing *Wordtech Sys. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1319 (Fed. Cir. 2010) ("The hypothetical negotiation 'attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began,' and 'necessarily involves an element of approximation and uncertainty.'" (quoting Lucent, 580 F.3d at 1324-25)).

242 *Lucent*, 580 F.3d at 1333 (quoting *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698 (1933) ("[A] different situation is presented if years have gone by before the evidence is offered. Experience is then available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within.")).

243 *Id.* (quoting *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1575 (Fed. Cir. 1988))

United States District Court
For the Northern District of California

have estimated during the negotiation."[244]

In this case the parties dispute whether it was permissible to consider AMI as a party to the hypothetical negotiation alongside TEK and IDQ. It is telling that, during the trial, TEK's respected damages expert Dr. Mody "gave testimony placing AMI at the negotiating table in the hypothetical negotiation."[245] Nonetheless, TEK urges that "the issue of who belonged at the hypothetical negotiating table presents a purely legal issue for the Court's determination."[246] At oral argument, TEK argued that the eye of the jury was not placed on the right factors. According to TEK, AMI's counsel improperly substituted AMI for IDQ masking the proper negotiation. Because the wrong party to the negotiation was considered by the jury, the jury's damages verdict – which recreated the hypothetical negotiation – was improperly arrived at and not supported by substantial evidence.

But at trial, and as mentioned above, TEK's expert had a different take.[247] In light of the permissive guidance from the Federal Circuit that "that factual developments occurring after the date of the hypothetical negotiation can inform the damages calculation" and the reasonableness of royalty calculations combined with TEK's tacit acceptance that AMI was a proper party to the negotiation, the court finds that AMI was properly seated at the negotiating table.[248]

---

[244] *Id.* at 1333-34 (citing *Sinclair Ref.*, 289 U.S. at 697 ("The use that has been made of the patented device is a legitimate aid to the appraisal of the value of the patent at the time of the breach.").

[245] Docket No. 265 at 18, n.13 (citing Docket No. 267-1, Ex. E at 754-55 ("Q: At the hypothetical negotiation you will have AMI as a participant, right? A: That's correct. Q: And it's your view that you would also have IDQ or Interndynamics as a participant, right? A: That's correct. Q: And then you would have the TEK as a participant as well, right? A: Yes, that's correct.").

[246] *Id.*

[247] Docket No. 201, Trial Tr. at 470:24-471: ("Q: Who would be the licensor in this hypothetical negotiation? A: The licensor would be AMI, But I've also considered the economic interest of other parties.").

[248] *See supra* notes 242 and 243.

United States District Court
For the Northern District of California

The court also credits Mr. Hansen's consideration of the interests of AMI's closely-related sister company, SSI, at the hypothetical negotiation.[249] AMI manufactures all of the tire repair kits

[249] *See* Docket No. 262-2, Vol. IV at 562:8-563:6 ("Q: Now in terms of related companies how close are AMI and SSI? A: I would refer to them as sister companies. Q: Are you aware whether they share any employees? A: My understanding is that they do share employees and SSI acquires all of the products that it sells from AMI. Q: Are you aware that the executive leadership team is the same for AMI and SSI? A: Yes. Q: Would that mean that the person who would be doing the hypothetical negotiation would also have a role with both AMI and SSI? A: That's likely, yes. Q: Would you understand that to have likely been Mr. Auerbach, in a hypothetical negotiation? A: My understanding is that he's the leader of that organization. So that would be up to them but that would be a reasonable expectation. Q: In terms of understanding your opinion, would it make any economic sense for Mr. Auerbach, who is the general manager of AMI and also the general manager of SSI, to somehow set aside SSI's economic interest when considering a license with TEK Corporation? A: Absolutely not."). An abundance of evidence proves that the relationship between AMI and SSI is more than the "loose corporate affiliation" claimed by TEK. *Cf.* Docket. No. 245 at 31. AMI and SSI are both wholly-owned by Accessories Marketing Holding Corp., which in turn is wholly-owned by Illinois Tool Works, Inc. Docket No. 262-2, Vol. I at 69:19-70:5 ("Mr. Gibson: And Exhibit 38 shows Accessories Marketing Holding Corporation. Q: What is that? A: It is our -- it's the parent it's the holding company that owns Accessories Marketing Inc. and Sealant Systems International. Q: And in terms of Accessories Marketing Holding, who owns them now? A: Illinois Tool Works based out of Chicago, Illinois. Q: And when did Illinois Tool Works purchase Accessories Marketing Holding? A: In April 2010."). AMI and SSI share office facilities, product development, operational and quality resources, and approximately ten employees. *See id.*, Vol. I at 68:2-69:1 ("Q: And as general manager of SSI, what do you do? A: I have the same responsibilities as I do with Accessories Marketing Inc. We are sister [] companies and we share resources. Q: In terms of sales and marketing what do you do for SSI or? A: The same the organizations are shared so the resources that are part of Accessories Marketing Inc. support our SSI International Business. Q: How long have you worked for AMI? A: I started working for AMI in 2004. Q: Where is AMI located? A: In San Luis Obispo, California. Q: All irght. Thank you. Where is SSI located? A: In San Luis Obispo, California. Q: And do they share any facilities? A: We do. We share the same office the same team in San Luis Obispo. Q: Do you share any other resources in addition to the office facilities? A: We do. We share product development resources, operational resources, and quality resources. Q: And in terms of employees, do you share, what kind of employees do you share? A: Approximately ten employees are shared between both organizations."). AMI's employee-witnesses at trial act in the same capacities for both AMI and SSI. *See id.*, Vol. I at 67:17-68:5 (Q: What do you do for a living? A: I'm the general manager of Accessories Marketing Inc. and Seal Sealant Systems International. Q: And what is your role as general manager of AMI? A: I manage all aspects of the business from sales operations product development marketing. I manage the entire business. Q: And in terms of marketing what are you managing, what are you doing? A: All promotional activities, advertising strategies, product development. I manage all of it. Q: And as general manager of SSI, what do you do? A: I have the same responsibilities as I do with Accessories Marketing Inc. We are sister [] companies and we share the same resources."); Vol. III at 351:20-352:16 ("Q: What is your current position at AMI? A: I'm the global director of manufacturing. Q: What is a global director of manufacturing? A: I handle basically the operations of the business. It would be new product development logistics, purchasing supply chain, customer service, quality assurance, manufacturing and so on. Everything except for sales and marketing. Q: Can you give us an example in terms of the life cycle of a product, where do you get involved? A: I handle the product from inception meaning the design concept all the way through manufacturing to where it's delivered to the customer. Q: And you have responsibilities in the final product and the quality of that? A: I do, yes. Q: Do you also have a position at SSI? A: I do which would be the exact same position. Q: What are your responsibilities as the global director of manufacturing at

United States District Court
For the Northern District of California

that SSI sells to automotive OEMs, and it sells those tire repair kits to SSI via an inter-company sale.[250] Thus, when SSI makes more sales to OEMs, AMI makes more sales to SSI.[251] Even Mody admitted that TEK "is a direct competitor of SSI."[252]

Mody also conceded that AMI would consider its "broad financial interest" and profitability at the hypothetical negotiation.[253] Hansen explained that, because of the close-knit financial relationship between AMI and SSI, it would "absolutely not" make any economic sense for AMI to not consider SSI's economic interest at the hypothetical negotiation.[254]

---

SSI? The exact same. Q: Okay. How long have you been with AMI and SSI? A: I have been there just over four years.").

[250] *See id.*, Vol. I at 79:24-80:12 ("Q: Now in terms of AMI's role in this, what is AMI's role with respect to the kit we see there the tire sealant compressor kit? A: AMI is the manufacturing arm for SSI. We manufacture the sealant and the compressor and we combine the two together and SSI sells it to the OEM manufacturers. Q: How does SSI acquire it form AMI? A: We do it through an inner company sale between the two sister entities. Q: And as a result of that inner company sale what happens to AMI's sales when SSI sales go up? A: They go up. Q: So AMI sales go up? A: AMI sales go up.").

[251] *See id.*, Vol. I at 80:8-12 ("Q: And as a result of that inner company sale what happens to AMI's sales when SSI sales go up? A: They go up. Q: So AMI sales go up? A: AMI sales go up.").

[252] *Id.*, Vol. V at 752:15-17 ("Q: And you would agree that TEK Corporation is a direct competitor of SSI, right? A: TEK Corporation is a direct competitor of SSI, yes.").

[253] *Id.*, Vol. V at 755:13-16 ("Q: Now at this hypothetical negotiation, AMI is going to consider the impact to its profitability as a result of this license, correct? Yes, possibly."); 763:11-20 ("Q: And you would expect AMI when it's participating in that hypothetical negotiation to be looking out for its economic interest? A: Right. And I should clarify. When I'm saying participate I mean AMI's interests are represented at the hypothetical negotiation. Q: When you say interest their economic interest? A: That's – well, all financial interest of the company. Q: Broad financial interest? A: That's right.").

[254] *Id.*, Vol. IV, 562:8-563:6 ("Q: Now in terms of related companies how close are AMI and SSI? A: I would refer to them as sister companies. Q: Are you aware whether they share any employees? A: My understanding is that they do share employees and SSI acquires all of the products that it sells from AMI. Q: Are you aware that the executive leadership team is the same for AMI and SSI? A: Yes. Q: Would that mean that the person who would be doing the hypothetical negotiation would also have a role with both AMI and SSI? A: That's likely, yes. Q: Would you understand that to have likely been Mr. Auerbach, in a hypothetical negotiation? A: My understanding is that he's the leader of that organization. So that would be up to them but that would be a reasonable expectation. Q: In terms of understanding your opinion, would it make any economic sense for Mr. Auerbach, who is the general manager of AMI and also the general manager of SSI, to somehow set aside SSI's economic interest when considering a license with TEK Corporation? A: Absolutely not.").

United States District Court
For the Northern District of California

The case law confirms that AMI may consider the effect of the license on SSI at the hypothetical negotiation.[255] It is of no moment that AMI and SSI are sister companies and do not stand in a parent-subsidiary posture. In *Poly-Am., L.P. v. GSE Lining Tech., Inc.*, the Federal Circuit held that the patentee could not recover a sister company's lost profits because the patentee had "not sold any item on which it claims damages to itself from [the infringer's] infringement."[256] The Federal Circuit noted that "the patentee needs to have been selling some item, the profits of which have been lost due to infringing sales, in order to claim damages consisting of lost profits."[257] *Poly-America* does not hold, as TEK argues, that sister companies cannot take each other's economic interests into account at a hypothetical negotiation.[258]

In sum, the interests of both AMI and SSI were properly considered.

**F. Supplemental Damages and Prejudgment Interest**

AMI requests prejudgment interest in the total of $161,454 based on the application of the prime rate compounded annually.[259] TEK does not dispute AMI's right to prejudgment interest or AMI's arithmetic. The court, too, is satisfied with AMI's figures. It finds AMI's request for prejudgment interest warranted.

---

[255] *See Union Carbide Chemicals & Plastics Tech. Corp. v. Shell Oil Co.*, 425 F.3d 1366, 1377-78 (Fed. Cir. 2005) (district court properly admitted evidence of impact of infringer's sales on patentee's parent company when parent was direct competitor of infringer; "any hypothetical negotiation with the holding company must necessarily include the reality that the economic impact on the [parent] would weigh heavily in all" decisions); *Synthes USA, LLC v. Spinal Kinetics, Inc.*, Case No. 5:09-cv-01201-RMW, 2012 WL 4483158, at *12 (N.D. Cal. Sept. 27, 2012) (agreeing that "the party negotiating on behalf of Synthes USA would be the Synthes organization as a whole" reflecting "economic reality: Synthes USA is a mere holding company and any negotiation on its behalf would be conducted by and for the benefit of its corporate parent, Synthes, Inc., which would undoubtedly have its potential lost sales and the lost sales of its subsidiaries" in mind) (internal quotation and citations omitted).

[256] 383 F.3d 1303, 1311 (Fed. Cir. 2004).

[257] *Id.*

[258] *Cf.* Docket No. 245 at 33.

[259] *See* Docket Nos. 244-9 and 244-10.

United States District Court
For the Northern District of California

The parties dispute over supplemental damages boils down to who should carry the fault for the jury's inability to assess damages over the period from 2012 to 2013. It is undisputed that AMI propounded discovery requests on damages during those periods. TEK objected to that discovery. AMI did not move to compel, move for sanctions, seek recourse under Rule 16 or present hypothetical royalties for the 2012-13 period to the jury. Both sides lob accusations that the other is foisting each other's shortcomings on one another inappropriately. The court thus must determine who should bear the burden of this trial failure.

As an initial matter, the court finds this case distinguishable from *Apple, Inc. v. Samsung Elecs. Co., Ltd.*[260] In *Apple v. Samsung* the jury confronted a verdict form spanning 20 pages and dozens of accused products.[261] Here, the accused products were fewer in number and the verdict form – comparatively – simple.[262] At trial Hansen testified that TEK's infringing sales for 2007 through 2011 totaled $17,955,662.[263] During closing argument AMI identified TEK's sales for 2007 through 2011 as the proper royalty base.[264] The jury apparently agreed with AMI and awarded damages based on a royalty base of $17,956,000.[265] The court is left with one reasonable conclusion: AMI was awarded damages for the period 2007 through 2011. While AMI did not do

---

[260] 926 F. Supp. 2d 1100 (N.D. Cal. 2013).

[261] *See* Case No. 5:11-cv-001846-LHK-PSG, Docket No. 1931.

[262] See Docket No. 217.

[263] *See* Docket No. 244-5, Ex. 4 at 465:1-10 ("Q: And why did you only go through -- why did you go from 2007 through 2011? A: I did not have, have not been provided with sales data on a product by product basis for periods after 2011. So as we sit here today in 2013, this would not reflect any sales that began on January 1st, 2012, up to today. So those would be additionally added to these figures. Q: So you analysis only goes through December 21st, 2011? A: That's correct. This would only account for damages during that period.").

[264] Docket No. 263-2, Ex. 11 at 1196:4-9 ("Now Mr. Hansen then took the total accused sales; you will have the total accused sales by year in Exhibit 77. Exhibit 77 has TEK's accused sales for each year and then Mr. Hansen has multiplied his two royalty rates as well. And you won't have the slide in front of you but you will have Exhibit 77 which has the sales numbers.").

[265] *See* Docket No. 217 at 4.

60

Case No. 5:11-cv-00774-PSG (Consolidated with Case No. 5:11-cv-01649-PSG)
ORDER GRANTING-IN-PART POST-TRIAL MOTIONS

United States District Court
For the Northern District of California

everything it could have to compel TEK to comply with its discovery obligations, it asked for damages information relating to 2012-2013 and was essentially stonewalled. TEK cites no case holding that a failure to move to compel or some other relief warrants capping AMI's access to supplemental damages. Because the jury calculated a royalty rate and applied it to a damages base running from 2007 to 2011 it is clear that the jury did not compensate AMI for damages during 2012 to 2013. Far from invading "the jury's province to determine actual damages," in this instance the court is leveraging the jury's verdict to arrive at a damages award that fully compensates the patentee pursuant to Section 284. AMI's request for supplemental damages is warranted.[266]

**E. This Case is Not Exceptional**

AMI urges the court to find this case exceptional under the meaning of 35 U.S.C. § 285. The court does not accept the invitation.

First, AMI argues that events surrounding the English mistranslation of Italian patent application TO2004A0117 warrant an exceptional case finding. But here AMI has not shown by clear and convincing evidence that TEK or its counsel engaged in any "material inappropriate conduct related to the matter in litigation," such as "misconduct during litigation, vexatious or unjustified litigation, conduct that violates Fed. R. Civ. P. 11, or like infractions."[267] Indeed, the absence of evidence is telling in light of a court-sanctioned stipulation that AMI could subpoena discovery and depose Ultra Translate.[268] AMI does not marshal evidence that details TEK's

[266] TEK does not take issue with AMI's supplemental damages calculation, just whether it is warranted at all. AMI requests the court apply a 7% reasonable royalty rate to TEK's additional, pre-verdict, infringing sales of $8,789,733, and award AMI an additional $615,282 in royalty damages.

[267] *Brooks Furniture Mfg.*, 393 F.3d at 1381; *cf. Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1324-26 (Fed. Cir. 2011) (affirming a finding of litigation misconduct where Eon-Net and its counsel destroyed relevant documents and intentionally did not implement a document retention plan, among other bad conduct).

[268] *See* Docket No. 132.

United States District Court
For the Northern District of California

counsel's conscious or knowing request for a mistranslation of the Italian patent application. For its part, TEK's counsel insists the original mistranslation occurred due to oversight, poor communication, and lack of attention due to a busy workload. Even though TEK was undoubtedly at fault, there is no record evidence of knowing misconduct.[269] The court gave AMI the leeway to investigate and the onus was on AMI to ferret out the evidence. But it didn't. Or at least it did not find enough to warrant a Rule 11 motion. Now is not the time to point backwards and cry foul.

Second, AMI focuses on TEK's argument that its devices did not infringe the '581 patent because the devices contain no "air flow path" as required in each independent claim in the '581 patent. The court construed "air flow path" to mean a "route from a compressor to a tire into which, when tire sealant is received, a mixture of air and tire sealant is directed."[270] But because the court elected not to construe the word "mixture," the parties advocated differing interpretations of that term to the jury. TEK argued that a "mixture" of fluid and gas requires the creation of a foam or mist, AMI argued that no chemical reaction is necessary to form a "mixture" within the meaning of the '581 patent, as long as the fluid and gas shared the same space. AMI suggests TEK's noninfringement defense at trial rested on an interpretation of the word "mixture" was unreasonable and made in bad faith.

To show that TEK's "mixture" argument was baseless, AMI must prove by clear and convincing evidence that "no reasonable litigant could reasonably expect success on the merits."[271] AMI has not done so here. TEK's mixture argument was rooted in the testimony of Kazerooni and

---

[269] TEK's counsel explained that he provided an administrative assistant with the Italian application and a copy of the '110 Patent to be sent to the translators as a "glossary," not as an uncertified translation of the Italian application, and that he did not realize that a mistake had been made until after TEK's expert rebuttal report had been sent for service. *See* Docket No. 126 at ¶¶ 7-8, 14. The administrative assistant explained that she did not review the documents sent to her and mistakenly referred to the '110 patent as a translation that needed to be certified in her email to the translation service. *See* Docket No. 127 at ¶¶ 5, 7.

[270] Docket No. 88 at 3-6.

[271] *Highmark*, 687 F.3d at 1309.

United States District Court
For the Northern District of California

Marini. Kazerooni testified at trial that he holds a doctorate in mechanical engineering and has taught at University of California Berkeley since 1991.[272] Kazerooni testified that a "mixture" of air and sealant must be either a foam made of air and fluid or a mist made of air and fluid, and that, if mixing had occurred, one would see both fluid and gas at the same time at any given cross-section of the flow pathway.[273] Kazerooni testified that, on the basis of his conversations with Marini and his own experience as a scientist, there was at no point a foam or mist mixture of sealant and air in the TEK devices at issue.[274] The court does not put much stock in Kazerooni's failure to test the disputed products – such tests might be avoided for any number of reasons beyond TEK's purported acknowledgement that its mixture defense was baseless. Kazerooni also explained that the central purpose of the tire valve in TEK's products is to ensure non-mixing of sealant and air prior to the sealant's entry into the tire itself, so that the fluid does not solidify and clog the tire valve.[275] Kazerooni never testified that a mist or foam was present in the air flow pathway.

Marini testified that the tire valve was specifically designed to protect against mixing of sealant and air because that mixing could lead to coagulation and clogging of the valve.[276] He also explained that TEK decided to use a silicon hose in its product because that more expensive

---

[272] *See* Docket No. 256-1, Ex. A at 768-69.

[273] *See* Docket No. 256-2, Ex. B at 929:10-13 ("Mixture comes either like a foam, air and fluid, or like a mist. You have a lot of air going in there and droplets of fluid going with it. So these are considered mixtures"); *id.* at 1029:23-30:3 ("Q: Now, you would agree with me that there is a mixture of air and sealant, there's a mixing in that container, correct? A: No, no. We define mixing very well. Air and fluid, again, for so many times, and I hope my students never see that because this is simple fact of mixing. They're not creating any mixture.").

[274] *See, e.g.*, *id.* at 934.

[275] *Id.* at 933-34, 941-42.

[276] *See, e.g.*, Docket No. 256-1, Ex. A at 663-64, 669-70 (explaining design attempts to prevent mixing and coagulation ).

United States District Court
For the Northern District of California

material helps prevent clogging of the tire valve due to residual sealant.[277] Finally, Marini testified that he did not believe that the simple touching of air and sealant constituted a chemical "mixture."[278]

Although TEK's marshaled mixing defense was not a winner, it was not baseless or presented in bad faith. TEK presented two witnesses – whose testimony the jury could have credited. That those witnesses did not persuade the jury does not mean those defenses were not reasonably relied upon.

Because the court finds neither of AMI's exceptional case arguments compelling, attorney fees are not warranted in this case.

**IT IS SO ORDERED.**

Dated: March 7, 2014

PAUL S. GREWAL
United States Magistrate Judge

[277] *See id.* at 678:9-11 ("It's because this [silicon hose] helps to don't leave residual behind and don't get the clogging of the tire valve.").

[278] *See id.* at 668 ("But touching, I don't think I consider a mix.").